UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

CHRISTINE JOHNSON, Individually and On
Behalf of All Others Similarly Situated,

                  Plaintiff,

          vs.

SIEMENS AG,

                  Defendant.

)
)
)
)
)
)
)
)
)
)
)
)
)

DEC 04 2009

BROOKLYN OFFICE

CV09 - 5310

Case No.

CLASS ACTION

COMPLAINT FOR VIOLATIONS OF
THE FEDERAL SECURITIES LAWS

GLEESON, J.

DEMAND FOR JURY TRIAL

REYES, M.J

## SUMMARY AND OVERVIEW

1.     This is a federal class action on behalf of purchasers of the American Depository

Receipt Shares ("ADRs" or "shares") of Siemens AG ("Siemens" or the "Company") between

November 8, 2007 and April 30, 2008, inclusive ( the "Class Period"), seeking to pursue

remedies under the Securities Exchange Act of 1934 (the "Exchange Act"). Siemens is a

German based corporation which does substantial business in the United States through its

various U.S. operations, with a focus in electronics and electrical engineering, and operating in

the industry, energy and healthcare sectors.

2.     As more fully set forth herein, Siemens has plead guilty in the United States to

violating the Securities Exchange Act of 1934 (the "Exchange Act") and the United States

Foreign Corrupt Practices Act of 1977 (the "FCPA") by systemically and extensively engaging in

illegal activities, including the establishment of sham businesses, phoney contracts, phantom

invoices, shadow companies, mail and wire fraud, bribery, and money laundering, in order to

obtain contracts or retain business for the Company. It knowingly used bagmen, elaborate

payment schemes and secret off-book accounts to conceal bribery payments; mischaracterized

bribes and kickbacks in corporate accounting records; circumvented and failed to maintain adequate internal controls; and failed to comply with the books and records provisions of the FCPA. Its most senior echelons of management, including its President and Chief Executive Officer, and his successor, and its Chief Financial Officer, and its compliance, legal, internal audit, and corporate finance departments each played a significant role in the illegal activity.

3.    As The Wall Street Journal has noted, statements by Siemens' executives to government prosecutors "depict a company where payment of bribes was common and highly organized. The statements portray top Siemens executives as scrambling to escape detection while prosecutors from neighboring countries drew an ever-tighter net." The illegal activity has had and continues to have a material adverse effect upon Siemens' business, financial condition, revenues, earnings, share price and global reputation, which its Chief Executive described as "quite staggering," and a threat to Siemens' very survival. Ultimately, Siemens paid fines and penalties of more than $1.6 billion, the largest fines for bribery in corporate history.

4.    Siemens itself has concluded in its Form 20-F filed with the SEC on December 11, 2006 ("Form 20-F") that its "internal control over financial reporting was not effective as of September 30, 2006" and that there is "significant evidence of collusion" at the Company's largest unit "to misappropriate funds and abuse authority among certain members of senior management along with others."

5.    Nevertheless, during the Class Period Siemens represented that it had cleaned up this corporate wide scandal and that it would meet its publicly announced revenue and earnings expectations. In truth, Siemens' ability to generate revenues and achieving earnings expectations was clearly dependent on its corporate-wide bribery activities. As a result of defendant's fraud

2

and misconduct, Siemens' shareholders have suffered, and will continue to suffer, billions of dollars in damages. Plaintiff, through this Complaint, seeks to recover those damages for Siemens shareholders.

## JURISDICTION AND VENUE

6. This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. §§ 1331 and 1337, and Section 27 of the Exchange Act, 15 U.S.C. § 78aa. The claims asserted herein arise under and pursuant to Sections 10(b) and 20(a) of the Exchange Act, 15 U.S.C. §§ 78j(b) and 78t(a), and SEC Rule 10b-5 promulgated thereunder, 17 C.F.R. § 240.10b-5.

7. A Complaint filed by the United States Securities and Exchange Commission (the "SEC") against Siemens in the United States District Court for the District of Columbia, to which Siemens has pleaded guilty, noted that Siemens' pervasive bribery and other improper payments had a strong U.S. jurisdictional nexus in that certain of the projects in connection with which the payments were made were approved by Siemens agents in the United States, financed by the World Bank or the U.S. Export-Import Bank, or because the payments were made through U.S. bank accounts, made through U.S.-based intermediaries, and/or were discussed in meetings in the United States or in mail, email, and fax communications into and out of the United States. It noted that there were at least 290 projects or individual sales involving business in Venezuela, China, Israel, Bangladesh, Nigeria, Argentina, Vietnam, Russia and Mexico in which Siemens employed the mails and other means and instrumentalities of U.S. interstate commerce in order to make bribe payments to foreign government officials. "The use of interstate commerce in connection with bribery included involving U.S.-based Siemens subsidiaries and their employees

3

in the bribery schemes; financing of three underlying projects by the World Bank and the U.S. Export-Import Bank; making illegal payments through U.S. banks; using U.S.-based companies as intermediaries, business consultants, and holders of slush funds; conducting meetings in the United States in furtherance of a bribery scheme; and transmitting mail, electronic mail, and facsimile messages into and out of the United States."

8.    Similarly, the Sentencing Memorandum by the United States Department of Justice, Criminal Division, Fraud Section, noted that the investigations of Siemens "revealed evidence of corrupt and improperly recorded payments with a strong nexus to the U.S."

9.    Venue is proper in this District pursuant to Section 27 of the Exchange Act, 15 U.S.C. § 78aa.  Siemens regularly transacts business in this district.  On March 12, 2001, Siemens became listed on the NYSE, thereby subjecting itself as an "issuer" to the United States Securities laws, including the FCPA.  The American Depositary Shares of Siemens ("ADSs," "ADRs" or "Shares") owned by plaintiff and thousands of other United States citizens are listed and traded on the NYSE.  The Shares were issued pursuant to a Deposit Agreement negotiated and executed in New York. The Deposit Agreement has three parties:  Siemens, Morgan Guaranty Trust Company of New York (now JP Morgan Chase Bank, N.A.), and holders and beneficial owners "from time to time" of Siemens ADRs.  The Deposit Agreement and/or a Form F-6 Registration Statements under the Securities Act of 1933 (the "Securities Act") filed with the SEC to permit the issuance of the Shares expressly states that ADS "Holders and Beneficial Owners shall be parties to this Agreement and shall be bound by the provisions hereof" and that "This Agreement and the ADRs shall be governed by and construed in accordance with the laws of the State of New York."  Siemens has filed periodic reports with the SEC and NYSE.

4

Thousands of Siemens' shareholders who own many millions of shares of Siemens, with a value measured in the hundreds of millions or billions of dollars, reside in the United States.

10.     In connection with the acts alleged in this complaint, defendant, directly or indirectly, used the means and instrumentalities of interstate commerce, including, but not limited to, the mails, interstate telephone communications and the facilities of the national securities markets.

## THE PARTIES

11.     Plaintiff Christine Johnson purchased the ADR shares of Siemens as described in the attached certification, incorporated by reference herein, and was damaged thereby.

12.     Defendant Siemens is a corporation incorporated and registered under the laws of Germany with its U.S. corporate headquarters located at Citicorp Center, 153 East 53rd Street, New York, NY.

