**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF NEW YORK**

_____
CHRISTINE JOHNSON, Individually and On )
Behalf of All Others Similarly Situated, ) Case No.  CV-09-5310 (JG) (RER)
 )
                Plaintiff, ) <u>CLASS ACTION</u>
 )
        vs. )
 )
SIEMENS AG, )
 )
              Defendant. )
_____)


**MEMORANDUM OF LAW IN SUPPORT OF MOTION OF**
**CHRISTINE JOHNSON  FOR APPOINTMENT AS LEAD PLAINTIFF**
**<u>AND APPROVAL OF HER SELECTION OF LEAD COUNSEL</u>**

**TABLE OF CONTENTS**

INTRODUCTION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

PROCEDURAL BACKGROUND . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

STATEMENT OF FACTS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

ARGUMENT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

      POINT I -     MOVANT SHOULD BE APPOINTED LEAD PLAINTIFF . . . . . . . . . . 7

          A.     The Procedure Required By The PSLRA . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

          B.     Movant Satisfies The "Lead Plaintiff" Requirements of the PSLRA
               and is Presumptively the "Most Adequate" Plaintiff . . . . . . . . . . . . . . . . . . . . . . 8

      POINT II -    THE COURT SHOULD APPROVE MOVANT'S
                       CHOICE OF COUNSEL . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

CONCLUSION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

Proposed Lead Plaintiff Christine Johnson ("Movant") hereby respectfully submits this memorandum of law in support of her motion for: (i) appointment as Lead Plaintiff pursuant to the Private Securities Litigation Reform Act of 1995 (the "PSLRA"); and (ii) approval of her selection of Weiss & Lurie as Lead Counsel.

## INTRODUCTION

This is a class action on behalf of all persons or entities who purchased or otherwise acquired American Depository Receipt Shares ("ADRs" or "shares") of Siemens AG ("Siemens" or the "Company") during the period November 8, 2007 through April 30, 2008 (the "Class Period"). The Class is seeking to pursue remedies under Section 10b of the Securities Exchange Act of 1934 (the "Exchange Act").

Movant purchased Siemens ADRs during the Class Period, and has suffered losses as a result of defendant's misconduct. Movant directed her counsel to conduct an extensive investigation of Siemens' wrongful conduct, following which she commenced this litigation. Movant is the Plaintiff in this Action and now seeks to be appointed as Lead Plaintiff of the Action. Additionally, Movant seeks Court approval of her selection of Weiss & Lurie as Lead Counsel. As discussed below, Movant has satisfied each of the requirements of the PSLRA and, therefore, is qualified for appointment as Lead Plaintiff in this Action.

## PROCEDURAL BACKGROUND

On or about December 4, 2009, following extensive research, Plaintiff filed this action, Johnson v. Siemens AG, Case No. CV-09-5310 in this Court. On December 7, 2009, Movant published notice of the pendency of the Johnson action on BusinessWire, advising members of

1

the proposed class of their right to move the Court to serve as lead plaintiff no later than sixty (60) days from the date of publication of the Notice, i.e., by February 5, 2010.

## STATEMENT OF FACTS

This is a class action on behalf of purchasers of the American Depository Receipt Shares of Siemens between November 8, 2007 and April 30, 2008, inclusive, seeking to pursue remedies under the Exchange Act. Siemens is a German based corporation which does substantial business in the United States through its various U.S. operations, with a focus in electronics and electrical engineering, and operating in the industry, energy and healthcare sectors. Its ADRs are traded on the New York Stock Exchange.

As more fully set forth herein, Siemens has plead guilty in the United States to violating the Exchange Act and the United States Foreign Corrupt Practices Act of 1977 (the "FCPA") by systemically and extensively engaging in illegal activities, including the establishment of sham businesses, phoney contracts, phantom invoices, shadow companies, mail and wire fraud, bribery, and money laundering, in order to obtain contracts or retain business for the Company. It knowingly used bagmen, elaborate payment schemes and secret off-book accounts to conceal bribery payments; mischaracterized bribes and kickbacks in corporate accounting records; circumvented and failed to maintain adequate internal controls; and failed to comply with the books and records provisions of the FCPA. Its most senior echelons of management, including its President and Chief Executive Officer, and his successor, and its Chief Financial Officer, and its compliance, legal, internal audit, and corporate finance departments each played a significant role in the illegal activity.

