Thomas D. Yannucci, P.C.*
James P. Gillespie, P.C.
Brant W. Bishop, P.C.
Oreste P. McClung
Kirkland & Ellis LLP
655 Fifteenth Street, N.W.
Washington, D.C.  20005
Telephone: (202) 879-5000
thomas.yannucci@kirkland.com
james.gillespie@kirkland.com
brant.bishop@kirkland.com
oreste.mcclung@kirkland.com

**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF NEW YORK**

| | |
|---|---|
| Christine Johnson, Individually and On Behalf of All Others Similarly Situated, | ) ) ) Case No.  09-cv-5310 (JG) (RER) |
| Plaintiff, | ) ) ) ECF Case |
| vs. | ) ) **DEFENDANT SIEMENS AG'S** ) **MEMORANDUM IN SUPPORT OF ITS** |
| Siemens AG, | ) **MOTION TO DISMISS THE** ) **AMENDED COMPLAINT** |
| Defendant. | ) ) |

# TABLE OF CONTENTS

Page (s)

**INTRODUCTION**………………………………………………………………………………1

**BACKGROUND** ……………………………………………………………………………………2

**ARGUMENT** ………………………………………………………………………………………5

**I.   PLAINTIFF FAILS TO PLEAD PARTICULARIZED FACTS GIVING RISE TO A STRONG INFERENCE OF SCIENTER** ……………………………………6

    A.   The Amended Complaint Fails To Allege Motive ……………………………7

    B.   The Amended Complaint Lacks Strong Circumstantial Indications Of Fraudulent Intent………………………………………………………12

    C.   Inferences Of Nonfraudulent Intent Are More Compelling ……………………18

**II.   THE ALLEGED MISSTATEMENTS ARE PROTECTED BY THE SAFE HARBOR FOR FORWARD-LOOKING STATEMENTS** ……………………………19

    A.   The Complained-of Statements Are Forward-Looking Statements Protected By The PSLRA ……………………………………………………………21

    B.   Siemens AG's Specific Risk Disclosures Render The Forward-Looking Statements Immaterial Under The Bespeaks Caution Doctrine …………………28

**III.   THE NEW ACCOUNTING CLAIMS ARE TIME-BARRED** ……………………29

    A.   Plaintiff's Accounting Claims Were Required To Be Brought Within Two Years Of Discovery Of The Facts Constituting The Violation …………………29

    B.   A Reasonable Plaintiff Would Have Discovered The Facts Constituting The Alleged Accounting Violation More Than Two Years Prior To The Filing Of The Accounting Claims……………………………………………30

    C.   The Newly-Added Accounting Fraud Claims Do Not Relate Back To The Original Complaint ……………………………………………………………31

**IV.   PLAINTIFF CANNOT ASSERT CLAIMS ON BEHALF OF PURCHASERS OF SIEMENS AG'S COMMON SHARES ON THE FRANKFURT STOCK EXCHANGE** ……………………………………………33

    A.   Purchasers Of Siemens AG's Common Shares On The Frankfurt Stock Exchange Are Foreclosed From Seeking Relief Under Section 10(b) Of The Exchange Act……………………………………………………………33

    B.   Plaintiff Lacks Standing To Bring Claims On Behalf Of Purchasers Of Siemens AG Common Shares On The Frankfurt Stock Exchange……………………33

**CONCLUSION** ……………………………………………………………………………………35

i

# TABLE OF AUTHORITIES

Page(s)

**Cases**

*Abu Dhabi Commercial Bank v. Morgan Stanley & Co. Inc.*,
   651 F. Supp. 2d 155 (S.D.N.Y. 2009) ................................................................ 34

*Acito v. IMCERA Group, Inc.*,
   47 F.3d 47 (2d Cir. 1995) ................................................................ 7, 10, 19

*Aegon N.V. Sec. Litig.*,
   No. 03 Civ. 0603 (RWS), 2004 WL 1415973 (S.D.N.Y. June 23, 2004) ........ 20, 21, 22, 23, 28

*Alcatel Sec. Litig.*,
   382 F. Supp. 513 (S.D.N.Y. 2005) ................................................................ 32

*AstraZeneca Sec. Litig.*,
   559 F. Supp. 2d 453 (S.D.N.Y. 2008) ................................................................ 9

*Austl. & N.Z. Banking Group Ltd. Sec. Litig.*,
   No. 08 Civ. 11278 (DLC), 2009 WL 4823923 (S.D.N.Y. Dec. 14, 2009) ........................ 28, 29

*Avon Pension Fund v. GlaxoSmithKlinePLC*,
   343 Fed. Appx. 671 (2d Cir. 2009) ................................................................ 10

*Bayou Hedge Fund Litig.*,
   534 F. Supp. 2d 405 (S.D.N.Y. 2007) ................................................................ 17

*Bell Atl. Corp. v. Twombly*,
   550 U.S. 544 (2007) ................................................................ 5

*Bristol-Myers Squibb Sec. Litig.*,
   312 F. Supp. 2d 549 (S.D.N.Y. 2004) ................................................................ 8, 10

*Campo v. Sears Holding Corp.*,
   No. 09-3589-cv, 2010 WL 1292329 (2d Cir. Apr. 6, 2010) ........................................ 13, 14, 15

*City of Brockton Ret. Sys. v. Shaw Group Inc.*,
   540 F. Supp. 2d 464 (S.D.N.Y. 2008) ................................................................ 9

*City of Sterling Heights Police & Fire Ret. Sys. v. Vodafone Group PLC*,
   655 F. Supp. 2d 262 (S.D.N.Y. 2009) ................................................................ 6

*DiLeo v. Ernst & Young*,
    901 F.2d 624 (7th Cir. 1990) ........................................................................... 19

*ECA & Local 134 IBEW Joint Pension Trust of Chicago v. JP Morgan Chase Co.*,
    553 F.3d 187 (2d Cir. 2009) ............................................................... 5, 6, 7, 12, 19

*Fellman v. Electro Optical Systems Corp.*,
    No. 98 Civ. 6403 (LBS), 2000 WL 489713 (S.D.N.Y. Apr. 25, 2000) ................... 23

*Focus Media Holding Ltd. Litig.*,
    --- F. Supp. 2d ---, 2010 WL 1221881 (S.D.N.Y. Mar. 29, 2010) ........................ 28

*Gildan Activewear, Inc. Securities Litigation*
    636 F. Supp. 2d 261(S.D.N.Y. 2009) ............................................................... 16

*Halperin v. eBanker USA.com, Inc.*,
    295 F.3d 352 (2d Cir. 2002) ........................................................................... 20

*Higginbotham v. Baxter Int'l Inc.*,
    495 F.3d 753 (7th Cir. 2007) ...................................................................... 14, 19

*Kalnit v. Eichler*,
    264 F.3d 131 (2d Cir. 2001) ...................................................................... 6, 9, 11

*Keyspan Corp. Sec. Litig.*,
    383 F. Supp. 2d 358 (E.D.N.Y. 2003) ..................................................... 8, 9, 10, 13, 17

*King County, Wash. v. IKB Deutsche Industriebank AG*,
    No. 09-cv-8387 (SAS), 2010 WL 2010943 (S.D.N.Y. May 18, 2010) ................... 34

*Malin v. XL Capital, Ltd.*,
    499 F. Supp. 2d 117 (D. Conn. 2007) ............................................................... 17

*Merck & Co., Inc. v. Reynolds*,
    130 S. Ct. 1784 (2010) .................................................................................. 29

*Morrison v. Nat'l Austl. Bank Ltd.*,
    No. 08-1191, --- S. Ct. ---, 2010 WL 2518523 (June 24, 2010) ........................ 2, 33

*Morse v. McWhorter*,
    200 F. Supp. 2d 853 (M.D. Tenn. 2000) ............................................................ 11

*Noah Educ. Holdings, Ltd. Sec. Litig.*,
    No. 08 Civ. 9203 (RJS), 2010 WL 1372709 (S.D.N.Y. Mar. 31, 2010) .............. 31, 32

*Nokia Oyj (Nokia Corp.) Sec. Litig.*,
    423 F. Supp. 2d 364 S.D.N.Y. 2006) ................................................................. 12

*Novak v. Kasaks*,
    216 F.3d 300 (2d Cir. 2000) ..................................................................... 7, 12

*Plumbers & Pipefitters Local Union Pension Fund v. Zimmer Holdings, Inc.*,
    673 F. Supp. 2d 718 (S.D. Ind. 2009) ........................................................... 11

*Plumbers & Steamfitters Local 773 Pension Fund v. Can. Imperial Bank of Commerce*,
    --- F. Supp. 2d ---, 2010 WL 961596 (S.D.N.Y. Mar. 17, 2010) ................................ 11, 12, 13

*PXRE Group, Ltd. Sec. Litig.*,
    600 F. Supp. 2d 510 (S.D.N.Y. 2009) ........................................................... 16, 17

*Rombach v. Chang*,
    355 F.3d 164 (2d Cir. 2004) ....................................................................... 11

*Sec. Capital Assurance, Ltd. Sec. Litig.*,
    No. 07 Civ. 11086 (DAB), 2010 WL 1372688 (S.D.N.Y. Mar. 31 2010) ............................. 14

*Shields v. Citytrust Bancorp, Inc.*,
    25 F.3d 1124 (2d Cir. 1994) ....................................................................... 11

*Slayton v. Am. Express Co.*,
    460 F.3d 215 (2d Cir. 2006) ....................................................................... 32

*Slayton v. Am. Express Co.*,
    604 F.3d 758 (2d Cir. 2010) ............................................................. 2, 18, 21, 22, 24

*Steinberg v. Ericsson LM Tel. Co.*,
    No. 07-cv-9615 (RPP), 2008 WL 5170640 (S.D.N.Y. Dec. 10, 2008) ............................. 12, 15

*Stevelman v. Alias Research Inc.*,
    174 F.3d 79 (2d Cir. 1999) .................................................................... 17, 31

*Teamsters Local 445 Freight Div. Pension Fund v. Dynex Capital Inc.*,
    531 F.3d 190 (2d Cir. 2008) .................................................................... 6, 19

*Tellabs, Inc. v. Makor Issues & Rights, Ltd.*,
    551 U.S. 308 (2007) ................................................................................. 6

*Tibco Software, Inc. Sec. Litig.*,
    No. C 05-2146 SBA, 2006 WL 1469654 (N.D. Cal. May 25, 2006) ................................. 11

iv

**Statutes**

15 U.S.C. § 78u-4(b)(2) ................................................................................. 1, 6, 22

15 U.S.C. § 78u-5(c) ................................................................... 1, 19, 21, 22, 23, 25

15 U.S.C. § 78u-5(e) .............................................................................................. 24

15 U.S.C. § 78u-5(i)(1) .......................................................................................... 21

28 U.S.C. 1658(b) ..................................................................................... 1, 29, 30

This lawsuit seeks to turn the salutary corporate practice of conducting periodic reviews of business performance into a badge of fraud.  Plaintiff effectively advances the theory that, when a performance review reveals a company will not meet financial projections, the company always must have known earlier that it would miss, but chose to mislead investors.  Plaintiff, however, fails to plead facts to support this reflexive cry of fraud.