## PLAINTIFF'S CLASS ACTION ALLEGATIONS

13.     Plaintiff brings this action as a class action pursuant to Federal Rules of Civil Procedure 23(a) and (b)(3) on behalf of a class consisting of all persons who purchased or otherwise acquired the securities of Siemens between November 8, 2007 and April 30, 2008, inclusive (the "Class") and who were damaged thereby.  Excluded form the Class is the defendant, all of the officers, directors, employees and partners thereof, members of their immediate families and their legal representatives, heirs, predecessors, successors and assigns and any entity in which any of the foregoing has a controlling interest.

14.     The members of the Class are so numerous that joinder of all members is impracticable.  Throughout the Class Period, Siemens ADRs were actively traded on the NYSE.

5

The Company has billions of shares issued and outstanding.  While the exact number of Class members is unknown to plaintiff at this time and can only be ascertained through appropriate discovery, plaintiff believes there are, at a minimum, thousands of members of the proposed Class.  Record owners and other members of the Class may be identified from records maintained by Siemens or its transfer agent and may be notified of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions.

15.     Common questions of law and fact exist as to all members of the Class and predominate over any questions affecting solely individual members of the Class.  Among the questions of law and fact common to the Class are:

(a)     Whether the federal securities laws were violated by defendant's acts and omissions as alleged herein;

(b)     Whether statements made by defendant to the investing public during the Class Period misrepresented and/or omitted  material facts about the financial condition of Siemens;

(c)     Whether defendant acted knowingly or recklessly in making materially false and misleading statements during the Class Period;

(d)     Whether the market prices of the Company's securities were artificially inflated or distorted during the Class Period because of defendant's conduct complained of herein; and

(e)     Whether the members of the Class have sustained damages and, if so, the proper measure of damages.

6

16.     Plaintiff's claims are typical of the claims of the members of the Class as they and members of the Class sustained damages arising out of the defendant's wrongful conduct in violation of federal securities laws as complained of herein.

17.     Plaintiff will fairly and adequately protect the interests of the members of the Class and has retained counsel competent and experienced in class and securities litigation. Plaintiff has no interests antagonistic to or in conflict with those of the Class.

18.     A class action is superior to other available methods for the fair and efficient adjudication of this controversy since joinder of all members of the Class is impracticable. Furthermore, because the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for the Class members individually to redress the wrongs done to them. There will be no difficulty in the management of this action as a class action.

## FACTUAL BACKGROUND AND SUBSTANTIVE ALLEGATIONS

19.     Siemens has, by its own admission, caused "grave harm" to itself and its shareholders and placed the Company's very survival in jeopardy. It has tarnished a 160-year heritage by systemically engaging in criminal activities in the United States, Europe, Asia, Africa, the Middle East, South America and other locations in which the Company does or would like to do business.

20.     As set forth in the Information Statement filed together with the SEC Complaint, and as admitted by Siemens, it: "(a) knowingly failed to implement sufficient antibribery compliance policies and procedures; (b) knowingly failed to implement sufficient controls over third party bank accounts and the use of cash; (c) knowingly failed to appropriately investigate

and respond to allegations of corrupt payments; (d) knowingly failed to discipline employees involved in making corrupt payments; (e) knowingly failed to establish a sufficiently empowered and competent Corporate Compliance Office; (f) knowingly failed to report to the Audit Committee substantiated allegations of corrupt payments around the world; (g) limited the quantity and scope of audits of payments to purported business consultants; (h) created and utilized certain mechanisms for making and concealing approximately $1,361,500,000 in payments to third parties; (i) engaged former Siemens employees as purported business consultants to act as conduits for corrupt payments; (j) continued to use off-books accounts for corrupt payments even after compliance risks associated with such accounts were raised at the highest levels of management; (k) used removable Post-It notes to affix signatures to approval forms authorizing payments to conceal the identity of the signors and obscure the audit trail; (1) allowed third party payments to be made based on a single signature in contravention of Siemens' 'four eyes principle,' which required authorization of payments by two Siemens managers; (m) changed the name of purported business consulting agreements to "agency agreements" or similar titles to avoid detection and conceal noncompliance with the 2005 business consulting agreement guidelines; (n) knowingly failed to exercise due diligence to prevent and detect criminal conduct; (o) knowingly included within substantial authority personnel individuals whom Siemens knew had engaged in illegal activities and other conduct inconsistent with an effective compliance and ethics program; (p) knowingly failed to take reasonable steps to ensure Siemens' compliance and ethics program was followed, including monitoring and internal audits to detect criminal conduct; (q) knowingly failed to evaluate regularly the effectiveness of Siemens' compliance and ethics program; (r) knowingly failed to

have and publicize a system whereby employees and agents could report or seek guidance regarding potential or actual criminal conduct without fear of retaliation; (s) knowingly failed to provide appropriate incentives to perform in accordance with the compliance and ethics program; and (t) knowingly entered into purported business consulting agreements with no basis, and without performing any due diligence, sometimes after Siemens had won the relevant project.

All in violation of Title 15, United States Code, Sections 78m(b)(2)(B), 78m(b)(5), and 78ff(a)."

## U.S. Investigation and Prosecution

21.     On January 20, 2006, the United States Department of Justice announced that "Siemens Medical Solutions USA Inc., two of its employees, and two partners in a joint venture were indicted on federal fraud charges relating to a $49 million radiology equipment contract that required minority business participation." The indictment was returned by a federal grand jury in the Northern District of Illinois and charged Siemens with forming "a sham joint venture with a minority business enterprise" in order to obtain a public contract and further charged that Siemens' employees "schemed to cover up the initial fraud when the contract was challenged by a competitor in a federal court lawsuit."

22.     One of the individuals indicted was Ellen Roth, an in-house attorney for Siemens USA and the principal corporate decision-maker responsible for creating the sham joint venture and drafting certain portions of the bid package. Roth was also charged with failing to take any steps to correct ongoing misrepresentations and false and fraudulent testimony presented to the court in the litigation brought by the competing bidder. The indictment also charged her with

9

knowingly and wilfully making materially false, fictitious and fraudulent statements and representations to the Federal Bureau of Investigation (the "FBI").

23. On February 8, 2007, Siemens Medical Solutions USA pleaded guilty to obstruction of justice and agreed to pay a $1 million fine and restitution of $1.5 million to resolve the federal criminal-fraud case.

24. On February 27, 2007, Ellen Roth pleaded guilty to lying to the FBI about how the company obtained the hospital contract. Siemens Medical Solutions USA executive Daniel Desmond also pleaded guilty to perjury.

## German and Other International Investigations and Prosecutions

25. On November 15, 2006, German public prosecutors and more than 200 police officers, tax inspectors and investigating magistrates raided approximately 30 offices and homes of current and former Siemens employees, seizing 36,000 documents and electronic data in connection with an investigation of embezzlement, bribery, tax evasion and falsification of corporate books and records by Siemens. Arrest warrants were issued for the heads of Siemens telecommunications division's internal audit and accounting and controlling departments and a former chief financial officer of the division.

26. On November 24, 2006, the German newspaper Süddeutsche Zeitung reported that a former Siemens employee told investigators that "it was common" to pay bribes in Africa to secure contracts and that he had acted as a middleman, channeling between 75 to 100 million euros a year to Nigeria through Austrian bank accounts in the 1990s. The accounts for which the payments were made were termed "black accounts." It reported that funds were allegedly routed

through front companies to the Arabian Gulf and from there rotated via the Caribbean to secret accounts in Switzerland.