On November 8, 2007, the beginning of the Class Period, Siemens announced strong growth and higher margins and that for 2008 Siemens will experience volume growth "twice as high as the rate of GDP growth and that [Siemens] operating profit will grow at least twice as fast as volume." According to a Siemens press release:

- Group profit from Operations was €1.990 billion, driven up sharply year-over-year by rising profits and earnings margins at all Groups.

- Income from continuing operations also climbed significantly, to €1.394 billion. EPS from continuing operations was €1.45 compared to €0.10 a year earlier.

- Net income was a negative €74 million due to non-operating items in discontinued operations, including approximately €1.0 billion in tax expense related to the carve-out of Siemens VDO Automotive. EPS was a negative €0.17 compared to a positive €0.10 a year earlier.

- Siemens continued to grow more than twice as fast as global GDP. Revenue was up 9% compared to the prior-year quarter, at €20.201 billion, and orders climbed 21%, to €21.328 billion.

- Free cash flow rose to €2.553 billion for the quarter, on higher income from continuing operations and a substantial improvement in net working capital year-over-year.

- Siemens announced plans for a €10 billion share repurchase program, and proposed a dividend for fiscal 2007 of €1.60 per share compared to €1.45 per share in the prior year.

On January 13, 2008, the <u>Frankfurter Allgemeine Sonntagszeitung</u> reported that it had interviewed Siemens' new Chief Executive Officer, Peter Löscher, and that he had stated that Siemens does not plan to reduce its earnings outlook. "There is no profit warning. Our statements are known: They include sales are growing double the pace of the global economy, profits double the pace of sales," he said. He noted that he does not have "any knowledge of our business significantly changing" because of a global slowdown. "In our order backlog, we're not yet feeling anything of slackness," he said.

3

On January 24, 2008, Siemens held its annual meeting and a meeting with securities analysts. At the meeting with analysts, Löscher assured them: "Turning now to the year ahead, we are confirming 2008 topline and earnings outlooks given in November. We will grow our revenues at least twice as fast as the global GDP. We will grow our group profit from operations at least twice as fast as our revenues."

On February 22, 2008, in an interview with Bloomberg Television in New York, Löscher reiterated that with respect to any global slowdown "[t]he impact for us as a company, we don't see it yet." He added that Siemens has an "outstanding" order book and at this pace will meet its 2008 goals. Bloomberg reported that Jochen Klusmann, an analyst at BHF-Bank in Germany, rated Siemens stock a "strong buy," noting that the slowdown "hasn't arrived in the industries yet in which Siemens is active."

Beginning in March 17, 2008 and continuing thereafter, Siemens released a series of disappointing announcements, including that it was experiencing delays and cancelled orders and that it would have to cut its quarterly earnings by €900 million and that the full extent of its bribery scandal had not been publicly disclosed.

On March 17, 2008, only weeks after Mr. Löscher's assurances, Siemens disclosed that delays and cancelled orders would cut its quarterly earnings by €900 million ($1.4 billion). As reported by The Wall Street Journal the next day: "The wholly unexpected warning suggests that the company's new chief executive, Peter Löscher, has not yet gotten a grip on the problems at Siemens, which has undergone a wholesale overhaul. Just a month ago, Mr. Löscher said Siemens was on track to meet its earnings targets for this year." The Journal observed that "analysts said the profit warning indicated that Siemens's business practices are deep-rooted and

4

difficult to change. Some investors even asked whether cleaning up its ethics had handicapped its ability to do business." It quoted an asset manager as saying "People in the market have been saying, 'without corruption, maybe they aren't able to deliver.'"