In the second half of 2007, Siemens AG changed its executive leadership and corporate structure:  Peter Löscher joined the Company as President and CEO, reorganized the Company into three Sectors and 15 Divisions and introduced new executives to lead these business segments.  As is common with reorganizations, Siemens' new senior management team conducted a review of Company business operations.  This business review revealed that a number of major projects were not progressing as forecast, causing Siemens to incur unforeseen raw materials and other project delay costs.  Consequently, on March 17, 2008 — before the end of its financial reporting period — Siemens AG alerted investors that its 2008 earnings would be some 900 million euros less than previously estimated.  Siemens AG's stock lost value in the wake of the warning.

Lead Plaintiff SEIU seeks to parlay Siemens AG's business reversal into securities fraud.  But SEIU's Amended Complaint fails for several reasons:

- *First*, all claims fail because the Amended Complaint does not "state with particularity facts giving rise to a strong inference that the defendant acted with" scienter, as required by the Private Securities Litigation Reform Act, 15 U.S.C. § 78u-4(b)(2), as well as applicable Supreme Court and Second Circuit precedent. *See* **Section I**.

- *Second*, the Amended Complaint's non-accounting claims are not actionable pursuant to the PSLRA safe harbor for forward-looking statements provided by 15 U.S.C. § 78u-5(c) and the bespeaks caution doctrine.  *See* **Section II**.

- *Third*, the applicable two-year limitations period bars the Amended Complaint's accounting claims.  28 U.S.C. § 1658(b).  *See* **Section III**.

- ***Fourth***, Plaintiff cannot bring claims on behalf of purchasers of Siemens AG common shares on the Frankfurt Stock Exchange because (i) the Supreme Court's recent decision in *Morrison v. National Australia Bank Ltd.*, No. 08-1191, --- S. Ct. ---, 2010 WL 2518523 (June 24, 2010) forecloses these claims; and (ii) Plaintiff, who only alleges to have purchased Siemens AG American Depository Receipts on the New York Stock Exchange, lacks standing to assert claims on behalf of purchasers of Siemens AG common shares on the Frankfurt Stock Exchange. ***See* Section IV**.

More generally, the law recognizes that all companies suffer business setbacks from time to time. That is why negative announcements alone are not the stuff of fraud. Rather, the law encourages businesses to conduct periodic reviews of their performance and disclose the results to the market — even if the results are poor. *See, e.g.*, *Slayton v. Am. Express Co.*, 604 F.3d 758, 777 (2d Cir. 2010) ("endeavoring in good faith to ascertain and disclose future losses" is a prudent course of action and does not support an inference of securities fraud). Because Plaintiff fails to plead facts that overcome this general principle and state a securities fraud claim, the Amended Complaint should be dismissed with prejudice.

## BACKGROUND

In late 2007 and early 2008, Siemens AG implemented significant changes to its senior management and organizational structure. For example, Peter Löscher became the Company's President and CEO in July 2007. (Ex. 4 at 96 (Form 20-F filed with SEC on Nov. 28, 2007).)[1] Later, on November 28, 2007, Siemens AG announced a restructuring of the Company, organizing its operations in three Sectors with a total of 15 Divisions and naming new executives to lead these business segments. (Ex. 5 (Nov. 28, 2007 Press Release); Ex. 4 at 96.) As new management integrated into the Company and observed quarterly results from the business units, Siemens AG initiated an internal review of its business. As it disclosed on January 24, 2008, the Company had experienced poor performance in its Fossil Power Generation Division, and was

---

[1] References to "Ex. #" are to exhibits to the McClung Declaration, filed concurrently herewith. Additionally, unless otherwise indicated, all emphasis herein is added.

engaged in an audit of its major projects.  (Am. Compl. ¶ 73; Ex. 8 at 3 (Jan. 24, 2008 Earnings Call Tr.).)  Soon thereafter, on March 17, 2008, Siemens AG revised its earnings forecast for the 2008 fiscal year — announcing that, after reviewing many of its construction and other major projects, it estimated a negative impact on earnings of approximately €900 million for fiscal year 2008.  (Am. Comp. ¶ 78; Ex. 10 (Form 6-K filed with the SEC on Mar. 17, 2008).)

More than 20 months later, on December 4, 2009, Christine Johnson filed suit against Siemens AG on behalf of a putative class of purchasers of American Depository Receipts ("ADRs") of Siemens AG between November 8, 2007 and April 30, 2008, alleging Siemens AG violated Section 10(b) of the Exchange Act and Rule 10b-5.  (Original Compl. ¶¶ 1, 6.)  The Johnson complaint alleges that Siemens AG misrepresented its ability to meet earnings estimates without supposedly bribing officials to secure contracts.  (Original Compl. ¶¶ 5, 63.)

On February 17, 2010, the Court appointed the 1999 SEIU Greater New York Pension Fund as PSLRA lead plaintiff.  On May 17, 2010 — over two years after Siemens AG's negative earnings announcement — SEIU filed an Amended Complaint on behalf of (i) persons who purchased Siemens AG's ADRs on the New York Stock Exchange, and (ii) United States citizens or residents who purchased common shares of Siemens AG on the Frankfurt Stock Exchange, between November 8, 2007 and March 17, 2008.  (Am. Compl. ¶ 1.)  SEIU alleges it purchased Siemens AG ADRs, but does not allege that it, or any other named plaintiff, purchased Siemens AG common shares on the Frankfurt Stock Exchange.  (Am. Compl. ¶ 17.)

As Christine Johnson did in the original complaint, SEIU alleges Siemens AG violated Section 10(b) of the Exchange Act and Rule 10b-5.  (Am. Comp. ¶¶ 10, 128-32.)  SEIU also asserts claims against two new defendants, Peter Löscher, President and CEO of Siemens AG,

and Joe Kaeser, Siemens AG's CFO, for alleged violations of Sections 10(b) and 20(a) of the
Exchange Act and Rule 10b-5.  (Am. Compl. ¶¶ 10, 128-34.)

     Plaintiff SEIU primarily contends that, on November 8, 2007, and in January 2008,
Defendants made false and misleading statements regarding Siemens AG's future business
prospects, which artificially inflated the price of the Company's securities.  (Am. Compl. ¶¶ 5, 6,
119.)   In particular, Plaintiff alleges that Defendants misrepresented Siemens AG's future
financial performance by projecting that it would experience "volume growth that is twice as
high as the rate of global GDP growth, and that [its] operating profit will grow twice as fast as
[its] volume," notwithstanding any problems with the Company's long-term projects.  (Am.
Compl. ¶¶ 5, 6, 59, 68, 73.)

     The Amended Complaint differs from the original complaint in that it attributes several
allegations to so-called "confidential witnesses."  (Am. Compl. ¶¶ 30 - 33, 42-53, 110-13.)  The
confidential witnesses are alleged to be former low-level employees or mid-level managers at
Siemens.  (Am. Compl. ¶¶ 30-33.)  None of the four confidential witnesses purport to have
worked at the Company's corporate headquarters, or in the investor relations or financial
reporting areas of the Company.  They also do not claim to have had any contact with Siemens
AG's senior executives such as Messrs. Löscher or Kaeser, and Confidential Witness 1 does not
even purport to have been at the Company during the time period at issue in the Amended
Complaint.  (Am. Compl. ¶ 30.)

     SEIU also proffers an accounting fraud theory not asserted (or even mentioned) in the
Johnson complaint.  Plaintiff contends that in its public statements regarding the year ended
September 30, 2007 (filed with the SEC on November 28, 2007) and the quarter ended
December 31, 2007 (filed with the SEC on January 24, 2008), the Company improperly

accounted for a large number of its long-term projects, thereby overstating its "operating income" by "hundreds of millions of euros." (Am. Compl. ¶¶ 3, 84, 85, 91.)  In support of its new accounting claim, Plaintiff quotes analyst reports from March 2008 that took issue with Siemens AG's accounting practices. (Am. Compl. ¶ 83 at pp. 36, 38.)

Plaintiff further alleges that, on March 17, 2008, "when Defendants' prior misrepresentations and fraudulent conduct were disclosed and became apparent to the market, the price of Siemens' securities fell precipitously as the prior artificial inflation came out of the price of Siemens' securities," and that Plaintiff and other members of the putative class suffered damages as a "direct result of Defendants' fraudulent scheme to artificially inflate the price of Siemens' securities and the subsequent significant decline in the value of Siemens' securities when Defendants' prior misrepresentations and other fraudulent conduct was revealed." (Am. Compl. ¶¶ 82, 119, 121, 122.)