27.     On December 6, 2006, <u>The Wall Street Journal</u> reported that Munich prosecutors ordered the release from prison of Reinhard Siekaczek, an employee of Siemens' telecommunications division, after he provided details of the bribery and corruption scheme, including information that at least one Siemens Board Member supervised a fund maintained to pay bribes to likely customers in Africa, Russia and the Middle East and that a member of Siemens' compliance department advised Siekaczek about how to prevent detection of the scheme.

28.     Siemens has also reported criminal investigations by Italian and German prosecutors of allegations that Siemens employees "provided improper benefits to former employees of Enel in connection with Enel contracts." It reported that "German prosecutors brought charges against two of the investigated former employees in March 2006. Furthermore, the prosecutors have asked the courts to confiscate the proceeds Siemens has obtained for performing the Enel contracts."

29.     Moreover, as a result of the complete breakdown of internal controls and corporate governance, Siemens was forced to enter into a plea agreement with Italian prosecutors. Siemens has disclosed that "In Italy, Siemens has entered into a so-called 'patteggiamento' (plea bargaining agreement without the admission of any guilt or responsibility) with the Italian prosecutors. Siemens agreed to pay a €0.5 million fine and to give up €6.121 million of profit relating to the Enel contracts. Siemens also accepted a one-year ban prohibiting it from entering into contracts with the Italian public administration."

11

30.     On December 13, 2006, <u>Bloomberg News</u> reported:

German police arrested former Siemens AG executive Thomas Ganswindt in an expanding investigation into suspected bribes by Europe's biggest engineering company.

Ganswindt, 46, was taken into custody in Munich, where Siemens is based, said Anton Winkler, the city's public prosecutor, in an interview today. Ganswindt oversaw the company's telephone networks unit for five years, before resigning in September.

\* \* \*

"With the arrest of Ganswindt, the bribery scandal has reached a new level," said Andreas Willi, a London-based analyst at JPMorgan Chase & Co., who rates Siemens shares "neutral." The investigation "probably makes it more difficult to win new orders in some areas of the world."

\* \* \*

The scandal is a "great danger" to Siemens and its reputation, Chief Executive Officer Klaus Kleinfeld said at a press briefing yesterday. The maker of high-speed trains and power turbines was the victim of a "sophisticated" criminal scheme, his predecessor as CEO, Heinrich von Pierer, said at the same meeting. Von Pierer stepped down in January 2005.

\* \* \*

As part of the probe, Munich authorities are reviewing about 36,000 documents from company archives. The Munich authorities said they suspect funds belonging to Siemens's fixed-line phone unit were funneled through accounts in Switzerland and Liechtenstein.

In Liechtenstein, authorities suspect that company funds of Siemens were used for bribery in connection with Siemens's telecommunication activities in Asia, Africa and Europe, chief prosecutor Robert Wallner in Vaduz said on Nov. 24.

Bribes also may have helped Siemens lock out rival bids and gain approval in 1994 to buy a stake in government-owned phone network company Italtel Spa, Cuno Tarfusser, a senior prosecutor in the Italian city of Bolzano, said on Nov. 28.

12

Apart from Ganswindt, five defendants, including one extradited from Austria to Germany, are being held in custody in Munich. The identities of the individuals held haven't been disclosed.

31.     In addition to Thomas Ganswindt, German police also arrested Michael Kutschenreuter, the former Chief Financial Officer at the Siemens communications unit. Those arrested were released after giving "extensive testimony."

32.     On December 21, 2006, Wolfgang Kreuzer, an attorney representing Reinhard Siekaczek, appeared on a television program in Germany in which he stated that there are "clear indications" that the compliance unit at Siemens was involved in a system of making illegal payments. "Usually, the compliance department is involved in the fight against corruption," Kreuzer stated. "It was the other way around" at Siemens. He said that Wilfried Walisch, head of Siemens' compliance division, attempted to establish a "more inconspicuous system" after Swiss prosecutors in 2002 began investigating bank accounts. As reported in the media, the search for a "different model" of making the improper payments led to a system of making payments through "phantom invoices and shadow companies."

33.     On December 24, 2006, the Sunday Times reported that Siemens Supervisory Board Chairman Heinrich von Pierer was warned by an employee in June 2003 that the Company was paying bribes to win contracts.

34.     On January 13, 2007, The Wall Street Journal reported that the Munich prosecutor's office confirmed that Heinz-Joachim Neubürger, the Chief Financial Officer of Siemens from 1998 to April 2006, was questioned concerning the bribery scheme and is being treated as a suspect. Mr. Neubürger is alleged to have tried to influence KPMG, Siemens' auditors, from investigating a payment irregularity that may have been a bribe.

13

35.     On January 23, 2007, The Wall Street Journal reported that Michael
Kutschenreuter, the former Chief Financial Officer at the Siemens telecommunications unit, and
Reinhard Siekaczek, a longtime Siemens executive, confirmed to German prosecutors that
Siemens' current Chief Financial Officer, Joe Kaeser, has known for years about the scheme to
pay bribes in order to secure overseas telecommunications contracts.  Mr. Kaeser was Chief
Financial Officer and a member of the executive management board of Siemens' wireless-
telecom-equipment unit from April 2001 to October 2004, and, according to Mr. Siekaczek, "had
people that created slush funds" at the wireless unit while Mr. Kaeser was employed there.  Mr.
Siekaczek testified that he personally helped to carry out bribes at the wireless unit.  The
prosecutors were also told that Rudi Lamprecht, a Management Board member, and Lothar
Pauly, the head of Siemens' telecommunications division until late 2005, knew since at least
early 2005 about the bribes-for-business scheme.  Mr. Kutschenreuter testified that Mr. Pauly
told him that "the wireless unit's former top management -- including Messrs. Kaeser and
Lamprecht -- were aware of bribe payments to win wireless contracts."  The Journal noted that
the statements made "are significant because they were presented as evidence in an arraignment
hearing, where prosecutors would have been required to point out any contradictions or
inaccuracies in the statements."

36.     On January 31, 2007, in a front page article entitled "At Siemens, Witnesses Cite
Pattern of Bribery," The Wall Street Journal reported that detailed witness statements by
company executives to German prosecutors "depict a company where payment of bribes was
common and highly organized.  The statements portray top Siemens executives as scrambling to
escape detection while prosecutors from neighboring countries drew an ever-tighter net."  The

14

article also stated that Michael Kutschenreuter, the former Chief Financial Officer at Siemens' communications unit, told prosecutors that Siemens had an encryption code to itemize bribe payments. The code was derived from the phrase "Make Profit," with the phrase's ten letters corresponding to the numbers 1-2-3-4-5-6-7-8-9-0, with the letter M indicating the number 1, the letter A indicating the number 2, and so on. "Thus, with the letter A standing for 2 and P standing for 5, a reference to 'file this in the APP file' meant a bribe was authorized at 2.55% of sales." Mr. Kutschenreuter admitted that "he was personally involved in lots of bribe payments after becoming finance chief in the land-line telecom unit in early 2001."

37.    The Journal also reported that the allegations of bribes being "carried out with the knowledge of senior managers" were confirmed by Reinhard Siekaczek and Andreas Mattes, Siemens executives who also provided statements to German prosecutors. "Mr. Siekaczek, who worked at Siemens for four decades, said in his witness statement that he was asked to set up slush funds for bribes in 1999 or 2000," The Journal reported. "He described a bank account in Salzburg, Austria, through which he said more than €75 million in bribe funds flowed each year. In 2001, he alleged, Mr. Kutschenreuter warned him to shift funds elsewhere because Swiss authorities were following the trail of Austrian accounts links to bribes in Nigeria." The paper also reported that "Mr. Mattes told prosecutors that a member of the telecom unit's management board told him in 2001 that bribes were commonly paid for securing big telecom projects."