Siemens' share price plunged 17% in a single session after the surprise profit warning. In fact, Siemens was not able to deliver without corruption. Its fiscal 2008 income from continuing operations plummeted by more than 50% from fiscal 2007. In 2008, it earned 1.859 billion euros; in 2007, it earned 3.909 billion euros. Its earning per share declined to €1.91 from €4.13 a year earlier.

On April 15, 2008, The Wall Street Journal reported that German prosecutors broadened their bribery investigation at Siemens to include its power-transmission business, "suggesting legal woes at Europe's largest engineering conglomerate are far from over."

On April 29, 2008, Siemens disclosed that Debevoise & Plimpton, which the Company had retained to conduct an investigation, for which Siemens paid hundreds of millions of dollars, found that Siemens had engaged in corruption and had violated domestic and foreign compliance regulations pertaining to internal controls and the accuracy of documentation in the power generation, power transmission and distribution, transportation systems, industrial solutions and services, and medical solutions divisions.

On April 30, 2008, the end of the Class Period, Siemens announced a sharp drop in second quarter profits. According to Spiegel Online:

> On Wednesday, the group announced a 67-percent slump in second quarter net profits, just one day after it emerged that the system of bribery was endemic throughout the company.

5

At a press conference in Munich Wednesday, the company announced that its profits in the quarter ending March fell to €18.09 billion.  And the company says it was maintaining its outlook for high growth.

CEO Peter Löscher, who was brought in to the company to act as new broom last year, said on Wednesday: "We have now concluded our project reviews in the conventional power generation business and, in total, we have a clear picture of the relevant risks."  He added that the company had "demonstrated its commitment to "increasing transparency and accountability."

As <u>The Wall Street Journal</u> has noted, statements by Siemens' executives to government prosecutors "depict a company where payment of bribes was common and highly organized. The statements portray top Siemens executives as scrambling to escape detection while prosecutors from neighboring countries drew an ever-tighter net."  The illegal activity has had and continues to have a material adverse effect upon Siemens' business, financial condition, revenues, earnings, share price and global reputation, which its Chief Executive described as "quite staggering," and a threat to Siemens' very survival.  Ultimately, Siemens paid fines and penalties of more than $1.6 billion, the largest fines for bribery in corporate history.

During the Class Period Siemens represented that it had cleaned up this corporate wide scandal and that it would meet its publicly announced revenue and earnings expectations.  In truth, Siemens' ability to generate revenues and achieving earnings expectations was clearly dependent on its corporate-wide bribery activities.  As a result of defendant's fraud and misconduct, Siemens' shareholders have suffered, and will continue to suffer, billions of dollars in damages.  Plaintiff, through this Action, seeks to recover those damages for Siemens shareholders.

## ARGUMENT

## POINT I

## MOVANT SHOULD BE APPOINTED LEAD PLAINTIFF

### A.     The Procedure Required By The PSLRA

The PSLRA has established a procedure that governs the appointment of a lead plaintiff in "each private action arising under [the Exchange Act] that is brought as a plaintiff class action pursuant to the Federal Rules of Civil Procedure." 15 U.S.C. § 78u-4(a)(1).

First, the plaintiff who files the initial action must publish a notice to the class, within 20 days of filing the action, informing class members of their right to file a motion for appointment as lead plaintiff.  15 U.S.C. § 78u-4(a)(3)(A)(i).  Plaintiff in the Action caused notice to be published on BusinessWire on December 7, 2009.[1]  See Declaration of Joseph H. Weiss ("Weiss Decl."), Exhibit A.  Within 60 days after publication of the notice, any person or group of persons who are members of the proposed class may apply to the Court to be appointed as lead plaintiff, whether or not they have previously filed a complaint in the action. 15 U.S.C. § 78u-4 (a)(3)(A) and (B).