Lastly, the Amended Complaint relies upon, and purports to quote from, several Siemens AG public statements, SEC filings, and conference call transcripts. (*E.g.*, Am. Compl. ¶¶ 58, 66, 70, 72, 73, 78, 79.)  For ease of reference, these documents are attached as exhibits to the McClung Declaration.  To further assist the Court with the evaluation of these public statements, Siemens AG appends as Exhibit A to this memorandum a chart cataloguing the statements Plaintiff alleges Defendants made concerning Siemens AG's future business prospects as well as Siemens AG's related cautionary statements regarding its future business prospects.

## ARGUMENT

As a general matter, "[t]o survive a motion to dismiss, a complaint must plead enough facts to state a claim to relief that is plausible on its face." *ECA & Local 134 IBEW Joint Pension Trust of Chicago v. JP Morgan Chase Co.*, 553 F.3d 187, 196 (2d Cir. 2009) (citing, *inter alia*, *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)) (quotations omitted); Fed. R.

Civ. P. 8(a)(2). Claims based on violations of Section 10(b) of Exchange Act are also subject to more stringent pleading standards. This is because "[p]rivate securities fraud actions, … if not adequately contained, can be employed abusively to impose substantial costs on companies and individuals whose conduct conforms to the law." *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 313 (2007). Accordingly, "[t]he securities laws do not provide a cause of action premised upon a hindsight review of faulty predictions as to business success." *City of Sterling Heights Police & Fire Ret. Sys. v. Vodafone Group PLC*, 655 F. Supp. 2d 262, 268 (S.D.N.Y. 2009). And a "plaintiff cannot base securities fraud claims on speculation and conclusory allegations." *Kalnit v. Eichler*, 264 F.3d 131, 142 (2d Cir. 2001). Instead, "[a]ny complaint alleging securities fraud must satisfy the heightened pleading requirements of the PSLRA and Fed. R. Civ. P. 9(b) by stating with particularity the circumstances constituting fraud." *ECA*, 553 F.3d at 196. Plaintiff fails to meet these requirements.

## I. PLAINTIFF FAILS TO PLEAD PARTICULARIZED FACTS GIVING RISE TO A STRONG INFERENCE OF SCIENTER

The PSLRA requires Plaintiff to "state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind." 15 U.S.C. § 78u-4(b)(2). "The requisite state of mind in a Section 10(b) and Rule 10b-5 action is an intent to deceive, manipulate, or defraud." *ECA*, 553 F.3d at 198 (quotations and citations omitted). To qualify as a "strong inference," an "inference of scienter must be more than merely plausible or reasonable — it must be cogent and at least as compelling as any opposing inference of nonfraudulent intent." *Tellabs*, 551 U.S. at 314. "When the defendant is a corporate entity, this means that the pleaded facts must create a strong inference that someone whose intent could be imputed to the corporation acted with the requisite scienter." *Teamsters Local 445 Freight Div. Pension Fund v. Dynex Capital Inc.*, 531 F.3d 190, 195 (2d Cir. 2008). In this Circuit, "[t]he requisite scienter

can be established by alleging facts to show either (1) that defendants had the motive and opportunity to commit fraud, or (2) strong circumstantial evidence of conscious misbehavior or recklessness." *ECA*, 553 F.3d at 198.

Here, the Amended Complaint lacks facts giving rise to any inference of scienter — much less a strong inference — for two reasons. ***First***, Plaintiff fails to allege a plausible motive. ***Second***, the Amended Complaint pleads no strong circumstantial indications of the requisite intent such as by identifying contemporaneous internal reports that specifically contradict the challenged corporate statements.

### A.     The Amended Complaint Fails To Allege Motive

To raise a strong inference of scienter through "motive and opportunity" to defraud, a plaintiff must allege that defendants "benefited in some concrete and personal way from the purported fraud." *Novak v. Kasaks*, 216 F.3d 300, 307-08 (2d Cir. 2000). "Motives that are common to most corporate officers, such as the desire for the corporation to appear profitable and the desire to keep stock prices high to increase officer compensation, do not constitute 'motive' for purposes of this inquiry." *ECA*, 553 F.3d at 198; *Acito v. IMCERA Group, Inc.*, 47 F.3d 47, 54 (2d Cir. 1995) ("If scienter could be pleaded on that basis alone, virtually every company … that experiences a downturn in stock price could be forced to defend securities fraud actions."). Plaintiff has not properly alleged any motive beyond that which is common to corporate officers and corporations.

Plaintiff's allegation that certain Siemens AG officers or directors sold Company stock in late 2007 (at the beginning of the putative class period), (Am. Compl. ¶ 118), does not approach raising a strong inference of fraudulent intent because Plaintiff has "failed to establish that [the] stock sales were 'unusual.'" *Acito*, 47 F.3d at 54. Plaintiff merely lists some supposed stock sales during the class period by persons affiliated with Siemens AG and improperly neglects to

7

put these sales in context of those persons' overall holdings or prior trading activity.  *See In re*

*Keyspan Corp. Sec. Litig.*, 383 F. Supp. 2d 358, 382 (E.D.N.Y. 2003) ("[P]laintiffs do not

adequately plead that defendants, individually or collectively, sold a large percentage of their

total shares; large dollar amounts, standing alone, typically do not suffice to establish motive.").

        For instance, Plaintiff omits the fact that five of the seven Siemens personnel alleged to

have made sales in late 2007 left the Company on December 31, 2007, and a sixth's term on the

Supervisory Board of the Company expired in January 2008.  These persons thus had no ability

to perpetuate a fraudulent scheme during the putative class period.  The Company announced

these individuals' departures on November 28, 2007 in its Form 20-F.  (Am. Compl. ¶ 66

(referring to Nov. 28, 2007 Form 20-F); Ex. 4 at 93, 96 (Form 20-F filed with SEC on Nov. 28,

2007).)  And Plaintiff fails to account for the fact that the cited sales were made in line with the

executives' established options plan, which is not "unusual."  *See In re Bristol-Myers Squibb*

*Sec. Litig.*, 312 F. Supp. 2d 549, 561 (S.D.N.Y. 2004) (plaintiffs failed to carry their burden of

demonstrating individuals' stock transactions were unusual where individuals' trading was

"undertaken primarily to make payments required for the exercise of stock options or to pay

taxes"); Ex. 15 (Siemens AG Directors' Dealings) (*available at* http://tinyurl.com/25ddxrg); Am.

Compl. ¶ 118.

        As for Joe Kaeser, the only Defendant that Plaintiff claims made sales during the class

period, Plaintiff omits the fact that Mr. Kaeser made several ***purchases*** of Siemens AG stock

during the time Plaintiff alleges the stock price was artificially inflated.  While Mr. Kaeser sold

4,714 shares on November 21, 2007, he purchased a total of 3,000 shares of Siemens AG during

the putative class period in late January and early February 2008.  (Ex. 15 (Siemens AG

Directors' Dealings).)  In fact, Mr. Kaeser's purchases came right after Plaintiff says Siemens

AG made misrepresentations to the marketplace on January 24, 2008.  (Am. Compl. ¶¶ 6, 72-77.)  This impeaches Plaintiff's theory because such purchases — if made in connection with a scheme to defraud — would have "defie[d] economic reason."  *Kalnit v. Eichler*, 264 F.3d 131, 140 (2d Cir. 2001) (quotations omitted).

In addition, any putative motive is further contradicted by the fact that all of the alleged sales of Siemens AG securities by its officers and directors, including Mr. Kaeser, occurred on or before December 10, 2007, over four months before the Company's negative announcement, and prior to many of the Company's supposed misstatements.  *See City of Brockton Ret. Sys. v. Shaw Group Inc.*, 540 F. Supp. 2d 464, 475 (S.D.N.Y. 2008) ("The 10-plus week gap between the defendants' sales and the Company's disclosure of accounting problems is not strongly suspicious."); *In re AstraZeneca Sec. Litig.*, 559 F. Supp. 2d 453, 468-69 (S.D.N.Y. 2008) (determining that plaintiffs' "theory of insider selling as motive" based on sales occurring early in the putative class period "is effectively negated by what occurred later" in the class period when the company chairman and its CFO did not make any sales despite further misrepresentations allegedly being made, and concluding that "the entire insider trading motive theory must be disregarded"), *aff'd*, 334 Fed. Appx. 404, 406-07 (2d Cir. 2009) (stating plaintiffs' theory of motive was "unpersuasive for the reasons stated by that district court"); *see also Keyspan*, 383 F. Supp. 2d at 385 ("[T]he sales pre-date all of the alleged false statements in 2001, and thus provide no suggestion of improper motives regarding those statements.").

Notably, Siemens AG's CEO, Peter Löscher, did not sell shares during the putative class period, at all, but rather purchased 50,000 Siemens AG shares on January 28, 2008, just days after the Amended Complaint alleges he overstated Siemens AG's prospects in a January 24, 2008 earnings release.  (Am. Compl. ¶¶ 6, 72, 73; Ex. 15 (Siemens AG Directors' Dealings).)

The absence of any unusual stock sales by Mr. Löscher, who is the individual alleged to have made most of the supposedly fraudulent statements during the class period, weighs heavily against an inference of scienter.  *See Acito*, 47 F.3d at 54 ("The fact that the other defendants did not sell their shares during the relevant class period undermines plaintiffs' claim that defendants delayed notifying the public…."); *Keyspan*, 383 F. Supp. 2d at 383-84 (finding fact that the CEO did not sell any shares during time period in question was "significant" and a factor that "weigh[s] against an inference of scienter").  In fact, Mr. Löscher's substantial purchase during the class period squarely contradicts any inference of fraudulent intent.  *See, e.g.*, *Bristol-Myers Squibb.*, 312 F. Supp. 2d at 561 (stating that senior officers' increase in holdings is "a fact wholly inconsistent with fraudulent intent"); *see also Avon Pension Fund v. GlaxoSmithKlinePLC*, 343 Fed. Appx. 671, 673 (2d Cir. 2009) (determining that allegations of insider trading did not show motive to defraud where individual defendants increased their net holdings of stock during the class period).