38.    The Journal article also reported that Messrs. Kutschenreuter and Siekaczek alleged in their statements to prosecutors that Joe Kaeser, now Chief Financial Officer at Siemens, "was aware of bribes while overseeing the wireless telecom unit's finances from 2001 to 2004." The arrest warrant for Mr. Siekaczek issued in November, 2006 "mapped out how

prosecutors suspect bribes were carried out in Egypt, Greece, Indonesia, Kuwait, Saudi Arabia and Vietnam from 2002 to 2004. It said that generally, after money was routed through at least three layers of secret accounts and shell companies, it was entrusted to 'bag men' who carried bundles of cash to local 'fixers.' The fixers then organized the payoffs on behalf of Siemens."

39.     On February 11, 2007, Kleinfeld called the allegations against Siemens "slanderous." He said in an interview with <u>Bild Zeitung</u> that he has not considered "for one second" stepping down.

40.     On March 27, 2007, Siemens confirmed that Feldmayer, a member of its eight-person corporate executive committee and its management-board, was arrested for alleged breach of trust.

41.     On April 25, 2007, Kleinfeld, who only two months earlier denied the possibility that he would resign from Siemens, announced that he in fact would do so when his contract expires on September 30.

42.     On April 26, 2007, Siemens disclosed that it was broadening its probe into suspicious consulting contracts beyond the telecom-equipment business. It said that it expected to report a "significant increase" in the number of possible bribes identified in an internal investigation. It disclosed that its credit rating was put on watch for a possible downgrading by Standard & Poor's, that the SEC's enforcement division had upgraded its informal inquiry to a formal investigation, that its own inquiry could result in having to record "material" additional charges for taxes and changes in previous financial statements, and that it "currently cannot exclude" the possibility of criminal or civil sanctions, penalties, compensatory damages, or the exclusion from public procurement contracts. The Company's Supervisory Board Chairman,

16

Gerhard Cromme, said that the Board decided that a "premature" renewal of Mr. Kleinfeld's contract "could pose grave risks to the company."

43.     On May 14, 2007, two former Siemens officials were convicted by a German state court of bribery and assisting bribery in connection with multimillion-dollar payments to officials at an Italian utility. The Court ordered Siemens to pay a fine of $51.3 million.

44.     On July 26, 2007, The Wall Street Journal reported that Siemens disclosed "a significant increase" in the number of suspicious business-consulting contracts under review.

45.     On August 16, 2007, The Wall Street Journal reported that Siemens "is still struggling to get its arms around the scope of potential wrongdoing," even after spending more than $250 million to do so. It noted that "Several forces are preventing a quick resolution: A lack of centralized oversight, internal resistance to probes and an ever-widening circle of suspicious payments tied to alleged bribes-for-business schemes."

46.     On September 27, 2007, The Wall Street Journal reported that Siemens increased the amount of suspicious transactions to approximately $2.3 billion or four times what had been estimated in December.

47.     On October 4, 2007, a Munich court fined Siemens €201 million ($284 million) for bribery at its telecommunications-equipment unit. The fine did not preclude further punitive action. The court focused on bribes paid to cabinet ministers and dozens of other officials in Nigeria, Russia and Libya.

48.     On November 7, 2007, Siemens, through a press release announced that:

In the framework of its Fit for 2010 program, Siemens has set a target for an optimized capital structure. It will be measured as the ratio of "adjusted industrial net debt" to "EBITDA." The capital structure target should be in a target range

17

between 0.8 and 1.0 by 2010. "This step completes Siemens' financial target system as defined in the Fit for 2010 program, while maintaining our traditionally solid financial position. At the same time, we are optimizing our capital structure on the basis of comprehensive analyses of competitors," said Siemens CFO Joe Kaeser.

In a move to achieve the target, Siemens simultaneously announced it is launching an extensive share buyback program. "As a result of the strong cash flow from operations and the size of the expected proceeds from the sale of Siemens VDO, we see potential for optimizing our capital structure. We therefore foresee a share buyback program with a total volume of up to €10 billion by 2010. Ultimately, we believe that a more efficient capital structure will strengthen EPS growth while ensuring cost-effective access to capital as well as strategic flexibility," said Siemens CEO Peter Löscher.

49.     On November 8, 2007, the beginning of the Class Period, Siemens announced

strong growth and higher margins and that for 2008 Siemens will experience volume growth

"twice as high as the rate of GDP growth and that [Siemens] operating profit will grow at least

twice as fast as volume." According to a Siemens press release:

- Group profit from Operations was €1.990 billion, driven up sharply year-over-year by rising profits and earnings margins at all Groups.

- Income from continuing operations also climbed significantly, to €1.394 billion. EPS from continuing operations was €1.45 compared to €0.10 a year earlier.

- Net income was a negative €74 million due to non-operating items in discontinued operations, including approximately €1.0 billion in tax expense related to the carve-out of Siemens VDO Automotive. EPS was a negative €0.17 compared to a positive €0.10 a year earlier.

- Siemens continued to grow more than twice as fast as global GDP. Revenue was up 9% compared to the prior-year quarter, at €20.201 billion, and orders climbed 21%, to €21.328 billion.

- Free cash flow rose to €2.553 billion for the quarter, on higher income from continuing operations and a substantial improvement in net working capital year-over-year.

- Siemens announced plans for a €10 billion share repurchase program, and proposed a dividend for fiscal 2007 of €1.60 per share compared to €1.45 per share in the prior year.

50.    Commenting on the apparent continued success of Siemens' global operations, Siemens CEO Peter Löscher remarked:

"The fourth quarter demonstrates the kind of quality growth Siemens can generate," said Siemens CEO Peter Löscher. "We expanded our business in all regions of the world, and all our operating Groups reached their Fit 4 2010 target margin ranges. This success in turn produced a strong increase in free cash flow. Net income was significantly impacted by tax expense related to the carve-out of Siemens VDO Automotive."

"At the corporate level, one of our plans for the year ahead is to make our balance sheet more efficient. We are therefore announcing a capital structure target ratio based on net industrial debt and EBITDA. To meet this midterm target, we are taking advantage of our strong cash position to return value to shareholders through a share buyback program, which we will conduct over the next three years up to a total of approximately €10 billion. Ultimately, we believe that a more efficient capital structure will strengthen EPS growth while ensuring cost-effective access to capital as well as strategic flexibility."

"Operationally, we expect more quality growth in fiscal 2008. Specifically, we anticipate volume growth that is twice as high as the rate of global GDP growth, and that our operating profit will grow at least twice as fast as our volume. Siemens remains very well positioned in dynamic world markets for solutions in industry, energy, and healthcare."

51.    The Company further announced:

Siemens is raising the target margin ranges for its operating units. "We're convinced that the creation of new structures within the three planned Sectors energy, Industry and Healthcare will make our company less complex, more transparent, more focused and, therefore, faster and more successful. As a result, it's also clear we'll exceed the current goals of our Fit for 2010 program," said Peter Löscher, Siemens CEO.