Second, the PSLRA provides that within 90 days after publication of the notice the Court shall consider any motion made by a class member and shall appoint as lead plaintiff the member or members of the class that the Court determines to be most capable of adequately representing

---

[1] Wire services have consistently been recognized as a suitable vehicle for meeting the statutory requirement that notice be published "in a widely circulated national business-oriented publication or wire service." See Lax v. First Merchants Acceptance Corp., 1997 U.S. Dist. LEXIS 11866 at *2 (N.D. Ill. Aug. 6, 1997).

the interests of class members.  15 U.S.C. § 78u-4 (a)(3)(B).  In determining the "most adequate plaintiff," the PSLRA provides that:

> [T]he court shall adopt a presumption that the most adequate plaintiff in any private action arising under this title is the person or group of persons that - -
>
> (aa)    has either filed the complaint or made a motion in response to a notice . . .;
>
> (bb)    in the determination of the court, has the largest financial interest in the relief sought by the class; and
>
> (cc)    otherwise satisfies the requirements of Rule 23 of the Federal Rules of Civil Procedure.

15 U.S.C. § 78u-4 (a)(3)(B)(iii).  See generally Greebel v. FTP Software, 939 F. Supp. 57, 64 (D. Mass. 1996).

### B.   Movant Satisfies the "Lead Plaintiff" Requirements of the PSLRA and is Presumptively the "Most Adequate" Plaintiff

The time period in which class members may move to be appointed lead plaintiffs under 15 U.S.C. § 78u-4 (a)(3)(A) and (B) expires on February 5, 2010.  Pursuant to the provisions of the PSLRA and within the requisite time frame after publication of the required notice (published on December 7, 2009), Movant herein timely moves this Court to be appointed Lead Plaintiff on behalf of all members of the Class.

Movant is willing to serve as a representative party on behalf of the Class as evidenced by her duly executed certification.  See Weiss Decl., Exhibit B.  In addition, Movant has selected and retained experienced and competent counsel to represent her and the Class.  See Weiss Decl., Exhibit C.

Accordingly, Movant has satisfied the individual requirements of 15 U.S.C. § 78u-4 (a)(3)(B) and is entitled to have her application for appointment as Lead Plaintiff and her selection of Lead Counsel, as set forth herein, considered and approved by the Court.

In addition, Movant is presumptively the "most adequate" plaintiff. During the Class Period, as evidenced by, among other things, the accompanying signed certification, Movant purchased 50 ADRs of the Company's stock and has suffered estimated losses of approximately $1,000 as a result of defendant's misconduct. See Weiss Decl., Exhibit B. While Movant's losses may be less than the losses often sustained by a proposed lead plaintiff in a securities class action, Movant nevertheless has demonstrated a significant commitment to the successful prosecution of this Action. As discussed herein, Movant has retained counsel who have conducted an extensive investigation into Movant's claims and those of the Class and have filed a comprehensive complaint seeking recovery on behalf of Movant and the Class she seeks to represent. Thus, Movant has demonstrated that she is more than adequate to act as Lead Plaintiff for the Class.

Moreover, Movant is unaware of any other plaintiff or lead plaintiff applicant who has plead a similar action, published notice and/or has a larger loss. As such, Movant has the greatest financial interest in the relief sought by the class in this litigation. Movant satisfies all of the PSLRA's prerequisites for appointment as Lead Plaintiff and should be appointed Lead Plaintiff pursuant to 15 U.S.C. § 78u-4 (a)(3)(B).

According to 15 U.S.C. § 78u-4 (a)(3)(B), in addition to possessing the largest financial interest in the outcome of the litigation, the lead plaintiff must also "otherwise satisf[y] the

9

requirements of Rule 23 of the Federal Rules of Civil Procedure." Movant otherwise satisfies Rule 23.

Rule 23(a) provides that a party may serve as a class representative only if the following four requirements are satisfied:

> (1) the class is so numerous that joinder of all members is impracticable, (2) there are questions of law or fact common to the class, (3) the claims or defenses of the representative parties are typical of the claims or defenses of the class, and (4) the representative parties will fairly and adequately protect the interests of the class.