What is more, the alleged fraud makes no sense in light of Siemens AG's share buyback during the putative class period.  On November 8, 2007 (the start of the putative class period), Siemens AG announced a very large share buyback program in an earnings release about which Plaintiff complains.  (Am. Compl. ¶ 62 (referring to share buyback program); Ex. 2 (Form 6-K dated Nov. 8, 2007).)  Between January 28, 2008 and March 14, 2008 — when Plaintiff's says the price of Siemens AG equity securities was artificially inflated — Siemens AG spent well over a €1 billion to purchase over 16.5 million shares of Company stock.  (Am. Compl. ¶¶ 119-22 (alleging artificial inflation); Ex. 16 (Siemens AG "Share Buyback Program") (*available at* http://tinyurl.com/26jkbzw), Ex. 11 (Form 6-K dated Mar. 17, 2008).)  If Defendants knew the price of Siemens AG stock was inflated, the Company would not have spent so much money

buying it.  Accordingly, because Plaintiff's "view of the facts defies economic reason, it does not yield a reasonable inference of fraudulent intent." *Kalnit*, 264 F.3d at 140-41 (quotations and alterations omitted); *see also Shields v. Citytrust Bancorp, Inc.*, 25 F.3d 1124, 1130 (2d Cir. 1994) ("In looking for a sufficient allegation of motive, we assume that the defendant is acting in his or her informed economic self-interest.").

Simply put, Siemens' share buyback weighs heavily against a finding of scienter. *See Plumbers & Pipefitters Local Union Pension Fund v. Zimmer Holdings, Inc.*, 673 F. Supp. 2d 718, 749 (S.D. Ind. 2009) ("Stock repurchase programs actually ***negate*** a finding of scienter.") (emphasis in original and quotations omitted); *In re Tibco Software, Inc. Sec. Litig.*, No. C 05-2146 SBA, 2006 WL 1469654, at *21 (N.D. Cal. May 25, 2006) (same); *Morse v. McWhorter*, 200 F. Supp. 2d 853, 898 (M.D. Tenn. 2000) ("A company's decision to reinvest in its own stock undermines an inference of scienter because ***it presumably would make no sense to purchase that stock if defendants knew the prices to be inflated***.") (quotations omitted), *vacated on other grounds*, 290 F.3d 795 (6th Cir. 2002); *see also Plumbers & Steamfitters Local 773 Pension Fund v. Can. Imperial Bank of Commerce*, --- F. Supp. 2d ---, 2010 WL 961596, at *9 (S.D.N.Y. Mar. 17, 2010) ("*CIBC*") (noting that the complaint did not allege that any defendant benefited in a concrete and personal way from the purported fraud where the company defendant purchased approximately $300 million of its own stock during the class period).

Lastly, the timing of the March 17, 2008 negative earnings announcement, which Siemens AG made six weeks before its expected April 30, 2008 earnings release for the quarter ended March 31, 2008, (Am. Compl. ¶ 78), further negates any inference of scienter. *See Rombach v. Chang*, 355 F.3d 164, 176 (2d Cir. 2004) ("[T]he allegation that defendants behaved recklessly is weakened by their disclosure of certain financial problems prior to the deadline to

11

file [the company's] financial statements."); *CIBC*, 2010 WL 961596, at *12 (stating that pre-announcement of write-downs expected in two quarterly releases is a "fact that contradicts an inference of scienter"); *Steinberg v. Ericsson LM Tel. Co.*, No. 07-cv-9615 (RPP), 2008 WL 5170640, at *12 n.6 (S.D.N.Y. Dec. 10, 2008) ("That Defendants 'pre-announced' the third-quarter results — voluntarily disclosed Ericsson's financial results earlier than was required — undermines any claim of motive.") (citation omitted); *In re Nokia Oyj (Nokia Corp.) Sec. Litig.*, 423 F. Supp. 2d 364, 407 n.16 (S.D.N.Y. 2006) ("[A]ny early disclosure of negative results tends, at least to some degree, to disprove alleged recklessness.").

> **B.    The Amended Complaint Lacks Strong Circumstantial Indications Of Fraudulent Intent**

In addition to failing to plead any plausible motive, the Amended Complaint also does not satisfy the "circumstantial allegations" prong for pleading scienter.  While a plaintiff may plead scienter by alleging facts to show strong circumstantial indications of conscious misbehavior or recklessness, "the strength of the circumstantial allegations must be correspondingly greater if there is no motive."  *ECA*, 553 F.3d at 199 (quotations omitted). Although Plaintiff makes some references to the corruption scandal concerning conduct that allegedly occurred before the class period, Plaintiff has not alleged any conscious misbehavior in connection with the purported fraud on which Plaintiff's claims are based.  In the absence of alleged conscious misbehavior, a plaintiff can attempt to demonstrate recklessness by "specifically alleg[ing] defendants' knowledge of facts or access to information contradicting their public statements." *Novak*, 216 F.3d at 308.

Plaintiff has not met this standard.  Nothing in the Amended Complaint suggests Defendants had knowledge of facts contradicting their public statements at the time they were made — a fatal omission. *In re Keyspan Corporation Securities Litigation* is instructive:

> Although the complaint is long on details of the mounting difficulties at Roy Kay, it is short on facts suggesting that any of the defendants had contemporaneous knowledge of these difficulties.  Without such facts, ***the complaint does nothing more than allege that because defendants ultimately disclosed negative information about Roy Kay, they must have been aware of this information earlier.  Such allegations, of course, constitute the fraud by hindsight formula that courts have rejected.***

383 F. Supp. 2d at 386.

To be sure, Plaintiff generally alleges that the Individual Defendants had knowledge of the relevant facts "[b]ecause of their executive and managerial positions."  (Am. Compl. ¶ 100.) But it is well settled that rote allegations such as these carry no weight.  *See, e.g.*, *Keyspan*, 383 F. Supp. 2d at 387 ("allegations that defendants must be charged with knowledge" "by virtue of their high-level positions" are insufficient); *CIBC*, 2010 WL 961596, at *10 ("Courts in this Circuit have long held that accusations founded on nothing more than a defendant's corporate position are entitled to no weight."); *see also Campo v. Sears Holding Corp.*, No. 09-3589-cv, 2010 WL 1292329, at *4 n.5 (2d Cir. Apr. 6, 2010) (rejecting plaintiffs' contention that relevant knowledge could be presumed by virtue of defendants' positions as "high-level executives and directors").  And it is not enough for Plaintiff to allege, in perfunctory fashion, access to "adverse" information.  (Am. Compl. ¶¶ 102, 103.)  Instead, "where plaintiffs contend defendants had access to contrary facts, they must specifically identify the reports or statements containing this information."  *Teamsters Local 445 Freight Div. Pension Fund v. Dynex Capital Inc.*, 531 F.3d 190, 196 (2d Cir. 2008) (quotations omitted); *see also Campo*, 2010 WL 1292329, at *4 n.6 (determining cited reports were inadequate to serve as a basis for strong inference of scienter on the part of individual defendants and company defendant).  Plaintiff does not do so.

Although allegations attributed in the Amended Complaint to four "confidential witnesses" describe problems with the Company's "Legacy Projects," (Am. Compl. ¶¶ 42-53), these allegations do not yield a strong inference that the statements about which Plaintiff

complains were made with fraudulent intent.  As an initial matter, the Second Circuit has been

skeptical of the use of confidential witness allegations to establish a strong inference of scienter.

*See Campo*, 2010 WL 1292329, at *3 n.4 ("The anonymity of the sources of plaintiffs' factual

allegations concerning scienter frustrates the requirement, announced in *Tellabs*, that a court

weigh competing inferences to determine whether a complaint gives rise to an inference of

scienter that is 'cogent and at least as compelling as any opposing inference of nonfraudulent

intent'") (quoting *Tellabs* and citing *Higginbotham v. Baxter Int'l Inc.*, 495 F.3d 753, 757 (7th

Cir. 2007)).[2]   What is more, the confidential witness allegations do not provide any specific

information suggesting Siemens AG's top executives knew the Company's statements about

expected revenue or earnings were false when made.  Nor do any of the confidential witnesses

purport to have provided, or even to be aware of, specific contradictory information given to

those in charge of Siemens AG's financial reporting or accounting functions.  While they suggest

Siemens was having trouble managing some of its major projects, the confidential witnesses

simply do not suggest the Company engaged in a fraudulent scheme.  *Cf. In re Sec. Capital*

*Assurance, Ltd. Sec. Litig.*, No. 07 Civ. 11086 (DAB), 2010 WL 1372688, at *27 (S.D.N.Y. Mar.

31 2010) ("Mere allegations of mismanagement do not state a claim for securities fraud.").