52.    On November 28, 2007, Siemens, through a press release announced:

Siemens AG has taken a further important step in restructuring the company. The company plans to organize its operations in the three Sectors Industry, Energy and

Healthcare into 15 Divisions as of January 2008. "This new and more focused company structure will further increase our profitability and transparency. Clear responsibilities will ensure that we are faster in the market and closer to our customers," said Siemens President and CEO Peter Löscher.

53.    On November 29, 2007, Siemens, through a press release announced:

Loescher, who joined Siemens in July, yesterday announced the details of an overhaul that will consolidate the current nine operating divisions into three units -- energy, industry and health care. The changes are part of a plan do away with regional and divisional management layers and cut costs.

He said today Siemens will focus on organic growth and only plans "smaller acquisitions and disposals" to bolster the company's fastest-growing businesses.

<p style="text-align:center">* * *</p>

Loescher told analysts in London on Nov. 9 streamlining Europe's largest engineering company will be a "tough" assignment that will take him years to accomplish. He said the company was too unwieldy, with costs above those of rivals including General Electric Co., his former employer.

54.    On January 13, 2008, the <u>Frankfurter Allgemeine Sonntagszeitung</u> reported that it had interviewed Siemens' new Chief Executive Officer, Peter Löscher, and that he had stated that Siemens does not plan to reduce its earnings outlook. "There is no profit warning. Our statements are known: They include sales are growing double the pace of the global economy, profits double the pace of sales," he said. He noted that he does not have "any knowledge of our business significantly changing" because of a global slowdown. "In our order backlog, we're not yet feeling anything of slackness," he said.

55.    On January 24, 2008, Siemens held its annual meeting and a meeting with securities analysts. At the meeting with analysts, Löscher assured them: "Turning now to the year ahead, we are confirming 2008 topline and earnings outlooks given in November. We will

<p style="text-align:center">20</p>

grow our revenues at least twice as fast as the global GDP.  We will grow our group profit from operations at least twice as fast as our revenues."

56.     On January 24, 2008, Siemens on the Q1 2008 Earnings Call confirmed that its earnings target.  According to Löscher:

> We off to a good start to the year.  Siemens' growth opportunities remain strong. We achieved strong organic growth and a book-to-bill ratio well above one of all sectors and a book-to-bill for the Group overall of 1.32, which is high in comparison to last year's of 1.2.
>
> <div align="center">* * *</div>
>
> Turning now to the year ahead, we are confirming 2008 topline and earnings outlooks given in November.  We will grow our revenues at least twice as fast as the global GDP.  We will grow our group profit from operations at least twice as fast as our revenues.  Joe will detail out the financials in a few minutes, and I like to first update you on the progress in the plans we have announced just around 90 days ago.
>
> We continue our execution against our strategic plan and its everything about delivery.  We are sound enough and I am pleased to say that in a short time we achieved some significant progress.

57.     During the conference call the Company fielded various questions regarding Siemens' earnings outlook as well as the impact of the SEC's investigation into the bribery scandal.  Siemens dispelled concern that the bribery scandal would have an adverse impact on the Company's ability to meet it.

> **<Q - Ben Uglow>:** Hi, Joe, Michael.  I had two topics.  First of all was just, given it's the AGM and given there has been so much noise as usual in the German press, could you give us all a sense for the current situation with legal proceedings?  I know that Peter and Dr. Kröner (47.47) met with the SEC, I think, before Christmas.  Does the amnesty program and the things coming out of that affect the timing of any settlement with the SEC?  So that would question number one.
>
> <div align="center">* * *</div>

<div align="center">21</div>

<A - Joe Kaeser>: Yeah; hi, Ben.  Let me start with the AGM and the channel environment.  I mean we've been trying hard over the last, I would say, 12 months to really, if I may say that, to separate the paper from the flyshit here; means basically you know facts versus opinions and all kinds of asked and unasked advices.  Because we have to run the company in the wake of a serious matter to be managed and it's your judgment on how management has been dealing with that.  So generally, everything which are facts are being represented in the legal proceedings, first of all.  And if I am not mistaken, there have not been significant news since we reported last about it in Q4.  I still feel extremely comfortable with our books and the records we have closed on fiscal 2007, as far as the completeness of all tax charges are concerned and there is no sign that there would be any material deviation to that going forward.

The meeting as you sed (49.46) SEC, I mean this is always something which is difficult to report on, because it is about perceptions -- the perception on our end has been it was a very good meeting and that -- let's say there is -- we had a very good meeting.  And actually as a matter of fact also the SEC has endorsed our 20-F 2006, which I think they would not have needed to be -- to do, if they hasn't been confident that the company is moving.

On the amnesty program, whether that would positively or negatively affect the SEC deliberations or settlement considerations, I would not think so, reason being that the company itself is moving forward with its remediation and introducing a robust compliance system all the way from the top to the bottom in all regions of this world and also test whether it had made it all the way down and once the company is done with that I think that's another time then to show to the government in the U.S. what the company has done on a company Compliance Program.  The amnesty program is laid out as such that we understand potential wrongdoing by people and not by the company, so therefore I would not expect that to be materially affecting any SEC topics.

58.    On February 22, 2008, in an interview with Bloomberg Television in New York, Löscher reiterated that with respect to any global slowdown "The impact for us as a company, we don't see it yet." He added that Siemens has an "outstanding" order book and at this pace will meet its 2008 goals. Bloomberg reported that Jochen Klusmann, an analyst at BHF-Bank in Germany, rated Siemens stock a "strong buy," noting that the slowdown "hasn't arrived in the industries yet in which Siemens is active."

22

59.     On January 24, 12008, Siemens again confirmed its previously published targets:

"We confirm our outlook for the full fiscal year," said Siemens chief executive
Peter Loescher.  "Growing revenues at least twice as fast as global gross domestic
product, and growing group profit from operations at least twice as fast as our
revenues."

60.     On March 5, 2008, in a published speech given by Löscher at the Wharton

Leadership Lecture series Löscher said that his first task was to aggressively change the firm's

culture and standards and implement a "zero tolerance policy.  According to Löscher:

"Corruption exists in the whole world; but it's not our marketing plan," Löscher
told the Wharton audience.  "It is not the business we are interested in, and it's not
a sustainable business model, either."  The Siemens CEO described his first-year
mission as making sure that "the organization, from a cultural perspective,
understands that this is a zero tolerance policy, that we stand for the highest
performance with the highest ethical standards -- and [that the goal is] to put all
the control systems in place and to travel the world and spread the word that
there's absolutely no compromise whatsoever."

61.     Beginning in March 17, 2008 and continuing thereafter, Siemens released a series

of disappointing announcements including that it was experiencing delays and cancelled orders

and that it would have to cut its quarterly earnings by €900 million and that full extent of its

bribery scandal had not been publicly disclosed.

62.     On March 17, 2008, weeks after Mr. Löscher's assurances, Siemens disclosed that

delays and cancelled orders would cut its quarterly earnings by €900 million ($1.4 billion).  As

reported by The Wall Street Journal the next day: "The wholly unexpected warning suggests that

the company's new chief executive, Peter Löscher, has not yet gotten a grip on the problems at

Siemens, which has undergone a wholesale overhaul.  Just a month ago, Mr. Löscher said

Siemens was on track to meet its earnings targets for this year."  The Journal observed that

"analysts said the profit warning indicated that Siemens's business practices are deep-rooted and

difficult to change.  Some investors even asked whether cleaning up its ethics had handicapped its ability to do business."  It quoted an asset manager as saying "People in the market have been saying, 'without corruption, maybe they aren't able to deliver.'"