Of the four prerequisites to class certification, only two -- typicality and adequacy -- directly address the personal characteristics of the class representatives. Consequently, in deciding a motion to serve as lead plaintiff, the Court should focus its inquiry on the typicality and adequacy prongs of Rule 23(a). Lax v. First Merchants, 1997 U.S. Dist. LEXIS 11866, at *20; Fischler v. Amsouth Bancorporation, 1997 U.S. Dist. LEXIS 2875, at *7-8 (M.D. Fla. Feb. 6, 1997).

Here, the movant satisfies both the typicality and adequacy requirements of Rule 23, thereby justifying her appointment as Lead Plaintiff. Typicality exists if claims "arise[] from the same course of events, and each class member makes similar legal arguments to prove the defendant's liability." See In re Drexel Burnham Lambert Group, Inc., 960 F.2d 285, 291 (2d Cir. 1992), cert. dismissed sub nom., 506 U.S. 1088 (1993). However, the claims of the class representatives need not be identical to the claims of the class to satisfy typicality. Instead, the courts have recognized that:

> [T]he typicality requirement may be satisfied even if there are factual dissimilarities or variations between the claims of the

10

>named plaintiffs and those of other class members, including distinctions in the qualifications of the class members.

Bishop v. New York City Dept. of Housing Preservation and Development, 141 F.R.D. 229, 238 (2d Cir. 1992);  See also Avagliano v. Sumitomo Shoji America, Inc., 103 F.R.D 562, 582 (S.D.N.Y. 1984).

As set forth above, Movant seeks to represent a class of purchasers of Siemens ADRs pursuing claims under the Exchange Act.  Thus, typicality is satisfied since the claims asserted by Movant arise "from the same event or course of conduct that gives rise to claims of other class members and the claims are based on the same legal theory."  Walsh v. Northrop Grumman Corp., 162 F.R.D. 440, 445 (E.D.N.Y. 1995).

Under Rule 23(a)(4), the representative party must also "fairly and adequately protect the interests of the class."  The standard for adequacy of representation under Rule 23(a)(4) is met by: (1) the absence of potential conflicts between the named plaintiff and the class members, and (2) the class representative's choice of counsel who is qualified, experienced and able to vigorously conduct the proposed litigation.  Garfinkel v. Memory Metals, Inc., 695 F. Supp. 1397, 1405 (D. Conn. 1988).

Here, Movant is the most adequate representative of the Class.  The interests of Movant are clearly aligned with the members of the Class and there is no evidence of any antagonism between Movant's interests and those of the other members of the Class she seeks to represent.  In addition, as shown below, the Movant's proposed Lead Counsel is highly qualified, experienced and able to conduct this complex litigation in a professional manner.  Thus, Movant prima facie satisfies the typicality and adequacy requirements of Rule 23.

## POINT II

## **THE COURT SHOULD APPROVE MOVANT'S CHOICE OF COUNSEL**

Pursuant to 15 U.S.C. § 78u-4 (a)(3)(B)(v), the lead plaintiff shall, subject to Court approval, select and retain counsel to represent the class she seeks to represent.  In that regard, Movant has selected Weiss & Lurie to serve as Lead Counsel.  Weiss & Lurie has extensive experience in successfully prosecuting shareholder and securities class actions, and has frequently appeared in major actions in this and other courts.  See Weiss Decl., Exhibit C.

## **CONCLUSION**

For all the foregoing reasons, Movant respectfully requests that the Court grant her request for appointment as Lead Plaintiff and approve her selection of Lead Counsel.

DATED: February 5, 2010         Respectfully submitted
New York, New York

**WEISS & LURIE**

 /s/ Joseph H. Weiss
Joseph H. Weiss
James E. Tullman
551 Fifth Avenue
New York, New York  10176
(212) 682-3025
jweiss@weisslurie.com
jtullman@weisslurie.com

**STULL, STULL & BRODY**
Jules Brody
6 East 45th Street
New York, New York   10017
(212) 687-7230
jbrody@ssbny.com

Attorneys for Plaintiff

12