    For instance, Plaintiff does not adequately allege that any of the reports purportedly

generated by Siemens concerning major projects were provided to senior executives at the

Company at the time the alleged misstatements were made, nor that such reports contradicted the

Company's ability to achieve its financial projections.  Instead, the Amended Complaint vaguely

---

[2]     Notably, *Higginbotham* held that the "upshot" of *Tellabs* is that courts "must discount
allegations that the complaint attributes" to confidential witnesses.  495 F.3d at 756.  This is
because "***[i]t is hard to see how information from anonymous sources could be deemed
'compelling' or how [the court] could take account of plausible opposing inferences***.  Perhaps
th[e] confidential sources have axes to grind.  Perhaps they are lying.  Perhaps they don't even
exist." *Id.* at 757.

states that certain reports could be monitored by "Company personnel in Germany."   (Am. Compl. ¶ 112.)   But Siemens has thousands of employees in Germany.   And while the Amended Complaint does state that the "Individual Defendants routinely received detailed reports about the on-going status of Siemens' Legacy Projects," this general allegation is not supported and does not raise an inference of scienter.   *See, e.g.*, *CIBC*, 2010 WL 961596, at *9 ("Plaintiffs should, but do not, provide specific instances in which Defendants received information that was contrary to their public declarations.").   Notably, although confidential witness allegations refer to "Field Action Reviews," an "SAP system," and "Risk and Opportunity Reports," which supposedly contained information about project problems, (Am. Compl. ¶¶ 110, 112-13), these allegations are insufficient because the confidential witnesses do not claim to have "knowledge of whether [top executives] actually accessed or reviewed the reports."   *Campo*, 2010 WL 1292329, at *3.   Put simply, the confidential witnesses were low-level employees or mid-level managers who do not claim to have knowledge of information provided to Siemens AG's top executives, and, therefore, their allegations are not probative of scienter.   *See, e.g.*, *Steinberg*, 2008 WL 5170640, at *13 ("Here, the Complaint fails to identify any reports Defendants Svanberg or Sundstrom saw, or any conversations in which they were provided information, that was inconsistent in any way with their public statements.   Indeed, all three of Plaintiff's confidential sources were mid-level managers in the United States who claim no contacts or communications with Defendants, or even with Ericsson's European corporate headquarters."). Further, according to the Amended Complaint, Confidential Witness 1 left the Company in 2006 — well before Mr. Löscher's arrival or any of the key events otherwise described.   (Am. Compl. ¶ 30.)

Moreover, the reports cited in the Amended Complaint do not purport to show the Company's prospective earnings, revenue, profit margins or growth, which are the subjects of the statements about which Plaintiff complains.   Although Plaintiff contends the reports demonstrate the Company was experiencing problems with various long-term projects, this does not mean that such problems (i) were not, to the extent known, already factored into the Company's projections or financial statements; (ii) were, at the time, material to the Company's financials; (iii) were reported contemporaneously to top executives, either at all or on a sufficient scale to suggest their statements would be misleading; or (iv) were ignored by persons with authority over the Company's public statements.   Plaintiff's deficient allegations here are similar to those at issue in *Gildan Activewear, Inc. Securities Litigation*, in which the court dismissed plaintiffs' Section 10(b) claims:

> Plaintiffs' primary contention supporting an inference of recklessness is that Gildan was experiencing significant problems at its Dominican Republic plant that made it "impossible" or "patently unrealistic" for it to achieve its projected earnings, and that the Company's internal modeling should have made them aware of that fact.   However, ***Plaintiffs do not allege any facts to suggest what those models revealed at the time, or what effect the models might have had on Gildan's financial results***. Thus, while it would be troubling if the Company had been aware that the problems at the Dominican facility contradicted their bullish comments about projected earnings, ***Plaintiffs have failed to allege with the requisite specificity exactly what contemporaneous data Defendants had, even to be able to suggest such knowledge***.

636 F. Supp. 2d 261, 273 (S.D.N.Y. 2009) (citations omitted).   As in *Gildan*, Plaintiff's allegations concerning project problems do not plead recklessness or knowledge that may be imputed to Siemens AG.  *See also In re PXRE Group, Ltd. Sec. Litig.*, 600 F. Supp. 2d 510, 547 (S.D.N.Y. 2009) ("In sum, the Court finds that the vast majority of the factual allegations contained in Plaintiff's [complaint] suffer from a similar defect.   Merely alleging facts suggesting that Defendants knew that river flooding was causing extensive damage in New

Orleans does not raise the inference that Defendants knew, or were reckless in not knowing, that Defendants' internal methods and proprietary software all failed to properly account for river flooding."), *aff'd*, 357 Fed. Appx. 393 (2d Cir. 2009).

Furthermore, Plaintiff's general and conclusory allegations that Defendants had a duty to monitor information related to the long-term projects do not raise an inference of scienter because "[e]ven an egregious failure to gather information will not establish 10b-5 liability as long as the defendants did not deliberately shut their eyes to the facts." *In re Bayou Hedge Fund Litig.*, 534 F. Supp. 2d 405, 415 (S.D.N.Y. 2007), *aff'd*, 573 F.3d 98 (2d Cir. 2009). While, if read charitably to Plaintiff, the Amended Complaint "might suggest that Defendants should have been more alert and more skeptical, nothing alleged indicates that management was promoting a fraud." *PXRE*, 600 F. Supp. 2d at 547 (finding plaintiff failed to adequately plead scienter under the "conscious misbehavior and recklessness" prong).

Lastly, Plaintiff's bald allegations that the Company failed to adhere to accounting rules do not support a strong inference of scienter. *Stevelman v. Alias Research Inc.*, 174 F.3d 79, 84 (2d Cir. 1999) ("Allegations of a violation of GAAP provisions or SEC regulations, without corresponding fraudulent intent, are not sufficient to state a securities fraud claim."); *Keyspan*, 383 F. Supp. 2d at 389 (similar). The Amended Complaint provides no facts from which to infer a nefarious intent to violate the accounting rules; for example, there are no allegations that senior financial officers directed that accounting rules be ignored or circumvented. *Cf. Malin v. XL Capital, Ltd.*, 499 F. Supp. 2d 117, 163 (D. Conn. 2007) ("There is no showing here, as there must be, that Defendants intentionally and deliberately refused to comply with GAAP or follow their own internal accounting policies.") (quotations omitted), *aff'd*, 312 Fed. Appx. 400 (2d Cir. 2009). And, any putative inferences of fraudulent intent are impeached by the speed with which

17

Siemens released its negative earnings announcement — before the financial reporting period ended — and the lack of a motive.

### C.      Inferences Of Nonfraudulent Intent Are More Compelling

The Amended Complaint's manifest failure to plead facts raising a plausible inference of scienter means that Plaintiff has no hope of meeting the *Tellabs* test of raising an inference of scienter that is at least as compelling as inferences of nonfraudulent intent.  The complete absence of a motive to deceive, together with the fact that Siemens AG made its negative earnings announcement weeks early, buttress the far more cogent conclusion that Siemens AG did not defraud the marketplace.

What is more, the internal review of major projects that Siemens AG conducted as it changed its organizational structure and new top executives integrated into the Company is good business.  It does not indicate fraud; rather, it is a method by which companies learn and improve their business practices.  *See Slayton v. Am. Express Co.*, 604 F.3d 758, 777 (2d. Cir. 2010) ("Ordering an investigation" was "a prudent course of action that weakens rather than strengthens an inference of scienter.") (quotations omitted).   Furthermore, contrary to any scheme to defraud, on January 24, 2008, in the very public statement Plaintiff claims was fraudulent, Siemens AG disclosed that it was evaluating its projects and expressed caution about the potential impact on the next quarter's results.  (Ex. 8 at 3 (Jan. 24, 2008 Earnings Call Tr.) ("[T]he performance of the Fossil Power Solutions business is simply unacceptable.  We have changed our management team.  Wolfgang Dehen will review the challenges, get to the root of it and sort it out."); *id.* at 7 ("[S]ince the progress on some projects is in the 30% to 50% stages for some of those I'd be cautious for fiscal Q2.  And then we should exactly know what needs to be done and get it over with.").)   That Siemens AG was not clairvoyant and its initial projections later needed to be modified after further analysis and receipt of additional information, again,

does not amount to fraud. *See, e.g.*, *Acito v. IMCERA Group, Inc.*, 47 F.3d 47, 53 (2d Cir. 1995) ("[D]efendants' lack of clairvoyance simply does not constitute securities fraud.").

To be sure, one might theorize that Siemens may have disclosed a negative impact on its earnings even more promptly if lower level employees were quicker to (i) understand that projections would not be reached, and (ii) pass that information up the ladder to top-level executives. But such assumptions do not support a Section 10(b) claim. *See Dynex*, 531 F.3d at 197 (determining that plaintiff failed to allege facts that raised an inference of fraudulent intent was at least as compelling as the competing inference that defendant's "statements … were the result of merely careless mistakes at the management level based on false information fed it from below.") (quotations and citation omitted). Moreover, "[t]aking the time necessary to get things right is both proper and lawful." *Higginbotham,* 495 F.3d at 761.

At bottom, Siemens' business review revealed financial results worse than what the market may have expected. Although lawsuits commonly follow such an event, it does not translate into a viable securities fraud claim — and Plaintiff has not alleged facts sufficient to hold otherwise. *See ECA*, 553 F.3d at 201 (citing policy against forcing every company that experiences a downturn in stock price to defend against securities fraud actions); *DiLeo v. Ernst & Young*, 901 F.2d 624, 627 (7th Cir. 1990) ("Securities laws do not guarantee sound business practices and do not protect investors against reverses. … Investors seeking relief under Rule 10b-5 have to distinguish their situation from that of many others who are adversely affected by business reverses.").

## II.  THE ALLEGED MISSTATEMENTS ARE PROTECTED BY THE SAFE HARBOR FOR FORWARD-LOOKING STATEMENTS

The PSLRA, 15 U.S.C. § 78u-5(c), "creates a 'safe harbor' for forward-looking statements, even those that, with the benefit of hindsight, turn out to be untrue." *In re Aegon*

*N.V. Sec. Litig.*, No. 03 Civ. 0603 (RWS), 2004 WL 1415973, at \*6 (S.D.N.Y. June 23, 2004).

Similarly, the judicially created bespeaks caution doctrine removes liability for statements accompanied by sufficiently cautionary language. *See, e.g.*, *Halperin v. eBanker USA.com, Inc.*, 295 F.3d 352, 357 (2d Cir. 2002) ("Certain alleged misrepresentations in a stock offering are immaterial as a matter of law because it cannot be said that any reasonable investor could consider them important in light of adequate cautionary language set out in the same offering.").