63.    Siemens' share price plunged 17% in a single session after the surprise profit warning.  In fact, Siemens was not able to deliver without corruption.  Its fiscal 2008 income from continuing operations plummeted by more than 50% from fiscal 2007.  In 2008, it earned 1.859 billion euros; in 2007, it earned 3.909 billion euros.  Its earning per share declined to €1.91 from €4.13 a year earlier.

64.    Similarly, on March 18, 2008, The New York Times, reported:

The wholly unexpected warning suggests that the company's new chief executive, Peter Löscher, has not yet gotten a grip on the problems at Siemens, which has undergone a wholesale overhaul.

Now, though, Siemens is back under a cloud -- this time because of business woes rather than bribery charges.

Shares of the company, which is based in Munich, plummeted more than 15 percent in Frankfurt.  That is the largest single-day drop in nearly two decades, and it dragged down a German market already badly rattled by the financial turmoil in the United States.

"The least you can say is that management was not on top of things," Jochen Klusmann, head of research at BHF Bank in Frankfurt, said.  "A lot of confidence gets destroyed when the management acts this way."

\* \* \*

"We're coming to terms with our past," Mr. Löscher said in a conference call with reporters, noting that the losses surfaced in a painstaking review.  "We've mercilessly uncovered the issues."

65. On April 15, 2008, The Wall Street Journal reported that German prosecutors broadened their bribery investigation at Siemens to include its power-transmission business, "suggesting legal woes at Europe's largest engineering conglomerate are far from over."

66. On April 29, 2008, Siemens disclosed that Debevoise & Plimpton, which the Company had retained to conduct an investigation, for which Siemens paid hundreds of millions of dollars, found that Siemens had engaged in corruption and had violated domestic and foreign compliance regulations pertaining to internal controls and the accuracy of documentation in the power generation, power transmission and distribution, transportation systems, industrial solutions and services, and medical solutions divisions.

67. On April 30, 2008, the end of the Class Period, Siemens announced a sharp drop in second quarter profits. According to Spiegel Online:

> On Wednesday, the group announced a 67-percent slump in second quarter net profits, just one day after it emerged that the system of bribery was endemic throughout the company.
>
> At a press conference in Munich Wednesday, the company announced that its profits in the quarter ending March fell to €18.09 billion. And the company says it was maintaining its outlook for high growth.
>
> CEO Peter Löscher, who was brought in to the company to act as new broom last year, said on Wednesday: "We have now concluded our project reviews in the conventional power generation business and, in total, we have a clear picture of the relevant risks." He added that the company had "demonstrated its commitment to "increasing transparency and accountability."

68. The article further reported:

> Meanwhile the company has had to deal with the fallout from the ongoing corruption scandal. On Tuesday Debevoise & Plimpton, the US law firm hired by Siemens to look into the affair, released its report on the company's business practices between 1999 and 2006. Debevoise & Plimpton found evidence of compliance violations "in each of the examined groups and in various countries."

The Siemens affair centers on an estimated €1.3 billion ($2.1 billion) in dubious payments -- mostly bribes to secure business for the company.

On Wednesday Löscher said that he had been surprised by the "size and range" of the corruption. He said, however, that the scandal had not affected business. "We have not lost the trust of our customers," he said, pointing to an increase in contracts in recent months.

69.    On May 1, 2008, The Wall Street Journal reported that Siemens' net income plunged by two-thirds in the most recent quarter, during which it spent €175 million in the quarter on outside advisors and compliance measures related to the corruption probe.

70.    On July 28, 2008, Reinhard Siekaczek, a Siemens sales executive until 2004, was convicted of funneling $77 million into bribery slush funds.

71.    On July 30, 2008, the Financial Times of London reported that the scandal "has already cost the German group €1.4 billion ($2.2 billion) in inquiries, fines and antitrust disputes."

72.    On November 5, 2008, Siemens disclosed that it had set aside €1 billion ($1.3 billion) to settle U.S. and German bribery charges.

73.    On November 24, 2008, Defendant Feldmayer was convicted by a German court of aggravated improper use of funds and tax evasion.

74.    On December 12, 2008, Siemens disclosed that it had agreed to settle U.S. charges that it violated anti-corruption laws by paying approximately $1.36 billion in bribes to government officials worldwide, knowingly using off-book accounts to conceal the corrupt payments, mischaracterizing bribes in corporate accounting records, and falsely describing kickbacks, among other illegal acts. It pled guilty to charges of circumventing or failing to maintain adequate internal controls and failing to comply with the books and records provisions

26

of the U.S. Foreign Corrupt Practices Act. Pursuant to the settlement with the SEC and the Justice Department, Siemens agreed to pay a fine and disgorgement of profits in the total amount of $800 million and to submit to monitoring to insure compliance with anti-bribery laws. A criminal information filed by the United States Attorney's Office in Washington stated "Siemens created elaborate payment schemes to conceal the nature of its corrupt payments." "The misconduct involved employees at all levels of the company, including former senior management."

75.     On December 15, 2008, Siemens announced that it will pay a fine of approximately $569 million to the Office of the Prosecutor General in Munich, Germany, to whom the Company previously paid an approximately $285 million fine. That brought the total fines and penalties to more than $1.6 billion, the largest fine for bribery in corporate history. Linda Chatman Thomsen, Director of the SEC's Division of Enforcement, said in a statement "This pattern of bribery by Siemens was unprecedented in scale and geographic reach."

76.     The SEC's complaint charged that between March 12, 2001 and September 30, 2007, Siemens engaged in "a widespread and systematic practice of paying bribes to foreign government officials to obtain business" and "created elaborate payment schemes to conceal the nature of its corrupt payments." It said that Siemens made at least 4,283 payments totaling $1.4 billion to bribe government officials for business and approximately 1,185 separate payments to third parties totaling approximately $391 million, which were not properly controlled and were used, at least in part, for such purposes as commercial bribery and embezzlement. It also charged Siemens with violating Section 30A of the Securities Exchange Act of 1934 [15 U.S.C. § 78dd-1] by making "illicit payments" to foreign government officials in order to obtain business;

Section 13(b)(2)(B) of the Act by "failing to have an adequate internal control system in place to detect and prevent the illicit payments;" and Section 13(b)(2)(A) of the Act by "improperly" recording the payments in its books and records. It also notes that Siemens failed to implement adequate internal controls to comply with the Company's NYSE listing.

77.     The SEC complaint noted that among the transactions on which Siemens paid bribes were those to design and build metro transit lines in Venezuela; metro trains and signaling devices in China; power plants in Israel; high voltage transmission lines in China; mobile telephone networks in Bangladesh; telecommunications projects in Nigeria; national identity cards in Argentina; medical devices in Vietnam, China, and Russia; traffic control systems in Russia; refineries in Mexico; and mobile communications networks in Vietnam. Siemens also paid kickbacks to Iraqi ministries in connection with sales of power stations and equipment to Iraq under the United Nations Oil for Food Program.

78.     The SEC complaint detailed the manner in which Siemens executives and employees falsified the Company's books and records.

> Specifically, Siemens failed to keep accurate books and records by: 1) establishing and funding secret, off-books accounts; 2) establishing and using a system of payment intermediaries to obscure the source and destination of funds; 3) making payments pursuant to business consultant agreements that inaccurately described the services provided; 3) generating false invoices and other false documents to justify payments; 5) disbursing millions in cash from cash desks with inaccurate documentation authorizing or supporting the withdrawals; 6) using post-it notes for the purpose of concealing the identity of persons authorizing illicit payments; 7) recording illicit ASSF payments as legitimate commissions in Oil for Food transactions; 8) falsifying U.N. documents in connection with the Oil for Food Program; and 9) recording bribes as payment for legitimate services.