The statements about which Plaintiff complains in the Amended Complaint (apart from those at issue in Plaintiff's accounting claims) are protected forward-looking statements. The Amended Complaint focuses on two statements: (i) the November 8, 2007 statement: "we expect more quality growth in fiscal 2008. Specifically, we anticipate volume growth that is twice as high as the rate of global GDP growth, and that our operating profit will grow at least twice as fast as our volume," and (ii) the January 24, 2008 statement: "We confirm our outlook for the full fiscal year: growing revenues at least twice as fast as global GDP and growing Group Profit from Operations at least twice as fast as our revenues." (Am. Compl. ¶¶ 5, 6, 59, 72.) Plaintiff also contends that Siemens AG's earnings outlook and profit margin targets were misleading. (Am. Compl. ¶¶ 58, 63, 73, 103; *see* appendix cataloguing the forward-looking statements and corresponding cautionary language attached as Exhibit A.) As set forth below, the challenged statements are not actionable.[3]

---

[3]     To the extent Plaintiff seeks to state an independent claim based on statements allegedly made by Peter Löscher and quoted in news articles on or about January 13, 2008, such a claim is not viable for the reasons set forth in this Section II because Mr. Löscher's statements reiterate prior protected forward-looking statements about expectations for the Company's growth, revenue and profits. (Am. Compl. ¶ 68.) In addition, statements that "the company is in great shape" and "business is booming," (Am. Compl. ¶ 70), are expressions of non-actionable corporate optimism. *E.g.*, *Rombach v. Chang*, 355 F.3d 164, 174 (2d Cir. 2004) ("[E]xpressions of puffery and corporate optimism do not give rise to securities violations."). Lastly, Plaintiff has not, and cannot, demonstrate the falsity of the statement "there is no profit warning," because

### A.    The Complained-of Statements Are Forward-Looking Statements Protected By The PSLRA

The safe harbor provision of the PSLRA provides that "in any private action arising under this chapter that is based on an untrue statement of a material fact or omission of a material fact necessary to make the statement not misleading, [an issuer or a person acting on behalf of an issuer] shall not be liable with respect to any forward-looking statement, whether written or oral." 15 U.S.C. § 78u-5(c)(1).  A statement is "forward-looking" if, *inter alia*, it is:

> (A) a statement containing a projection of revenues, income (including income loss), earnings (including earnings loss) per share, capital expenditures, dividends, capital structure, or other financial items;

> (B) a statement of the plans and objectives of management for future operations, including plans or objectives relating to the products or services of the issuer;

> (C) a statement of future economic performance, including any such statement contained in a discussion and analysis of financial condition by the management or in the results of operations included pursuant to the rules and regulations of the Commission; [or]

> (D) any statement of the assumptions underlying or relating to any statement described in subparagraph (A), (B), or (C).

15 U.S.C. § 78u-5(i)(1).   The challenged statements — statements about the Company's expected revenues, earnings, growth, margins and profit — fall squarely within this definition. *See, e.g.*, *Slayton*, 604 F.3d at 766-67 (finding statement about expected losses "fits comfortably" within parts (A) and (C)); *id.* at 769 (The "statement is plainly forward-looking — it projects results in the future."); *Aegon*, 2004 WL 1415973, at *11-12 (stating that earnings forecasts and growth expectations fall within the definition of forward-looking statements).

As a result, each of these statements is not actionable if *either* (1) Plaintiff "fails to prove that the forward-looking statement" "was made with actual knowledge" "that the statement was

---

there simply was no profit warning at the time of that statement in mid-January 2008.  (Am. Compl. ¶¶ 68, 70.)

false or misleading"; *or* (2) the forward-looking statement is "identified as a forward-looking statement, and is accompanied by meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the forward-looking statement." 15 U.S.C. § 78u-5(c).  While the PSLRA "safe harbor is written in the disjunctive," such that fraud claims based on forward-looking statements fail if either prong applies, *Slayton*, 604 F.3d at 766, ***both*** apply here.

> 1. **Plaintiff Fails To Plead Facts Giving Rise To A Strong Inference That The Forward-Looking Statements Were Made With Actual Knowledge They Were False**

The safe harbor's requirement that Plaintiff prove each forward-looking statement "was made with actual knowledge" imposes upon Plaintiff the heightened pleading requirements of the PSLRA.  Accordingly, a Plaintiff "must plead specific facts that support a strong inference that the Defendants had actual knowledge of the [forward-looking] statements' falsity; in the absence of such facts, the claims must be dismissed."  *Aegon*, 2004 WL 1415973, at *12.

The Second Circuit recently confirmed that this pleading requirement applies with force when it affirmed dismissal of a Section 10(b) claim for failure to satisfy the actual knowledge prong.  *Slayton*, 604 F.3d at 773-77.  In doing so, the Second Circuit posed the question as "whether the plaintiffs have stated with particularity facts giving rise to a strong inference that the defendants made the [forward-looking] statement with actual knowledge that it was false or misleading."  *Id.* at 775.  Thus, it is the same inquiry as pleading an intent to deceive with respect to statements of historical fact under 15 U.S.C. § 78u-4(b)(2), except liability attaches only upon a showing of knowing falsity.  *Id.* at 773.  That is, "plaintiffs must show more than recklessness – an objective inquiry – they must show actual subjective knowledge."  *Id.* at 776 n.9.

Plaintiff's allegations of scienter with respect to all forward-looking statements fail to demonstrate actual knowledge.  As in *Slayton*, Plaintiff has "not alleged any theory as to why the

defendants would knowingly mislead investors.  [Plaintiff has] not pleaded any facts supporting a motive to deceive." *Id.* at 776.  Plaintiff's failure to allege any viable motive is detailed in Section I.A.  And where Plaintiff does "not allege facts supporting a motive," its "circumstantial evidence of actual knowledge must be correspondingly greater." *Id.*  Here, the Amended Complaint is devoid of circumstantial allegations of actual knowledge as set forth in Section I.B. On top of that, *Slayton* instructs that the Company's audit of its major projects does not indicate an intent to deceive, but instead that the Company "was endeavoring in good faith to ascertain and disclosure future losses," which was "a prudent course of action that weakens rather than strengthens an inference of scienter." *Id.* at 777.  Finally, Plaintiff's boilerplate "no safe harbor" allegation of actual knowledge in paragraph 126 of the Amended Complaint comes nowhere near providing the "specific facts" that are required. *See, e.g., Aegon*, 2004 WL 1415973, at *12 (finding that forward-looking statements were "immunized" where "Plaintiffs only generally allege that the Defendants had actual knowledge of the alleged falsity of their statements"); *Fellman v. Electro Optical Systems Corp.*, No. 98 Civ. 6403 (LBS), 2000 WL 489713, at *4 (S.D.N.Y. Apr. 25, 2000) (similar).

     **2.**     **The Alleged Misstatements Are Not Actionable Because They Were Identified As Forward-Looking And Accompanied By Meaningful Cautionary Language**

Even if Plaintiff had sufficiently alleged actual knowledge, Plaintiff's non-accounting claims would still fail because the "meaningful cautionary statements" prong of the safe harbor also applies.  The safe harbor provision immunizes a forward-looking statement that is "identified as a forward-looking statement, and is accompanied by meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the forward-looking statement." 15 U.S.C. § 78u-5(c)(1)(A).

Siemens AG's filings with the SEC and conference call materials identified statements that were forward-looking. For example, Siemens AG's November 8, 2007 and January 24, 2008 earnings releases as well as the January 24, 2008 conference call presentation provided:

> This document contains forward-looking statements and information – that is, statements related to future, not past, events. These statements may be identified by words such as "expects," "looks forward to," "anticipates," "intends," "plans," "believes," "seeks," "estimates," "will" or words of similar meaning.

(Ex. A (Appendix of Forward-Looking Statements and Meaningful Cautionary Language).)

The statements Plaintiff challenges used typical words associated with forward-looking statements such as "will," "expect," "anticipate," "outlook" and "targeting," and are clearly statements about future events.  (*E.g.*, Am. Compl. ¶¶ 58 ("we'll exceed the current goals …"); 59 ("we expect more quality growth … we anticipate volume growth … and that our operating profit will grow …"), 72 ("We confirm our outlook …"); 73 ("We will grow our revenues … We will grow our Group profit …"); *id.* ("We are targeting a margin of …"; Ex. A.)  These cues, together with the "forward-looking statements" explanatory paragraphs in each of Siemens AG's SEC filings and conference call materials, identified the challenged statements as forward-looking.  *Slayton*, 604 F.3d at 769 ("The use of linguistic cues like 'we expect' or 'we believe,' when combined with an explanatory description of the company's intention to thereby designate a statement as forward-looking, generally should be sufficient to put the reader on notice that the company is making a forward-looking statement.").

Also, meaningful cautionary language accompanied each of the forward-looking statements.  Although Plaintiff avoids mentioning Siemens AG's risk disclosures as it selectively quotes from the Company's SEC filings, the "court shall consider any statement cited in the complaint and any cautionary statement accompanying the forward-looking statement, which are not subject to material dispute, cited by the defendant."  15 U.S.C. § 78u-5(e).  A review of the

risk disclosures demonstrates that the Company repeatedly warned that actual results may differ from those that were projected, and identified important factors that could cause a different outcome, as required by 15 U.S.C. § 78u-5(c)(1)(A).