79.     The SEC complaint also noted that Siemens' bribery and other improper payments had a U.S. jurisdictional nexus in that certain of the projects in connection with which the

payments were made were financed by the World Bank or the U.S. Export-Import Bank, or because the payments were funneled through U.S. bank accounts, made through U.S.-based intermediaries, or were discussed in meetings in the United States or in mail, email, and fax communications into and out of the United States.  It noted that there were at least 290 projects or individual sales involving business in Venezuela, China, Israel, Bangladesh, Nigeria, Argentina, Vietnam, Russia and Mexico in which Siemens "employed the mails and other means and instrumentalities of U.S. interstate commerce in order to make bribe payments to foreign government officials." "The use of interstate commerce in connection with bribery including involving U.S.-based Siemens subsidiaries and their employees in the bribery schemes; financing of three underlying projects by the World Bank and the U.S. Export-Import Bank; making illegal payments through U.S. banks; using U.S.-based companies as intermediaries, business consultants, and holders of slush funds; conducting meetings in the United States in furtherance of a bribery scheme; and transmitting mail, electronic mail, and facsimile messages into and out of the United States."

80.     Similarly, the Sentencing Memorandum by the United States Department of Justice, Criminal Division, Fraud Section, noted that the investigations of Siemens "revealed evidence of corrupt and improperly recorded payments with a strong nexus to the U.S."

81.     The bribery and money laundering schemes were carried out by Siemens employees notwithstanding Siemens' agreement in 2001 to abide by NYSE regulations governing proper corporate governance, which was meant to prevent just this type of illegal activity.

82.     The bribery and money laundering schemes were carried out by Siemens employees notwithstanding the provisions of the Sarbanes-Oxley Act, which applies to companies like Siemens, who, although incorporated in foreign jurisdictions, sell their securities to investors in the United States, list their securities on U.S. stock exchanges and file reports with the SEC.  Sarbanes-Oxley embodies and expresses a strong policy of the United States and its states to require public corporations which list their securities on exchanges in the United States and have shareholders in the United States to have enhanced and effective internal controls to assure honest business dealings and accounting and truthful disclosure by corporate fiduciaries and the protection of the corporation and its shareholders from the harm and damage that inevitably result from dishonest business dealings, inadequate controls and false and misleading statements to shareholders and investors.

83.     On December 8, 2009, Siemens announced that it had entered into settlement agreements with six former board members.  The press reported that Heinrich von Pierer will pay 5 million euros to Siemens, Klaus Kleinfeld will pay 2 million euros, Uriel Sharef will pay 4 million euros, Jurgen Radomski and Johannes Feldmayer will each pay 3 million euros and Karl-Hermann Baumann will pay 1 million euros.

84.     As a result of the wrongdoing detailed above, Siemens' shareholders have suffered billions of dollars in damages.

85.     The market for Siemens' securities was open, well-developed and efficient at all relevant times.  As a result of these materially false and misleading statements and failures to disclose, Siemens' shares traded at artificially inflated prices during the Class Period.  Plaintiff and other members of the Class purchased or otherwise acquired Siemens securities relying upon

the integrity of the market price of Siemens' securities and market information relating to Siemens, and have been damaged thereby.

86.     At all relevant times, the material misrepresentations and omissions particularized in this Complaint directly or proximately caused or were a substantial contributing cause of the damages sustained by plaintiff and other members of the Class.  As described herein, during the Class Period, defendant made or caused to be made a series of materially false or misleading statements about Siemens' business, prospects and operations.  These material misstatements and omissions had the cause and effect of creating in the market an unrealistically positive assessment of Siemens and its business, prospects and operations, thus causing the Company's securities to be overvalued and artificially inflated at all relevant times.  Defendant's materially false and misleading statements during the Class Period resulted in plaintiff and other members of the Class purchasing the Company's securities at artificially inflated prices, thus causing the damages complained of herein.

### PRESUMPTION OF RELIANCE: FRAUD ON THE MARKET DOCTRINE

87.     Plaintiff will rely, in part, upon the presumption of reliance established by the fraud-on-the-market doctrine in that:

(a)     Defendant made false and misleading statements of material fact, and failed to disclose material facts, during the Class Period;

(b)     The misstatements and omissions were material;

(c)     The securities of the Company traded in efficient and open markets; Siemens was followed by numerous major analysts; its securities met the requirements for

31

listing, and were listed and actively traded on the NYSE, a highly efficient and automated market;

(d)     Siemens regularly communicated with public investors via established market communication mechanisms, including through regular disseminations of press releases on the national circuits of major newswire services and through other wide-ranging public disclosures, such as communications with the financial press and other similar reporting services; and

(e)     Siemens was followed by several securities analysts employed by major brokerage firms who wrote reports which were distributed to the sales force and certain customers of their respective brokerage firms.  Each of these reports was publicly available and entered the public marketplace.

88.     As a result of the foregoing, the market for Siemens' securities promptly digested current information regarding Siemens from all publicly available sources and reflected such information in Siemens' share price.  Under these circumstances, all purchasers of Siemens' securities during the Class Period suffered similar injury through their purchase of Siemens' securities at artificially inflated prices and a presumption of reliance applies.

89.     The misstatements and omissions alleged would tend to induce a reasonable investor to misjudge the value of Siemens' securities.  Plaintiff and members of the Class purchased their Siemens ADRs and publicly traded securities between the time defendant misrepresented or failed to disclose material facts and the time the true facts were disclosed, without knowledge of the omitted facts.

32

90. Based upon the foregoing, Plaintiff and other members of the Class are entitled to a presumption of reliance upon the integrity of the market price for the Company's securities.

## STATUTORY SAFE HARBOR PROVISION IS INAPPLICABLE

91. The statutory safe harbor provided for forward-looking statements under certain circumstances does not apply to any of the allegedly false statements pleaded in this Complaint. Many of the specific statements pleaded herein were not identified as "forward-looking statements" when made. To the extent there were any forward-looking statements, there were no meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the purportedly forward-looking statements.

92. Alternatively, to the extent that the statutory safe harbor does apply to any forward-looking statements pleaded herein, defendant is liable for those false forward-looking statements because at the time each of those forward-looking statements was made, the particular speaker knew that the particular forward-looking statement was false, and/or the forward-looking statement was authorized and/or approved by an executive officer of Siemens who knew that those statements were false when made.

## ADDITIONAL SCIENTER ALLEGATIONS

93. As alleged herein, Defendant acted with scienter in that it knew that the public documents and statements issued or disseminated in the name of the Company were materially false and misleading, or that the statements therein were made and distributed with reckless disregard for facts that defendant either knew or should have known. Defendant knew or recklessly disregarded the fact that such misleading statements would be distributed and disseminated to the investing public, and knowingly participated in and/or acquiesced in the

33

issuance and dissemination of such statements in violation of the federal securities laws. Defendant either knew that such statements were false and misleading or acted with reckless disregard of such falsity. If Defendant did not have actual knowledge of the misrepresentations and omissions alleged, then it was reckless in failing to obtain such knowledge by deliberately refraining from taking those steps necessary to discover whether the disseminated statements were true.