For instance, Siemens AG's November 8, 2007 announcement provides the following cautionary language:

> This document contains forward-looking statements ... ***Such statements are based on our current expectations and certain assumptions, and are, therefore, subject to certain risks and uncertainties.*** A variety of factors, many of which are beyond Siemens' control, affect its operations, performance, business strategy and results and could cause the actual results, performance or achievements of Siemens worldwide to be materially different from any future results, performance or achievements that may be expressed or implied by such forward-looking statements. For us, particular uncertainties arise, among others, from: changes in general economic and business conditions (including margin developments in major business areas); the challenges of integrating major acquisitions and implementing joint ventures and other significant portfolio measures; changes in currency exchange rates and interest rates; introduction of competing products or technologies by other companies; lack of acceptance of new products or services by customers targeted by Siemens worldwide; changes in business strategy; the outcome of pending investigations and legal proceedings; our analysis of the potential impact of such matters on our financial statements; as well as various other factors. More detailed information about our risk factors is contained in Siemens' filings with the SEC, which are available on the Siemens website, www.siemens.com, and on the SEC's website, www.sec.gov. ***Should one or more of these risks or uncertainties materialize, or should underlying assumptions prove incorrect, actual results may vary materially from those described in the relevant forward-looking statement*** as expected, anticipated, intended, planned, believed, sought, estimated or projected.

(Ex. 2; Ex. A.)   Siemens AG's November 9, 2007 presentation and January 24, 2008 announcement and conference call materials contain similar cautionary language. (Exs. 3, 7-9; Ex. A.)

Moreover, the risk factors in Siemens AG's SEC filings, which the "forward-looking statements" paragraphs incorporated by reference, specifically disclosed the risks concerning the

Company's "Legacy Projects" that Plaintiff describes in the Amended Complaint.  (Am. Compl. ¶¶ 40-51.)  For example, prior to November 8, 2007 (the beginning of the putative class period), Siemens AG warned of potential cost overruns and other problems associated with its long-term contracts in its Form 20-F filed with the SEC on December 11, 2006:

> ***Our financial results and cash flows may be adversely affected by cost overruns or additional payment obligations particularly with respect to our long-term contracts:***  A majority of our operating Groups, including SBS, I&S, SBT, PG, PTD and TS perform a significant portion of their business, especially large projects, under long-term contracts that are awarded on a competitive bidding basis.  ***The profit margins realized on such fixed-priced contracts may vary from original estimates as a result of changes in costs and productivity over their term.  We sometimes bear the risk of quality problems, cost overruns or contractual penalties caused by unexpected technological problems, unforeseen developments at the project sites, performance problems with our subcontractors or other logistical difficulties.***  Certain of our multi-year contracts also contain demanding installation and maintenance requirements, in addition to other performance criteria relating to timing, unit cost requirements and compliance with government regulations, which, if not satisfied, could subject us to substantial contractual penalties, damages, non-payment and contract termination.  ***There can be no assurance that all of our fixed-priced contracts can be completed profitably.***

(Ex. 1 at 4-5 (emphasis in first sentence in original); Ex. A.)  Siemens AG included similar language in its Form 20-F filed with the SEC on November 28, 2007, prior to the challenged January 24, 2008 statements.  (*See* Ex. 4 at 6; Ex. A.)  And, as Siemens AG did in its November 8, 2007 announcement, in its January 24, 2008 statements, Siemens AG referred investors to the specific risks identified in its SEC filings such as the November 28, 2007 Form 20-F, and noted the audit that was then on-going.  (*See* Ex. 7-9; Ex. A.)

Siemens AG also warned about risks specifically associated with the inability to hire and retain qualified personnel such as engineers, another risk at issue in the Amended Complaint.  (Am. Compl ¶¶ 41-48.)  For example, Siemens AG highlighted its dependence on having qualified personnel in its Form 20-F filed with the SEC on December 11, 2006:

> ***We are dependent upon hiring and retaining highly qualified
> management and technical personnel:*** Competition for highly qualified
> management and technical personnel remains intense in the industries in
> which our business Groups operate.  In many of our business areas, we
> further intend to extend our service businesses significantly, for which we
> will need highly skilled employees.  ***Our future success depends in part
> on our continued ability to hire, assimilate and retain engineers and
> other qualified personnel.  There can be no assurance that we will
> continue to be successful in attracting and retaining highly qualified
> employees in the future and any inability to do so could have a material
> adverse effect on our business.***

(Ex. 1 at 6 (emphasis in first sentence in original); Ex. A.)  Siemens AG's November 28, 2007

Form 20-F contains similar language.  (Ex. 4 at 7; Ex. A.)

Lastly, Siemens warned about risks associated with supply costs and raw material prices,

on which Plaintiff focuses in paragraphs 49 and 50 of the Amended Complaint.  In this regard,

Siemens AG's Form 20-F filed with the SEC on December 11, 2006 highlighted the Company's

dependence on contracts for components and services:

> ***We are dependent upon the ability of third parties to deliver parts,
> components and services on time:***  We rely on third parties to supply us
> with parts, components and services.  Using third parties to manufacture,
> assemble and test our products reduces our control over manufacturing
> yields, quality assurance, product delivery schedules and costs.  The third
> parties that supply us with parts and components also have other
> customers and may not have sufficient capacity to meet all of their
> customers' needs, including ours, during periods of excess demand.
> Component supply delays can affect the performance of certain of our
> operating Groups.  Although we work closely with our suppliers to avoid
> supply-related problems, there can be no assurance that we will not
> encounter supply problems in the future or that we will be able to replace a
> supplier that is not able to meet our demand.  This risk is particularly
> evident in businesses with a very limited number of suppliers. Shortages
> and delays could materially harm our business.  ***Unanticipated increases
> in the price of components due to market shortages or other reasons
> could also adversely affect the performance of certain of our business
> Groups***.
>
> ***We may be adversely affected by rising raw material prices:***  Our
> operating Groups are exposed to fluctuations in energy and raw material
> prices.  In the recent past, oil, steel and copper prices in particular have
> increased on a worldwide basis.  ***If we are not able to compensate for or***

> *pass on our increased costs to customers, such price increases could*
> *have a material adverse impact on our financial results*.

(Ex. 1 at 6 (emphasis in first sentence in original); Ex. A.)  Siemens AG's November 28, 2007

Form 20-F contains similar language in the risk disclosures under the heading "Supply Chain

Management."  (Ex. 4 at 7; Ex. A.)

Thus, investors were provided meaningful cautionary language concerning the risks

about which Plaintiff complains, both before and during the putative class period.  As such,

Plaintiff's claims based on Defendants' forward-looking statements should be dismissed.  *See,*

*e.g.*, *In re Focus Media Holding Ltd. Litig.*, --- F. Supp. 2d ---, 2010 WL 1221881, at *5

(S.D.N.Y. Mar. 29, 2010) (determining that PSLRA safe harbor provision applied to protect

statements made in press release where SEC filings to which investors were referred by the press

release warned of risks concerning gross margins); *Aegon*, 2004 WL 1415973, at *12-14 (finding

company's statements related to earnings forecasts in press releases and Form 20-F were

protected under the PSLRA safe harbor, given the company's risk disclosures).

**B.      Siemens AG's Specific Risk Disclosures Render The Forward-Looking**
**Statements Immaterial Under The Bespeaks Caution Doctrine**

In addition to qualifying for protection under the statutory safe harbor, the forward-

looking statements are not actionable pursuant to the judicially-created bespeaks caution

doctrine, which "removes liability for statements accompanied by sufficiently cautionary

language." *In re Austl. & N.Z. Banking Group Ltd. Sec. Litig.*, No. 08 Civ. 11278 (DLC), 2009

WL 4823923, at *13 (S.D.N.Y. Dec. 14, 2009).  As described in Section II.A.2 above, the

Company detailed risks associated with its long-term contracts, engineering personnel, and

supply costs in its SEC filings before and during the putative class period.  (*See also* Ex. 1 at 4-6,

Ex. 4 at 6-7; Ex. A.)  These disclosures warned of the "specific contingency that lies at the heart

of the alleged misrepresentation[s]." *In re Austl. & N.Z. Banking Group*, 2009 WL 4823923, at

*14 (finding company's statements concerning expected revenue growth were not actionable under the bespeaks caution doctrine) (quotations and citation omitted).  Illustrating this point is that during the January 24, 2008 Earnings Conference Call, Siemens disclosed that review of its projects would continue into the second-quarter and expressed caution about the potential impact on second-quarter results.  (Ex. 8 at 3 (Jan. 24, 2008 Earnings Call Tr.) ("[T]he performance of the Fossil Power Solutions business is simply unacceptable.  We have changed our management team.  Wolfgang Dehen will review the challenges, get to the root of it and sort it out. … [There] is a program review which is ongoing in the Transportation division as well, which is now our Mobility division."); *id.* at 7 ("[S]ince the progress on some projects is in the 30% to 50% stages for some of those I'd be cautious for fiscal Q2.  And then we should exactly know what needs to be done and get it over with.").)

## III.     THE NEW ACCOUNTING CLAIMS ARE TIME-BARRED

### A.     Plaintiff's Accounting Claims Were Required To Be Brought Within Two Years Of Discovery Of The Facts Constituting The Violation

The statute of limitations applicable to claims brought under Section 10(b) of the Exchange Act provides that such claims must be brought within "2 years after the discovery of the facts constituting the violation [or] 5 years after such violation."  28 U.S.C. § 1658(b).  The Supreme Court recently expounded on the meaning of this limitations provision in *Merck & Co., Inc. v. Reynolds*; it held that the term "discovery," as used in the statute, "encompasses not only those facts the plaintiff actually knew, but also those facts a reasonably diligent plaintiff would have known."  130 S. Ct. 1784, 1796 (2010).  Accordingly, if a reasonable plaintiff should have discovered the facts constituting a securities fraud violation more than two years before the filing of the claim, then the claim should be dismissed as time-barred.