## BASIS OF ALLEGATIONS

94.     Plaintiff has alleged the preceding based upon the investigation of plaintiff's counsel, which included a review of United States Securities and Exchange Commission filings by Siemens, as well as regulatory filings and reports, securities analysts' reports and advisories about the Company, press releases and other public statements issued by the Company, and media reports about the Company, and plaintiff believes that substantial additional evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

### COUNT I

### Violation of Section 10(b) of the Exchange Act and
### Rule 10b-5 of the Securities and Exchange Commission

95.     Plaintiff repeats and realleges each and every allegation contained in the foregoing paragraphs as if fully set forth herein.

96.     During the Class Period, defendant carried out a plan, scheme and course of conduct which was intended to and, throughout the Class Period, did: (i) deceive the investing public regarding Siemens' business, operations, management and the intrinsic value of Siemens common stock; and (ii) caused plaintiff and other members of the Class to purchase Siemens

34

securities at artificially inflated prices. In furtherance of this unlawful scheme, plan and course

of conduct, defendant, took the actions set forth herein.

97.     Defendant (a) employed devices, schemes, and artifices to defraud; (b) made

untrue statements of material facts or omitted to state material facts necessary in order to make

the statements made, in light of the circumstances under which they were made, not misleading;

or (c) engaged in acts, practices, and a course of business which operated as a fraud and deceit

upon the purchasers of the Company's securities in an effort to maintain artificially high market

prices for Siemens' securities in violation of Section 10(b) of the Exchange Act and Rule 10b-5.

All defendants are sued either as primary participants in the wrongful and illegal conduct charged

herein or as controlling persons as alleged below.

98.     Defendant directly and indirectly, by the use, means or instrumentalities of

interstate commerce and/or of the mails, engaged and participated in a continuous course of

conduct to conceal adverse material information about the business, operations and prospects of

Siemens as specified herein.

99.     Defendant employed devices, schemes and artifices to defraud, while in

possession of material adverse non-public information and engaged in acts, practices, and a

course of conduct as alleged herein in an effort to assure investors of Siemens' value and

performance and continued substantial growth, which included the making of, or the

participation in the making of, untrue statements of material facts and omitting to state material

facts necessary in order to make the statements made about Siemens and its business operations

and prospects in the light of the circumstances under which they were made, not misleading, as

set forth more particularly herein, and engaged in transactions, practices and a course of business

35

which operated as a fraud and deceit upon the purchasers of Siemens securities during the Class
Period.

100.    Defendant had actual knowledge of the misrepresentations and omissions of
material facts set forth herein, or acted with reckless disregard for the truth in that they failed to
ascertain and to disclose such facts, even though such facts were available to them. Defendant's
material misrepresentations and/or omissions were done knowingly or recklessly and for the
purpose and effect of concealing Siemens' operating condition and business prospects from the
investing public and supporting the artificially inflated price of its securities. As demonstrated
by defendant's overstatements and misstatements of the Company's business, operations and
earnings throughout the Class Period, defendant, if it did not have actual knowledge of the
misrepresentations and omissions alleged, was reckless in failing to obtain such knowledge by
deliberately refraining from taking those steps necessary to discover whether those statements
were false or misleading.

101.    As a result of the dissemination of the materially false and misleading information
and failure to disclose material facts, as set forth above, the market price of Siemens' securities
was artificially inflated during the Class Period. In ignorance of the fact that market prices of
Siemens' publicly-traded securities were artificially inflated, and relying directly or indirectly on
the false and misleading statements made by defendant, or upon the integrity of the market in
which the securities trade, and/or on the absence of material adverse information that was known
to or recklessly disregarded by defendant but not disclosed in public statements by defendant
during the Class Period, plaintiff and the other members of the Class acquired Siemens securities
during the Class Period at artificially high prices and were damaged thereby.

36

102.     At the time of said misrepresentations and omissions, plaintiff and other members of the Class were ignorant of their falsity, and believed them to be true. Had plaintiff and the other members of the Class and the marketplace known the truth regarding the problems that Siemens was experiencing, which were not disclosed by defendant, plaintiff and other members of the Class would not have purchased or otherwise acquired their Siemens securities, or, if they had acquired such securities during the Class Period, they would not have done so at the artificially inflated prices which they paid.

103.     By virtue of the foregoing, defendant has violated Section 10(b) of the Exchange Act, and SEC Rule 10b-5 promulgated thereunder.

104.     As a direct and proximate result of defendant's wrongful conduct, plaintiff and the other members of the Class have suffered damages in connection with their respective purchases and sales of the Company's securities during the Class Period.

WHEREFORE, plaintiff, on her own behalf and on behalf of the Class, prays for judgment as follows:

A.     Declaring this action to be a proper class action and certifying plaintiff as class representative under Rule 23 of the Federal Rules of Civil Procedure;

B.     Awarding compensatory damages in favor of plaintiff and the other members of the Class against Siemens for the damages sustained as a result of Siemens' wrongdoings, together with interest thereon;

C.     Awarding plaintiff and the Class their reasonable costs and expenses incurred in this action, including fees of counsel and experts;

37

D.      Awarding extraordinary, equitable and/or injunctive relief as permitted by law,

equity and the federal statutory provisions sued hereunder, pursuant to Rules 64 and 65 and any

appropriate state law remedies to assure that the Class has an effective remedy; and

E.      Granting such other and further relief as the Court may deem just and proper.

## JURY DEMAND

Plaintiff demands a trial by jury on all issues so triable.

DATED:      December 3, 2009                     Respectfully submitted
            New York, New York

                                                 **WEISS & LURIE**

                                                 Joseph H. Weiss
                                                 James E. Tullman
                                                 551 Fifth Avenue
                                                 New York, New York  10176
                                                 (212) 682-3025
                                                 jweiss@weisslurie.com
                                                 jtullman@weisslurie.com

                                                 **STULL, STULL & BRODY**
                                                 Jules Brody
                                                 6 East 45th Street
                                                 New York, New York  10017
                                                 (212) 687-7230
                                                 jbrody@ssbny.com

                                                 Attorneys for Plaintiff

## CERTIFICATION OF PLAINTIFF
## PURSUANT TO FEDERAL SECURITIES LAWS

CHRISTINE JOHNSON ("Plaintiff"), hereby certifies as follows:

1.      I have reviewed the complaint being filed on my behalf and on behalf of all others similarly situated and authorized its filing.

2.      I did not purchase the security that is the subject of this action at the direction of counsel or in order to participate in this private action.

3.      I am willing to serve as a representative party on behalf of the class, including providing testimony at deposition and trial, if necessary.

4.      To the best of my current knowledge, I purchased the following shares of SIEMENS AG during the class period referenced in the complaint:

| Date | Purchased or Sold | No. of Shares | Price per Share |
|------|-------------------|---------------|-----------------|
| 3/5/08 | Purchased | 50 | $131.643 |

5.      I have not served as a class representative in a federal securities case in the last three years.

6.      I will not accept any payment for serving as a representative party on behalf of the class beyond Plaintiff's pro rata share of any recovery, except as ordered or approved by the court, including any award for reasonable costs and expenses (including lost wages) directly relating to the representation of the class.

7.      The matters stated in this certification are true to the best of my current knowledge, information and belief.

8.      I hereby certify, under penalty of perjury, that the foregoing is true and correct.

DATED:      July 25, 2009

_____
CHRISTINE JOHNSON