**B.** **A Reasonable Plaintiff Would Have Discovered The Facts Constituting The Alleged Accounting Violation More Than Two Years Prior To The Filing Of The Accounting Claims**

Plaintiff first asserted accounting claims on May 17, 2010, in the Amended Complaint. These accounting allegations themselves show that a reasonable plaintiff should have discovered the basis for the claims well before May 17, 2008, over two years prior to Plaintiff's filing of the Amended Complaint. Plaintiff's accounting claims are thus barred by 15 U.S.C. § 1658(b).

Plaintiff says that Defendants' supposed wrongful conduct was revealed to the market on March 17, 2008: "Defendants' prior misrepresentations and fraudulent conduct were disclosed and became apparent to the market" on March 17, 2008, two months before the relevant date, May 17, 2008. (Am. Compl. ¶ 119; *see also id.* at ¶¶ 121-22 (referring to the stock price drop on March 17, 2008 "when Defendants' prior misrepresentations and other fraudulent conduct was revealed"); *id.* at p. 30 ("The Truth Is Revealed").)

What is more, the Amended Complaint relies on March 2008 analyst reports that discussed Siemens AG's accounting practices. One report stated: "Siemens had undertaken €50m of engineering work without any contractual cover on the basis that the timetable was tight and the client was going to place the order. We have no problem with such commercial risks but we do have a problem with the accounting treatment. Siemens decided to capitalise these costs as inventory despite the lack of any firm order." (Am. Compl. ¶ 83; Ex. 13.) A second report said: "the charge announced today, especially the €600m in Power Generation division is likely to involve large elements of kitchen sink accounting." (Am. Compl. ¶ 83; Ex. 14.) Thus, the accounting practices Plaintiff challenges were disclosed and scrutinized in analysts reports published in March 2008.

Lastly, Plaintiff contends that Siemens AG's March 17, 2008 negative earnings announcement was itself an admission of alleged accounting irregularities that, nonetheless, were

not the basis of suit until over two years later. Specifically, the Amended Complaint bases the alleged accounting violations on a supposed inability to make reliable measurements or estimates, (*e.g.*, Am. Compl. ¶¶ 90-91), and claims "Defendants have effectively admitted, prior to and during the Class Period, Siemens was unable to reliably measure the costs of numerous Legacy Projects." (Am. Compl. ¶ 90.) Therefore, by Plaintiff's allegations, a reasonably diligent plaintiff would have known of the facts constituting Siemens AG's supposed accounting violations prior to May 17, 2008, because Siemens AG purportedly "effectively admitted" to accounting errors two months earlier.[4]

### C. The Newly-Added Accounting Fraud Claims Do Not Relate Back To The Original Complaint

Plaintiff cannot salvage its untimely accounting fraud claims by contending that they somehow relate back to the original Christine Johnson complaint because the accounting claims were not even mentioned in that pleading.

Federal Rule of Civil Procedure 15(c)(1)(B) allows an amended complaint to relate back to the date of the original complaint for statute of limitations purposes when "the amendment asserts a claim or defense that arose out of the conduct, transaction, or occurrence set out — or attempted to be set out — in the original pleading." The key question in determining whether an amended complaint relates back to the original complaint is "whether adequate notice of the matters raised in the amended pleading has been given to the opposing party within the statute of limitations by the general fact situation alleged in the original pleading." *In re Noah Educ. Holdings, Ltd. Sec. Litig.*, No. 08 Civ. 9203 (RJS), 2010 WL 1372709, at *8 (S.D.N.Y. Mar. 31, 2010) (internal quotations omitted) (quoting *Stevelman v. Alias Research Inc.*, 174 F.3d 79, 86-87 (2d Cir. 1999)). An amended complaint may relate back to the original complaint where the

---

[4] While Siemens AG flatly denies its accounting was wrong, what matters for purposes of this Motion is what Plaintiff alleges.

amended complaint merely makes the prior allegations more clear and precise.  *Slayton v. Am. Express Co.*, 460 F.3d 215, 228 (2d Cir. 2006).  "In contrast, even where an amended complaint tracks the legal theory of the first complaint, claims that are based on an entirely distinct set of factual allegations will not relate back."  *Id.* (quotations omitted).  Newly-added claims in an amended complaint may not relate back even where the allegations arise from the same SEC filings or public statements at issue in the original complaint.  *Noah*, 2010 WL 1372709, at *9 (dismissing new allegations as time-barred even though they concerned alleged misstatements made in same registration statement and prospectus at issue in the original complaint).

Here, Plaintiff's newly-added accounting fraud claims do not relate back to the original complaint because they involve a new and distinct theory of liability; they do not merely clarify Christine Johnson's prior allegations.  The original complaint focused on Siemens AG's supposed inability to achieve its projected financial performance without engaging in bribery; it makes no claim that Siemens AG improperly accounted for its long-term projects.  (Original Compl. ¶¶ 5, 63; Am. Compl. ¶¶ 3, 84-98.)  The original complaint does not refer to International Financial Reporting Standards or base any claims on Siemens AG's purported failure to prepare its financial statements in accordance with such standards, nor does it contend Siemens AG was unable to measure reliably the costs of its long-term projects.  Thus, the original complaint provided Siemens AG with no notice that Plaintiff would assert these new accounting claims, and such claims should be dismissed.  *See, e.g.*, *In re Alcatel Sec. Litig.* 382 F. Supp. 513, 528 (S.D.N.Y. 2005) (finding that allegations regarding alleged improper accounting for goodwill first raised in amended complaint were time barred and did not relate back to original complaint).

IV.    **PLAINTIFF CANNOT ASSERT CLAIMS ON BEHALF OF PURCHASERS OF SIEMENS AG'S COMMON SHARES ON THE FRANKFURT STOCK EXCHANGE**

The Amended Complaint asserts claims on behalf of those "who purchased Siemens' common shares on the Frankfurt Stock Exchange." (Am. Compl. ¶ 1.) These claims fail for two independent reasons. *First*, as the Supreme Court recently held, Section 10(b) does not extend extraterritorially to claims by purchasers of securities on a foreign exchange. *Second*, Plaintiff lacks standing to bring claims on behalf of such purchasers.

A.    **Purchasers Of Siemens AG's Common Shares On The Frankfurt Stock Exchange Are Foreclosed From Seeking Relief Under Section 10(b) Of The Exchange Act**

All claims brought on behalf of those who purchased Siemens AG's common shares on the Frankfurt Stock Exchange must be dismissed because Section 10(b) of the Exchange Act applies only to "transactions in securities listed on domestic exchanges, and domestic transactions in other securities." *Morrison v. Nat'l Austl. Bank Ltd.*, No. 08-1191, --- S. Ct. ---, 2010 WL 2518523, at *11 (June 24, 2010). That is, the reach of Section 10(b) is limited to transactions involving "the purchase or sale of a security listed on an American stock exchange, and the purchase or sale of any other security in the United States." *Id.* at *14.

The Amended Complaint purports to assert claims on behalf of "U.S. citizens or residents who purchased Siemens' common shares on the Frankfurt Stock Exchange." (Am. Compl. ¶ 1.) By definition, these transactions occurred abroad and do not involve securities listed on a domestic exchange. Claims based on those foreign transactions are thus squarely foreclosed by *Morrison*.

B.    **Plaintiff Lacks Standing To Bring Claims On Behalf Of Purchasers Of Siemens AG Common Shares On The Frankfurt Stock Exchange**

Furthermore, "Plaintiffs cannot assert class claims on behalf of purchasers of securities they themselves did not buy."  *King County, Wash. v. IKB Deutsche Industriebank AG*, No. 09-cv-8387 (SAS), 2010 WL 2010943, at *2 (S.D.N.Y. May 18, 2010).  Plaintiff SEIU alleges that it purchased Siemens AG ADRs.  (Am. Compl. ¶17.)  Plaintiff did not purchase other types of Siemens AG securities, particularly Siemens AG common shares traded on the Frankfurt Stock Exchange.  Nor does the Amended Complaint name any other plaintiff who alleges to have done so.  Accordingly, Plaintiff lacks standing to sue on behalf of purchasers of Siemens AG common shares on the Frankfurt Stock Exchange, and all claims based on the purchase of those securities should be dismissed.  This is so regardless of whether (i) the disposition of the merits of Plaintiff's claims might require the same result as the disposition of the merits of claims of purchasers of Siemens AG common shares, and (ii) Plaintiff has been appointed lead plaintiff and might be an adequate class representative.  *See King County*, 2010 WL 2010943, at *2 (dismissing class claims of purchasers of securities not purchased by any named plaintiff "regardless of whether the disposition of [plaintiff's] case necessarily requires the same result as the case of another.") (quotations omitted); *Abu Dhabi Commercial Bank v. Morgan Stanley & Co. Inc.*, 651 F. Supp. 2d 155, 175 (S.D.N.Y. 2009) ("Standing is a threshold question for any case brought before a federal court, regardless of whether plaintiffs bring the case as a class action.  While plaintiffs are correct that they may be deemed adequate class representatives for claims based on securities they did not purchase, one of the named plaintiffs must have purchased those securities.") (citations omitted).

**CONCLUSION**

For the reasons set forth above, Siemens AG respectfully requests that the Court grant

Siemens AG's motion to dismiss the Amended Complaint with prejudice.

Dated:  July 23, 2010                                  Respectfully submitted,


                                                       /s/ James P. Gillespie, P.C.

                                                       Thomas D. Yannucci, P.C.*
                                                       James P. Gillespie, P.C.
                                                       Brant W. Bishop, P.C.
                                                       Oreste P. McClung
                                                       KIRKLAND & ELLIS LLP
                                                       655 Fifteenth Street, N.W.
                                                       Washington, D.C.  20005
                                                       Telephone: (202) 879-5000
                                                       james.gillespie@kirkland.com
                                                       brant.bishop@kirkland.com
                                                       oreste.mcclung@kirkland.com

                                                       *pro hac vice application forthcoming

                                                       *Attorneys for Siemens AG*