UNITED STATES DISTRICT COURT                    <u>ONLINE PUBLICATION ONLY</u>
EASTERN DISTRICT OF NEW YORK
-------------------------------------------------------------X
                                              :
CHRISTINE JOHNSON, Individually and on        :
Behalf of All Others Similarly Situated,      :
                                              :    MEMORANDUM
                             Plaintiff,       :    <u>AND ORDER</u>
                                              :    09-CV-5310 (JG) (RER)
              -against-                        :
                                              :
SIEMENS AG,                                   :
                                              :
                             Defendant.       :
-------------------------------------------------------------X

A P P E A R A N C E S:

          ROBBINS GELLER RUDMAN & DOWD, LLP
          58 South Service Road, Suite 200
          Melville, New York 11747
          By:    David A. Rosenfeld
                 Samuel H. Rudman
          *Attorneys for Lead Plaintiff 1199 SEIU Greater New York Pension Fund*

          KIRKLAND & ELLIS, LLP
          655 Fifteenth Street, NW, Suite 1200
          Washington, DC 20005
          By:    Brant W. Bishop
                 James Philip Gillespie
          *Attorneys for Defendant Siemens AG*


JOHN GLEESON, United States District Judge:

          Lead plaintiff 1199 SEIU Greater New Pension Fund ("1199 SEIU") brings this

class action against Siemens AG ("Siemens"), Siemens' Chief Executive Officer ("CEO") and

President Peter Löscher, and Siemens' Chief Financial Officer ("CFO") and Executive Vice

President Joe Kaeser[1] pursuant to the Securities Exchange Act of 1934 (the "Exchange Act") and

---

[1]          Kaeser and Löscher are referred to as "individual defendants" in lead plaintiff's amended
complaint, Siemens' memorandum in support of its motion to dismiss, and lead plaintiff's opposition to the motion.
However, neither individual appears as a named defendant in the caption of the amended complaint. Perhaps for

Rule 23 of the Federal Rules of Civil Procedure on behalf of (i) all individuals who purchased

Siemens' American Depository Receipts ("ADRs") on the New York Stock Exchange ("NYSE")

between November 8, 2007 and March 17, 2008 (the "class period"), and (ii) all United States

citizens or residents who purchased Siemens' common shares on the Frankfurt Stock Exchange

("FSE") during the class period.[2]  Lead plaintiff alleges that Siemens violated § 10(b) of the

Exchange Act, 15 U.S.C. § 78j(b), and Rule 10b-5 promulgated thereunder, 17 C.F.R. § 240.10b-

5, by knowingly or recklessly disseminating or approving false statements about the financial

well-being of the company during the class period, which artificially inflated the prices of

Siemens' securities and induced class members to purchase those securities at the inflated prices.

Lead plaintiff asserts that the individual defendants, Löscher and Kaeser, are jointly and

severally liable as control persons pursuant to § 20(a) of the Exchange Act, 15 U.S.C. §78t(a),

for Siemens' alleged violations of § 10(b) and Rule 10b-5 by virtue of their positions with the

company and their ability to control both the statements and the actions of Siemens and its

employees.

Siemens moves to dismiss the amended complaint on four grounds.  First, it

argues that lead plaintiff has failed to allege scienter with the particularity required by the Private

Securities Litigation Reform Act ("PSLRA"), 15 U.S.C. § 78u-4(b)(2). Second, it contends that

lead plaintiff's non-accounting claims are not actionable pursuant to the PSLRA safe harbor for

this reason, the docket sheet reflects that on May 17, 2010, the case was terminated as to Kaeser and Löscher, apparently without objection.  On September 24, 2010, more than four months after the amended complaint was filed, lead plaintiff wrote in its memorandum opposing Siemen's motion to dismiss that Kaeser and Löscher "are being served pursuant to the Hague Convention."  Pl.'s Opp. Mot. Dismiss 14-15, July 23, 2010, ECF No. 25.  The record contains no indication that such service was ever effected.  Accordingly, it appears that Kaeser and Löscher have never been made parties to this action.  Nonetheless, for the purposes of this Memorandum and Order, I refer to these individuals as though they were defendants.

[2]         "Excluded from the Class are Defendants, members of the immediate family of each of the Defendants, any person, firm, trust, corporation, officer, director or other individual or entity in which any Defendant has a controlling interest or which is related to or affiliated with any of the Defendants, and the legal representatives, agents, affiliates, heirs, successors-in-interest or assigns of any such excluded party."  Am. Compl. at ¶ 22, May 17, 2010, ECF No. 21.

forward-looking statements, 15 U.S.C. § 78u-5(c), and the "bespeaks caution" doctrine. Third, Siemens argues that lead plaintiff's accounting claims are barred by the applicable two-year statute of limitations, 28 U.S.C. § 1658(b). Finally, it contends that lead plaintiff cannot bring claims on behalf of purchasers of Siemens AG common shares on the FSE because the Supreme Court's decision in *Morrison v. National Australia Bank Ltd.*, No. 08-1191, 130 S.Ct. 2869 (2010), forecloses these claims, and because lead plaintiff lacks standing to assert them.

For the reasons stated below, the motion to dismiss is granted. Lead plaintiff's claims under § 10(b) and Rule 10b-5 against Siemens are dismissed pursuant to Fed. R. Civ. P. 12(b)(6) for failure to state a claim, as the amended complaint fails to allege facts giving rise to a strong inference of scienter as required under the PSLRA. Lead plaintiff's claims under § 20(a) against Löscher and Kaeser are dismissed also pursuant to Rule 12(b)(6), because an individual defendant cannot be held liable as a control person in the absence of an alleged violation of § 10(b) or Rule 10b-5.

## BACKGROUND

A.    *Procedural Background*

This action was initiated on December 4, 2009 by plaintiff Christine Johnson, who filed a class action complaint against Siemens pursuant to § 10(b) of the Exchange Act on behalf of all persons who purchased or otherwise acquired Siemens securities between November 8, 2007 and April 30, 2008.[3] Johnson alleged that between those dates, Siemens falsely represented that it had cleaned up the effects of a years-long, corporation-wide bribery scandal that was the subject of criminal investigations in the United States, Germany and Italy beginning in January 2006. According to Johnson's complaint, between November 8, 2007 and

---

[3]    This period is longer than the class period defined in the amended complaint, which runs from November 8, 2007 to March 17, 2008.

April 30, 2008, Siemens announced optimistic earnings outlooks that fraudulently failed to account for the adverse effects of the bribery scandal and misrepresented the company's ability to meet its projected earnings estimates without engaging in illegal activity to secure contracts.

On February 17, 2010, I appointed 1199 SEIU – which purchased Siemens ADRs during the class period – as lead plaintiff, and on May 17, 2010, 1199 SEIU filed an amended complaint. The amended complaint redefined the class, shortened the class period, attempted to add Löscher and Kaeser as defendants, and revised the complaint's theories of liability. In the latter regard, the amended complaint posits that statements made by defendants during the class period about the company's financial prospects were fraudulent because they failed to account for severe problems plaguing numerous "legacy projects," long-term, fixed-price contracts awarded by Siemens on a competitive bidding basis. Asserting causes of action under Exchange Act §§ 10(b) and 20(a) and Rule 10b-5, the amended complaint seeks class certification pursuant to Fed. R. Civ. P. 23 and an award of damages to all class members, as well as reasonable costs and attorneys fees. Siemens filed its motion to dismiss on July 23, 2010. Oral argument was heard on the motion on November 19, 2010.

B.     *Factual Background*

1.     *The Defendants*

Siemens is an electrical engineering and electronics company that operates in approximately 190 countries and employs more than 400,000 people. ¶¶ 2, 34.[4] Throughout the class period, Löscher served as Siemens' CEO and President and as a member of the company's Managing Board. ¶ 19. The Managing Board is responsible for managing the company, preparing its quarterly and half-yearly reports, and overseeing its internal policies and legal

---

[4]     All citations in the form "¶ __" are to the amended complaint. Unless otherwise noted, where citations to the amended complaint are made, the facts and statements of law in this memorandum and opinion are as alleged by lead plaintiff and do not represent the findings of the court.

compliance.  *Id*.  Throughout the class period, Kaeser was also a member of the Managing Board and served as CFO and Executive Vice President of Siemens.  ¶ 20.  Both Löscher and Kaeser signed Siemens' fiscal 2007 Form 20-F, which was filed with the SEC during the class period.[5] ¶¶ 19, 20, 66.

>2.    *The Bribery Investigations and Settlement*

Before Löscher assumed his position at Siemens, the company came under investigation by the United States Department of Justice ("DOJ") and the United States Securities and Exchange Commission ("SEC") for suspected violations of the anti-bribery provisions of the Foreign Corrupt Practices Act of 1977 ("FCPA").  *Id*.  Siemens was also investigated by foreign regulatory agencies.  *Id*.  In early 2007, also before Löscher joined the company, Siemens initiated an internal investigation, ¶¶ 4, 54, which eventually revealed that the company had systemically employed criminal practices in its dealings worldwide, ¶ 55.  During the course of the investigation, many of the Siemens' long-standing directors and officers left the company.  ¶ 4.  It was against this backdrop that Löscher assumed his position, and his "mission . . . was clear: finish the clean up of the Siemens Bribery Scandal, restore managements' [sic] reputation and credibility and improve Siemens' business."  *Id*.  The DOJ and SEC investigations were not resolved until December 15, 2008 – nine months after the end of the class period – when Siemens pled guilty to violating the Exchange Act and the FCPA and paid a total of $800 million in fines and penalties.  ¶¶ 8, 57.

---

[5]    The amended complaint alleges that Löscher and Kaeser "signed Siemens' fiscal *2008* Form 20-F, which was filed with the SEC during the Class Period."  ¶¶ 19, 20 (emphasis added).  Because the 2008 form was not filed during the class period, and is not at issue in this case, I understand "2008" to be a typographical error, and assume that lead plaintiff intended to reference the 2007 form, which was filed with the SEC on November 28, 2007, during the class period.  The 2007 form was signed by both Löscher and Kaeser.  *See* Siemens Aktiengesellschaft Form 20-F, Nov. 28, 2007 ("2007 Form 20-F").

3.      *The Legacy Projects*

Effective January 1, 2008, Siemens reorganized its operations into three sectors, Industry, Energy and Healthcare.  ¶ 34.  The Energy Sector includes business activities that Siemens had previously classified as Power Generation ("PG"), ¶ 36, and the Industry Sector contains business activities formerly classified as Transportation Systems, or Mobility ("TS"), ¶ 35.  Part of the PG and TS business portfolios include long-term construction contracts known as "legacy projects."  ¶¶ 3, 42, 72.  Legacy projects also make up part of Siemens' IT Service and Solutions ("SIS") business.  *See* ¶ 83.  Because legacy projects are multi-year, fixed-price contracts, they subject Siemens to significant financial risk.  ¶ 3.  Prior to the class period, the legacy projects were hamstrung by construction delays, cost overruns, and supply cost issues.  ¶ 40.  These problems were attributable in large part to inadequate staffing; many of the legacy projects were staffed with engineers who had insufficient training to manage them, and who were given authority to make key budgetary and planning decisions they were ill-equipped to make.  ¶¶ 41, 42, 47-48.  Construction delays due to flawed project designs, flawed execution plans and shortages of labor caused the projects to run past their deadlines.  ¶¶ 42, 50.  This led in turn to supply cost issues because as projects ran past their deadlines for completion, the supply contracts entered into by Siemens at the start of each contract would lapse, forcing the company to negotiate new supply contracts at higher prices.  ¶ 50.

Siemens employees used various methods to monitor the progress of legacy projects and track the problems they encountered.  For instance, according to a confidential witness referred to in the amended complaint as "CW2,"[6] field engineers working on power plant projects prepared daily reports on the status of their projects.  ¶ 45.  Confidential witnesses

---

[6]      CW2 was an electrical commissioning engineer and power train fact finder for Siemens PG Division, who worked for the company from 2000 through 2009.  ¶ 31.

referred to as "CW1"[7] and "CW3"[8] reported that Siemens employees used a "SAP application" to track various metrics relating to the legacy projects, such as man-hours expended on each project, projected and expended costs, and procurement activity. ¶¶ 110, 112. Information about incurred and expected costs was also analyzed in formal reports prepared at unspecified times and intervals by CW3 and others in similar positions within the company. ¶ 113. When the variance between incurred and expected costs exceeded $50,000, CW3 and his cohorts prepared detailed "Risk and Opportunity Reports" "on a regular basis." *Id*. In addition, CW1 described "a quite elaborate system to track [the financial] health" of power plant construction projects, by which "flags were put up" and "a recovery plan" adopted if a project fell behind schedule or was projected to be unprofitable. ¶ 111 (brackets in original). CW2 reported that customers of Siemens monitored the progress of projects and sought compensation from Siemens when it missed scheduled project milestone dates. ¶ 46. A confidential witness referred to as "CW4"[9] told of quarterly meetings in Germany, where approximately 100 PG Division managers from around the world engaged in comprehensive reviews of the Division's financial and operational performance. ¶ 52. The amended complaint does not specify the time period during which these meetings occurred, but it states that in CW4's opinion, "the light went on" among Siemens senior management in "the winter of 2007"[10] that many of the Division's projects were experiencing delays and cost overruns. *Id*.

---

[7]     CW1 is former planning/scheduling engineer for Siemens PG division, who was employed by Siemens from 2001 to 2005 and served as a consultant to the company through 2006. ¶ 30.

[8]     CW3 worked at Siemens "at various times" from September 2001 to May 2009 in such capacities as cost engineer, logistics engineer, and senior project controls manager. ¶ 32.

[9]     CW4 was a support manager in Siemens PG Division until 2009. ¶ 33.

[10]     It is unclear from the amended complaint whether "winter of 2007" refers to the first or the last months of that year. When asked what was meant by "winter of 2007" at oral argument, counsel for lead plaintiff responded, "It's like December-January timeframe," without clarifying whether he meant December 2006 and January 2007 or December 2007 and January 2008. *See* Transcript of Proceedings on Nov. 19, 2010 at 24. He then stated: "I know it was – for a fact there was – there were news articles talking about what happened at these meetings on January 1st, New Years Day of 2007." *Id*. at 24-25. Later in the argument, counsel for Siemens

Prior to the class period, according to CW4, Siemens routinely accepted contracts with large financial risk and little likelihood of profit. ¶ 51. Also prior to the class period, the company decided to shift its policy away from maintaining a large order backlog to one focused on fulfilling the orders Siemens accepted and decreasing its backlog of uncompleted projects. ¶ 51. In connection with this shift in policy, Siemens undertook a rigorous project-related portfolio analysis within all of its divisions. *Id.* CW4 reported that this review was begun following the realization among management in the winter of 2007 that many of the legacy projects were in trouble. ¶ 52.

    4.    *The Charges Taken and the Drop in Securities Prices*

The massive cost overruns associated with the legacy projects eventually forced Siemens to take substantial charges against its earnings. ¶ 40. According to CW4, senior management in the PG division indicated at some unspecified time that they "wanted to take a big charge and not dribble out bad news," as taking a single charge would allow the PG division to "report only good news" going forward after the single announcement. ¶53. Nonetheless, charges were announced in more than one stage, coupled with statements of caution for the future. On January 24, 2008, Siemens issued a press release announcing its earnings for the first quarter of fiscal 2008, which ended on December 31, 2007. ¶ 72. In the press release, Siemens reported that PG and TS had taken a charge of €200 million "at major projects." *Id.* On a

---

observed that lead plaintiff's counsel had "clarified that the winter of 2007 means late December 2007 to January 2008. . . . The confidential witness four terms that meeting in late December 2007 or early January 2008 as the genesis, the beginning of the review [of the legacy projects]." *Id*. at 37. Counsel for lead plaintiff did not object to this characterization. Despite the confusion at oral argument as to whether "winter 2007" signifies the end of 2006 and beginning of 2007, or the end of 2007 and beginning of 2008, the ambiguity is resolved by a sentence in lead plaintiff's brief in opposition to the motion to dismiss, which states: "In the winter of 2007, *when the Individual Defendants had occupied their positions for months*, Siemens' PG division senior management convened a meeting to review the division's financial and operational performance and understood that a multitude of the division's projects were experiencing time delays and cost overruns." Pl.'s Opp. Mot. Dismiss 14-15 (emphasis added). According to the amended complaint, Löscher assumed the position of CEO in the summer of 2007. ¶ 4. In light of these representations, I conclude that "winter of 2007" refers to the final months of that year.

conference call also held on January 24, 2008, Kaeser explained that the charge reflected problems with "execution and getting a timely project management together" on long-term projects. ¶ 74. Kaeser stated that the PG division had conducted "a very thorough review on all the projects and to all what they've known and what they can think of has been included in the €900 million charge [sic]," but he warned that he was "cautious that whether or not that remains stable till the end. . . . I'd be cautious for fiscal Q2. And then we should exactly know what needs to be done and get it over with." ¶ 74.

Seven and a half weeks later, on March 17, 2008, Siemens announced that increased costs associated with the legacy projects were anticipated to reduce the company's earnings by up to an additional €900 million during the second fiscal quarter of 2008, ending March 31, 2008. ¶¶ 7, 78. Siemens attributed the anticipated charges to problems with major projects in the PG and TS divisions, namely structural changes in the supplier markets, difficulty recruiting experienced project engineers, delays in the awarding of major projects, and ongoing troubles with the Combino business, ¶ 78, which involved the production of lightweight trams, ¶ 83. Siemens further announced that that it would likely take additional charges on the projects during fiscal year 2008. ¶ 7.

Lead plaintiff alleges that as a result of this announcement on March 17, 2008, the price of Siemens' securities dropped precipitously. ¶ 119. Between Friday, March 14, 2008 and Monday, March 17, 2008, the price of Siemens' ADRs fell 15%, causing real economic loss to investors who had purchased the securities during the class period. ¶ 121. More specifically, Siemens alleges that the price of Siemens' securities had been artificially inflated throughout the class period, as defendants fraudulently misrepresented the company's financial performance and future business risk by expressing optimism without disclosing the problems with the legacy

projects.  ¶ 119-121.  When the truth about the company's exposure to cost overruns on the legacy projects was finally revealed on March 17, 2008, the inflationary effect of the misrepresentations was eliminated, and stock prices plummeted.  *Id.*

     5.     *The Alleged Misstatements*

     Lead plaintiff identifies seven statements – including press releases, SEC filings, slide presentations, and statements to the press – made by Siemens during the class period that it alleges were materially false and misleading because they overstated the company's financial performance and failed to disclose, or misrepresented the nature of, the problems and risks associated with the legacy projects.  In addition, lead plaintiff alleges that Siemens improperly accounted for revenue and costs associated with the legacy projects throughout the class period, thereby misrepresenting the company's financial performance.  ¶ 3.  Each allegedly misleading statement and the alleged accounting irregularities are described in detail below.

     a.     *November 2008 Statements*

     On November 8, 2007, Siemens published a Form 6-K with the SEC.  The filing included press releases that contained allegedly fraudulent statements concerning the company's financial results for fiscal 2007 and its financial outlook for future years.  ¶ 58.  Lead plaintiff highlights portions of these press releases in which the company and Löscher announced that Siemens expected its volume and profit to grow in fiscal 2008, that it was raising its target margins, and that it would exceed the performance goals that had been set for 2010.  *Id.*  Löscher predicted with respect to fiscal 2008: "Specifically, we anticipate volume growth that is twice as high as the rate of global GDP growth, and that our operating profit will grow at least twice as fast as our volume."

On the following day, November 9, 2007, Siemens issued slides for a conference call with securities analysts in London; one slide is alleged to have contained fraudulent statements. ¶ 63. That slide presented "Siemens Outlook 2008," predicting for the company as a whole:

- Quality growth and earnings conversion
- Revenue growth > 2x GDP
- Earnings growth of Operations Groups [excluding
  Strategic Equity Investments and Other Operations]
  twice top-line growth

*Id.* The slide also presented an "outlook" for each of the company's three sectors: "[r]evenue growth at 'GDP [squared]'" and "[m]argin increase despite of low margin project backlog [sic]" were projected for the Energy sector; the Industry sector was expected to "[d]ouble market growth in Industry Automation (A&D Group)" and "[l]everage global sales and distribution network"; and "2x GDP revenue growth in constant US $ terms" and "[i]nnovations driv[ing] market share gains in the US and globally" were anticipated in the Healthcare sector. *Id.*

On November 28, 2007, Siemens filed its fiscal 2007 Form 20-F, which contained financial statements for the year. ¶ 66. Lead plaintiff does not reference any specific items in the 2007 Form 20-F, but it does allege that the financial statements made on the form were represented to have been prepared in accordance with IFRS. *Id.*

Lead plaintiff alleges that the statements made in the November 8, 2007 press releases and the November 9, 2007 slide were materially false and misleading because defendants failed to disclose six adverse facts: (1) that Siemens was experiencing more than $1 billion in cost overruns on a large number of legacy projects; (2) that defendants commissioned "quite a large amount of people" to conduct an extensive "review and audit" of dozens of legacy projects that were facing extensive management, cost, and execution problems; (3) that as a

result of these problems, defendants commissioned "a technology engineering team" to understand whether technology related matters were giving rise to such delays and/or failures; (4) that many of the legacy projects had severe supply cost issues; (5) that the company's financial results were materially overstated, as the company had improperly accounted for its legacy projects; and (6) that based on the foregoing facts, defendants lacked a reasonable basis for their positive statements about the company, its prospects, and its growth.[11] ¶¶ 64, 67.

b.     *January 13, 2008 Statements*

On January 13, 2008, the *Frankfurter Algemeine Sonntagszeitung* reported that Löscher had stated in an interview, "There is no profit warning. Our statements are known: They include sales are growing double the pace of the global economy, profits double the pace of sales." ¶ 68. Löscher was further quoted as saying that he did not have "any knowledge of our business significantly changing because of a global slowdown. In our order backlog, we're not yet feeling anything of slackness." ¶ 68. That same day, Löscher was quoted in a *Reuters* article, saying, "There is no profit warning. The company is in great shape. Our business is booming. . . . The credit market crisis in the United States is hitting consumption first. Our core business is long-term infrastructure projects. If at all, an effect would become noticeable in that area with some delay." ¶ 70. Löscher was also reported to have said that the rise of oil prices did not concern him because it could have a "stimulating effect" on Siemens' efficient energy business: "Renewable energy will be one of the main drivers of our growth. . . . Another positive effect of the high oil prices for us, for example, is additional buying power in the Arabic countries. And if they invest in anything, then it will be largely infrastructure projects."

---

[11]     The quoted portions are also quoted in the complaint, but the quotations in the complaint are not contributed and their source is not clear.

Lead plaintiff alleges that the quoted statements were materially false and misleading because they omitted the same six adverse facts identified by lead plaintiff in connection with defendants' November 2007 statements.

c.     *January 24, 2008 Statements*

On January 24, 2008, Siemens published a Form 6-K with the SEC containing a press release that lead plaintiff alleges contained fraudulent statements. *Ex. 7*, at 5-6; ¶ 72. The press release addressed Siemens' earnings for the first quarter of fiscal 2008, which ended on December 31, 2007. ¶ 72. Lead plaintiff identifies in particular two paragraphs in which Siemens reported sharply rising income from continuing operations and increased earnings per share due primarily to "higher Group profit from Operations and lower central costs related to legal and regulatory matters." ¶ 72. These paragraphs noted that "Group profit from Operations climbed on rising revenue and improved profitability. The majority of Groups in Operations increased both Group profit and Group profit margin compared to the first quarter a year ago . . . ." *Id*. According to the press release, "the increase was due to operating leverage combined with rising revenue," particularly in three groups, Automation and Drives, Industrial Solutions and Services, and Power Transmission and Distribution, which were needed to off-set a decline in Group profit in PG and TS, "as both groups took higher charges [€200 million] at major projects compared to the prior-year period." *Id*. (brackets in the amended complaint). In addition, lead plaintiff highlights the following statement by Löscher, quoted in the press release:

> Siemens' strong fundamental growth opportunities remain in place, as shown by our organic revenue growth of 8% and a book-to-bill ratio above 1.3 in the first quarter. We confirm our outlook for the full fiscal year: growing revenues at least twice as fast as global GDP and growing Group Profit from Operations at least twice as fast as our revenues.

We are moving forward on executing our strategic agenda. With today's announcement of ambitious margin targets for our Industry and Energy sectors, and for all our divisions, we continue to raise performance goals with increased accountability.

*Id*.

Also on January 24, 2008, Siemens held a conference call with securities analysts to discuss its fiscal 2008 first quarter earnings, and in particular the €200 million charge announced in the January 24 Form 6-K. ¶ 73. In its amended complaint, lead plaintiff selectively quotes from the conference call transcript and alleges that defendants' statements on that call were fraudulent. ¶ 73-75. Lead plaintiff emphasizes statements by Löscher and Kaeser to the effect that Siemens was "off to a good start" for 2008 with "growth opportunities [that] remain strong" and Group profits from operations that "evidence . . . the power of our underlying business." ¶ 73. Löscher continued to predict that in 2008, Siemens would "grow our revenues at least twice as fast as the global GDP [and] our Group profit from operations at least twice as fast as revenues." *Id*. Löscher also stated that Siemens was "on track to deliver on the objectives we have set out" for establishing "Transparency, Accountability and Performance." *Id*. Lead plaintiff acknowledges that Löscher identified problems in the PG and TS divisions and explained that management would continue to review problems in those divisions and would "come back to [the analysts] with more details shortly." *Id*. Löscher also announced that Siemens had changed its management teams in the PG and TS divisions, and that the new management teams would begin to review the problems in their divisions to "get to the root of it and sort it out . . . to get these problems fixed soon." ¶¶ 73, 80.

In the portions of the conference call quoted by lead plaintiff in the amended complaint, Kaeser focused on the €200 million charge, which he said was taken in light of problems with long-term contracts in the PG division. ¶¶ 74-75. Kaeser explained that the

charge was "about execution and getting a timely project management together," and that it was "related to matters of delays in the project start [and] supplier related failures to ship boilers and other topics on time." ¶ 74. Kaeser said that the division had "done a very thorough review on all the projects," and that management had "sent quite a large amount of people from Audit to help the division do a thorough review on the issues we've been seeing in project management and also in supplier management." ¶¶ 74-75. The €200 million charge included "everything . . . the division could think of" after its review "in terms of risk going forward." ¶ 74. Nonetheless, Kaeser warned that for some of the projects still in the early stages, "I'd be cautious for fiscal Q2." ¶ 74. In addition, although he represented that the projects had already been thoroughly reviewed, Kaeser stated that the review and audit would continue, and further findings would be announced promptly:

> [I]f you look at the root cause of the charges it's been related to matters of delays in the project start. It's been related to supplier related failures . . . predominantly coming out of the fact that it's a very, very strong . . . sellers market from the products. So therefore there is uncertainty and I do trust that the new management team will get to the bottom of that quickly. And then see whether there is any more need to do a review on the projects. At this point in time, it's taken everything [in the €200 million charge] the division can think of in terms of risks going forward.

*Id.* (second set of brackets in the amended complaint). In addition, Kaeser said that Siemens had "set up a technology engineering team to really go to the bottom of matters and make sure that we are not looking for root causes in project management whereas they are in technology. That's I think what we have not quite fully understood and that's why I'm cautious about Q2. But everything else I think we've thoroughly understood and accounted for in the [€200 million] charge." ¶ 75 (brackets in the amended complaint).

Lead plaintiff alleges that the statements made in the January 24, 2008 press release and phone call were materially false and misleading because they misrepresented and failed to disclose nine facts: (1) that Siemens was experiencing more than $1 billion in cost overruns on a large number of legacy projects; (2) that defendants commissioned "quite a large amount of people" to conduct an extensive "review and audit" of dozens of legacy projects that were facing extensive management, cost, and execution problems; (3) that as a result of these problems, defendants commissioned "a technology engineering team" to understand whether technology related matters were giving rise to such delays and/or failures; (4) that the new corporate management structure was implemented by defendants to address systemic project execution failures that were then causing hundreds of millions of dollars in cost overruns on dozens of legacy projects; (5) that any "increased profitability" expected from the company's new corporate structure was significantly dwarfed by massive losses on a number of legacy projects; (6) that the PG division had not "done a very thorough review on all the projects and to all what they've known and what they can think of has been included in the €200 million charge [sic]"; (7) that the company's first quarter profit from operations did not "evidence the power of its underlying business," as Löscher represented, because Siemens was experiencing significant problems with a number of legacy projects; (8) that the company's financial results were materially overstated, as the company had improperly accounted for its legacy projects; and (9) that based on the foregoing, defendants lacked a reasonable basis for their positive statements about the company, its prospects, and its growth. ¶ 77.

d.  *The Alleged Accounting Irregularities*

i.  *Alleged Violations of International Accounting Standards*

Lead plaintiff also alleges that throughout the class period, Siemens falsely represented that its financial statements for fiscal 2007 and first quarter fiscal 2008 were prepared in accordance with International Financial Reporting Standards ("IFRS") and International Accounting Standards ("IAS"), principles issued and adopted by the International Accounting Standards Board ("IASB") and accepted by the European Union as the appropriate international accounting conventions.  ¶¶ 84, 86-87.  EU Commission regulations require Siemens, as a publicly traded company, to issue financial results in accordance with IFRS.  ¶ 88. Lead plaintiff alleges that Siemens improperly accounted for a large number of the legacy projects throughout the class period, thereby overstating its operating results by hundreds of millions of euros.  ¶ 85.  In particular, lead plaintiff alleges that Siemens failed to comply with three IASs.

First, IAS No. 11 prescribes procedures for accounting for construction contracts with outcomes that cannot be estimated reliably.  ¶ 89.  Generally, construction contract revenue and costs are to be recognized as revenue and expenses, respectively, by reference to the stage of completion of contract activity at the balance sheet date, and any expected loss on the contract is to be recognized immediately.  *Id*.  However, when the outcome of a construction contract cannot be reliably estimated, revenue is to be recognized only to the extent of incurred costs that the company will likely recover, and contract costs are to be recognized as an expense in the period in which the costs are incurred.  ¶ 90.  When it is probable that total contract costs will exceed total contract revenues, the expected loss should be recognized immediately.  *Id*.  Lead plaintiff alleges that the outcomes of the legacy projects could not reliably be estimated at any

time during the class period, but that Siemens nonetheless purported to recognize contract revenue and contract costs based on the stage of completion of the contracts. ¶ 91. As a result, Siemens allegedly recognized project revenue in excess of its recoverable costs and failed to recognize total costs in the period in which they were incurred. *Id.*

In addition, lead plaintiff alleges that Siemens' financial statements for fiscal 2007 and first quarter fiscal 2008 failed to reflect the financial consequences that would follow from expiration of a "massive amount" of the company's supply agreements prior to and during the class period. ¶ 92. According to the amended complaint, this failure constituted a violation of IAS No. 34, which requires companies to include in its interim financial statements "events or transactions material to an understanding of the current interim period." ¶ 93 (quoting IAS No. 34).

Finally, IAS No. 10 requires an entity to update the disclosures in its financial statements if it "receives information after the reporting period about conditions that existed at the end of the reporting period." ¶ 94 (quoting IAS No. 10). Lead plaintiff alleges Siemens violated IAS No. 10 by failing to disclose the financial ramifications associated with expiration of its supplier agreements, although lead plaintiff alleges that defendants became aware of these ramifications prior to the issuance of financial statements concerning the last quarter of fiscal 2007 and first quarter fiscal 2008, not after the close of those reporting periods. ¶ 94-95.

        ii.    *Alleged Violation of the Framework for the Preparation and Presentation of Financial Statements*

In addition to numbered pronouncements, the IFRS incorporate the Framework for the Preparation and Presentation of Financial Statements ("Framework"). ¶ 87. Lead plaintiff alleges Siemens' financial statements issued during the class period violated eleven Framework principles. The amended complaint lists the eleven principles but provides no

specific allegations as to how each principle was violated.  The eleven principles are: (1) the principle established by Framework 1, that "an asset is a resource controlled by the enterprise as a result of past events"; (2) the principle established by Framework 12, "that financial statements should 'provide information about the financial position, performance and changes in financial position of an entity that is useful to a wide range of users in making economic decisions'"; (3) the principle established by Framework 14, "that financial statements should 'show the results of the stewardship of management, or the accountability of management for the resources entrusted to it'"; (4) the principle established by Framework 6, "that financial statements should provide information about the 'economic resources' controlled by an entity, as well as 'its financial structure, its liquidity and solvency, and its capacity to adapt to changes in the environment in which it operates'"; (5) the principle established by Framework 17, "that financial statements should provide information about an entity's performance during a period, 'in particular its profitability . . . in order to assess potential changes in the economic resources that it is likely to control in the future' and, importantly, 'the variability of performance'"; (6) the principle established by Framework 31, "that the information in the financial statements should be reliable in that it represents what it purports to represent (*i.e.*., 'free from material error and bias')"; (7) the principle established by Framework 37, "that prudence should be exercised in preparation of financial statements in response to the 'uncertainties that inevitably surround many events and circumstances.' 'Prudence is the inclusion of a degree of caution' in such preparation 'such that assets or income are not overstated and liabilities or expenses are not understated'"; (8) the principle established by Framework 38,  "that nothing material [should be] left out of the information that may be necessary to ensure that the financial statements meet the criteria of reliability and relevance"; (9) the principle established in Framework 39, "that financial

statements have the characteristic of comparability in that 'the financial effect of like transactions and other events must be carried out in a consistent way throughout an entity . . . and for different entities'"; (10) the principle established by Framework 43, "that the timeliness of reporting should be considered, as an 'undue delay' may impair the relevance of financial information,'"; and (11) the principle established in Framework 46, "that 'the application of principal qualitative characteristics and of appropriate accounting standards normally results in financial statements that convey what is generally understood as a true and fair view of, or as presenting fairly,' 'the financial position, performance and changes in financial position of an entity.'" ¶ 98 (internal quotations are to the relevant Framework) (alterations to internal quotations in the amended complaint).

### iii.    *Alleged Violation of SEC Regulation S-X*

Finally, the amended complaint contains lead plaintiff's interpretation of the requirements of SEC Regulation S-X, 17 C.F.R. Part 210. ¶ 96. According to lead plaintiff, Regulation S-X "requires that material contingencies be disclosed in interim financial statements regardless of whether a significant change from the previous year had occurred and provides that financial reports filed with the SEC that failed to comply with Generally Accepted Accounting Principles – or, for foreign issuers, a comprehensive body of accounting principles (such as IFRS) – are presumed to be misleading and inaccurate." *Id.* (citing 17 C.F.R. § 210.10-01(a)(5). The amended complaint does not explicitly allege that Siemens violated Regulation S-X or, if so, in what way.

### 6.    *The March 17, 2008 Announcement*

On March 17, 2008, Siemens published a Form 6-K with the SEC that contained a press release in which Siemens announced that based on its "extensive review of major projects,"

the company expected to take a charge of approximately €900 million against its earnings in the 2008 second fiscal quarter, ending March 31, 2008.  ¶ 78.  Financial analysts' reports issued after the March 17 announcement reflected that €600 million of the €900 million charge would be taken at PG, €200 million at TS, and €100 million at SIS.  ¶ 83.  Siemens acknowledged that the anticipated charge would constitute "a substantial impact on earnings in the current fiscal year," but maintained that "commitment to the targets for 2010 is confirmed."  *Id.*

Also on March 17, 2008, Siemens held a conference call with securities analysts to discuss the expected €900 million charge.  ¶ 79.  In its amended complaint, lead plaintiff again quotes selectively from the conference call transcript.  *See* ¶¶ 80-81.  During the call Löscher stated that the announced charge was "clearly related to legacy projects" and was "based on intermediate results of a thorough review and audit of turnkey and other similar projects," which Siemens had announced it was undertaking on January 24, 2008.  ¶ 80.  Wolfgang Dehen, CEO of Siemens Energy division explained that "project resources have been fundamentally overstretched," which led to delays in project execution, which in turn led to "the fact that our binding price offers 2005 are expiring and therefore the company has to face much more unfavorable procurement condition as it was originally agreed upon [sic]."  ¶ 81.  When challenged by one analyst, who asked why Siemens had not anticipated that the supply agreements would expire, Dehen clarified that "the delays had not been expected to be that lasting . . . and therefore we're running into uncertainties about how long the suppliers will stick to their agreed upon promises."  *Id.*

Following the March 17 announcement, financial analysts expressed surprise at the size of the charge.  One analyst announced that it had met with company representatives "[a]s late as two weeks ago," about one month after the €200 million charged was announced on

January 24, 2008, and had left the meeting anticipating that additional charges would be taken but not that they "would be anywhere near" the amount announced on March 17. ¶ 83. As another analyst put it, "We were expecting further charges after the poor Q1 results but we did not expect anything of this size." *Id.* Other analysts questioned the timing both of the announcement and of the charge. *Id.* For example, with respect to €50 million of the charge associated with engineering work undertaken by Siemens, one analyst criticized the company for its accounting treatment of the project, concluding that the costs now being charged "were, in effect, bid costs [that] should have been charged in the first place." *Id.* Analyst reports were also replete with accusations of mismanagement. *Id.* They noted that Siemens' share prices had dropped nearly 18% within one day of the announcement.

DISCUSSION

A.       *Plaintiff's Claims Under Section 10(b) and Rule 10b-5*

      1.       *Pleading Requirements Under the PSLRA*

In deciding a motion to dismiss in a securities fraud case, a court may consider not only the plaintiff's complaint, but "any written instrument attached [to the complaint] as an exhibit or any statements or documents incorporated in it by reference, as well as public disclosure documents required by law to be, and that have been, filed with the SEC, and documents that the plaintiffs either possessed or knew about and upon which they relied in bringing the suit." *Rothman v. Gregor*, 220 F.3d 81, 88 (2d Cir. 2000) (citations omitted). The court must accept all factual allegations in the complaint as true and draw all reasonable inferences in the plaintiff's favor. *See Shomo v. City of New York,* 579 F.3d 176, 183 (2d Cir.2009).

"To state a cause of action under Section 10(b) and Rule 10b-5, a plaintiff must plead that the defendant made a false statement or omitted a material fact, with scienter, and that plaintiff's reliance on defendant's action caused plaintiff injury." *San Leandro Emergency Med. Group Profit Sharing Plan v. Philip Morris Cos.*, 75 F.3d 801, 808 (2d Cir. 1996). Ordinarily, "[t]o survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." *Ashcroft v. Iqbal,* 129 S.Ct. 1937, 1949 (2009). Pursuant to the PSLRA, however, a plaintiff in a securities fraud action must satisfy a more stringent pleading standard. First, the complaint must "specify each statement alleged to have been misleading, the reason or reasons why the statement is misleading, and, if an allegation regarding the statement or omission is made on information and belief, the complaint shall state with particularity all facts on which that belief is formed." 15 U.S.C. § 78u-4(b)(1). Second, with respect to each act or omission allegedly constituting securities fraud, the complaint must "state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind." 15 U.S.C. § 78u-4(b)(2).

2. *Failure to Allege Scienter*

To survive a Rule 12(b)(6) motion to dismiss under the PSLRA, the amended complaint must allege facts giving rise to a "strong inference" of scienter. "When defendant is a corporate entity, this means that the pleaded facts must create a strong inference that someone whose intent could be imputed to the corporation acted with the requisite scienter." *Teamsters Local 445 Freight Division Pension Fund v. Dynex Capital, Inc.*, 531 F.3d 190, 195 (2d Cir. 2008). "Congress did not define 'strong inference,' but the Supreme Court has recently held that, to qualify as 'strong,' an 'inference of scienter must be more than merely plausible or reasonable – it must be cogent and at least as compelling as any opposing inference of

nonfraudulent intent.'" *Id.* at 194 (quoting *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 314 (2007)). The Supreme Court has defined "scienter" as "a mental state embracing an intent to deceive, manipulate, or defraud." *Tellabs*, 551 U.S. at 319 (quoting *Ernst & Ernst v. Hochfelder*, 425 U.S. 185, 193094 (1976)).

In the Second Circuit, a strong inference of this requisite mental state is established where the complaint alleges facts that show either "(1) that defendants had the motive and opportunity to commit fraud, or (2) strong circumstantial evidence of conscious misbehavior or recklessness." *ECA, Local 134 IBEW Joint Pension Trust of Chicago v. JP Morgan Chase Co.*, 553 F.3d 187, 198 (2d Cir. 2009). This standard is met "where the complaint sufficiently alleges that the defendants (1) benefitted in a concrete and personal way from the purported fraud; (2) engaged in deliberately illegal behavior; (3) knew facts or had access to information suggesting that their public statements were not accurate; or (4) failed to check information they had a duty to monitor." *Dynex Capital*, 531 F.3d at 194 (quoting *Novak v. Kansas*, 216 F.3d 300, 311 (2d Cir. 2000)).

a.      *Motive and Opportunity*

In order to establish an inference of scienter through allegations of motive and opportunity, lead plaintiff must allege that Siemens or its officers "benefitted in some concrete and personal way from the purported fraud." *Novak*, 216 F.3d at 307-08. "Motives that are common to most corporate officers, such as the desire for the corporation to appear profitable and the desire to keep stock prices high to increase officer compensation, do not constitute 'motive' for purposes of this inquiry." *ECA*, 553 F.3d at 198; *see also Chill v. Gen. Elec. Co.*, 101 F.3d 263, 268 (2d Cir. 1996) ("[I]f scienter could be pleaded on that basis alone, virtually every company in the United States that experiences a downturn in stock price could be forced to

defend securities fraud actions." (quotation marks omitted)).  Rather, motive is generally established by alleging facts that show a "desire to profit from extensive insider sales."  *Novak*, 216 F.3d at 308.

Lead plaintiff asserts that its allegations of "suspicious insider trading" by Siemens insiders is enough to establish an inference of scienter.  Pl.'s Mem. Opp. Mot. Dismiss 21.  The amended complaint alleges that Kaeser and six "other Company insiders" traded 215,549 shares for gross proceeds of over €22,040,599 between November 19, 2007 and December 7, 2007 "while in possession of materially adverse information."  ¶ 118.  Kaeser personally sold 4,714 shares on November 21, 2007 for €453,723.  Löscher is not alleged to have sold any shares during the class period.  *Id.*

Lead plaintiff's allegations are insufficient to establish motive.  "[T]he mere fact that insider stock sales occurred does not suffice to establish scienter."  *In re Keyspan Corp. Securities Litigation*, 383 F.Supp. 2d 358, 381 (E.D.N.Y. 2003) (quoting *Ressler v. Liz Claiborne, Inc.*, 75 F.Supp.2d 43, 58 (E.D.N.Y. 1999).  Rather, lead plaintiff must establish that "unusual" insider trading activity took place during the class period.  *See Acito v. IMCERA Group, Inc.*, 47 F.3d 47, 54 (2d Cir. 1995).  "Factors considered in determining whether insider trading activity is unusual include the amount of profit from the sales, the portion of stockholdings sold, the change in volume of insider sales, and the number of insiders selling."  *In re Scholastic Corp. Securities Litigation*, 252 F.3d 63, 74-75 (2d Cir. 2001).  Accordingly, sale of a large number of shares, standing alone, is insufficient to establish motive.  *Keyspan*, 383 F.Supp.2d at 381; *see also Acito*, 47 F.3d at 54 (insider's sale of 30,000 shares insufficient to give rise to inference of scienter where shares represented less than 11% of his holdings).  Lead plaintiff alleges that a handful of insiders sold a number of shares during the class period, but the

amended complaint does not place these sales in a context suggesting that the shares represented a significant portion of the sellers' overall holdings or that the sales were otherwise unusual in any way.

Indeed, omitted from the amended complaint are facts concerning the purchase and sale of Siemens securities that undermine lead plaintiff's arguments about motive and opportunity. For instance, SEC filings indicate that Kaeser, who sold 4,714 shares at the start of the class period, also bought 3,000 shares between January 28, 2008 and February 1, 2008, just days after the January 24, 2008 press release and telephone conference in which Siemens and its officers allegedly made false statements in order to artificially inflate the price of Siemens securities. Siemens Aktiengesellschaft Form 20-F at 112-13, Dec. 2, 2008, ("2008 Form 20-F"). During that same period, on January 28 and 29, 2008, Siemens board members and other individuals closely associated with the company, including Kaeser and Löscher, sold no securities and purchased a total of 69,425 Siemens shares and ADRs. *Id*. at 112. Fifty-thousand of those shares were purchased by President and CEO Löscher, who did not sell any securities during the class period. *Id*. at 112-13. Lead plaintiff's failure to allege any unusual sales by Löscher counsels against drawing an inference of scienter. *See Keyspan*, 383 F.Supp.2d at 383-84 (failure of CEO and chairman, "who actually made most of the alleged misstatements during the class period," to engage in suspicious sales "is significant" in countering inference of fraud).

In addition, the timing of the alleged securities sales weighs against an inference of scienter. Courts in this circuit considering scienter allegations look to the timing of insider sales. *See, e.g.*, *Keyspan*, 383 F.Supp.2d at 384-85 (a "long lapse of time" between insiders' sale of stock and disclosure of allegedly fraudulently concealed information "suggests that one or more other factors, unrelated to the alleged fraud, led to defendants' decision to make the sales");

*Ressler*, 75 F.Supp.2d at 60 (insider sales taking place over six months prior to negative disclosures did not support an inference of fraud); *City of Brockton Retirement Sys. v. Shaw Group Inc.*, 540 F.Supp.2d 464, 475 (S.D.N.Y. 2008) ("The 10-plus week gap between the defendants' sales and the Company's disclosure of accounting problems is not strongly suspicious.").  In Siemens' case, the purportedly suspicious sales occurred between November 19, 2007 and December 7, 2007, which was the very start of the class period, prior to many of Siemens' allegedly fraudulent statements, and three or four months before the company's negative announcement.  This timing is incompatible with a theory that the insiders promulgated misstatements about the company's financial prospects in order to inflate the value of their holdings and then benefit from the inflation by selling their shares before the truth was revealed.

Also incompatible with lead plaintiff's theory is Siemens' share buyback program, announced in a press release on November 7, 2007, *see* Siemens Aktiengesellschaft Form 6-K at 3, Nov. 8, 2007, and implemented throughout the class period, *see* Siemens Aktiengesellschaft Form 6-K, Mar. 17, 2008 ("Mar. 17, 2008 Form 6-K").  Between January 28, 2008 and March 14, 2008, Siemens purchased over 16.5 million of its own securities.  Mar. 17, 2008 Form 6-K.  If Siemens and its officers were engaged in a scheme to inflate the value of Siemens' securities during that precise period of time, it would "def[y] economic reason" for the company to engage in this large-scale buyback program.  *Kalnit v. Eichler*, 264 F.3d 131, 140 (2d Cir. 2001) (quotation marks omitted).  "Where plaintiff's view of the facts defies economic reason, it does not yield a reasonable inference of fraudulent intent."  *Id*. at 140-41 (quotation marks, brackets and ellipses omitted).

For the reasons stated above, the amended complaint fails to allege facts showing "that defendants had the motive and opportunity to commit fraud."  *ECA*, 553 F.3d at 198.

b.      *Conscious Misbehavior or Recklessness*

Where a plaintiff fails to establish motive and opportunity to defraud, it is "still possible" to plead scienter, but "the strength of the circumstantial allegations must be correspondingly greater." *Kalnit*, 264 F.3d at 142 (quoting *Beck v. Mfrs. Hanover Trust Co.*, 820 F.2d 46, 50 (2d Cir. 1987)).  In the absence of apparent motive, a plaintiff can allege scienter by demonstrating "'strong circumstantial evidence' of defendants' 'conscious misbehavior or recklessness.'"  *Id.* (quoting *Shields v. Citytrust Bancorp, Inc.*, 25 F.3d 1124, 1128 (2d Cir. 1994)).  An inference of recklessness may, "in some cases," be drawn where the plaintiff demonstrates "[a]n egregious refusal to see the obvious, or to investigate the doubtful[.]"  *Chill*, 101 F.3d at 269 (quotation marks omitted).  Thus, the "conscious misbehavior or recklessness" standard can be met by a showing that defendants "engaged in deliberately illegal behavior[;] knew facts or had access to information suggesting that their public statements were not accurate; or . . . failed to check information they had a duty to monitor."  *Dynex Capital*, 531 F.3d at 194 (quoting *Novak*, 216 F.3d at 311).

Lead plaintiff does not allege that the defendants engaged in deliberately illegal behavior.  Rather, the amended complaint states that the defendants "were made privy to confidential proprietary information" that belied their public statements, ¶ 99, and that "it was incumbent upon defendants to closely monitor Siemens' operational and financial performance on the Legacy Projects," ¶ 107, and therefore to discover and disseminate information concerning the health of the projects, *see* ¶ 114.  To establish an inference of scienter, lead plaintiff must do more than allege that the individual defendants or other Siemens officers had or should have had knowledge of certain facts contrary to their public statements simply by virtue of their high-level positions, their general responsibility for monitoring Siemens' activities, and

their access to inside information.  *See In re Health Mgmt., Inc. Sec. Litig.*, 970 F.Supp. 192, 204-05 (E.D.N.Y. 1997) (defendant's position as a member of a company's board of directors, her responsibility "for monitoring the overall management and direction" of the company, and her access to inside information were insufficient to establish inference of scienter); *Keyspan*, 383 F.Supp.2d at 387 (Plaintiffs' allegations that defendants may be charged with knowledge of activities at Roy Kay by virtue of their high-level positions are . . . insufficient.").  Rather, lead plaintiff must "specifically identify . . . reports or statements" that were provided to Siemens' management, that contained facts contrary to the defendants' public statements, and that defendants recklessly ignored or intentionally concealed in making those statements.  *Novak*, 216 F.3d at 309.

i.      *Knowledge of Facts Contrary to Public Statements*

Lead plaintiff points to a number of reports and statements that documented the ill-health of the legacy projects, which it alleges the individual defendants and other members of Siemens' senior management had access to.  The amended complaint includes the accounts of four confidential witnesses who reported that the legacy projects had been beset with difficulties since at least 2000, ¶ 42, and that these problems were monitored by various means, including a "SAP application," daily reports of field engineers, "Risk and Opportunity Reports" prepared whenever incurred costs significantly exceeded expected costs, a "quite elaborate system" used to track the financial health of power plant construction projects, and quarterly meetings of PG division managers.  ¶¶ 45, 46, 52, 110-113.  Lead plaintiff generally alleges that "Defendants were routinely informed" of the troubles with the legacy projects.  ¶ 104.  However, lead plaintiff does not specifically allege that Siemens senior management ever received any of the reports identified in the amended complaint.

Siemens operates in approximately 190 countries and employs more than 400,000 people. ¶ 2, 34. Its net income in fiscal 2007 was €4.038 billion. 2007 Form 20-F at 47. It is hardly plausible that the company's management reviewed daily status reports prepared by field engineers to track the implementation of individual contracts. Indeed, according to the amended complaint, it was not until "the winter of 2007" that "the light went on" among senior Siemens management that the legacy projects were experiencing delays and cost overruns. ¶ 52. This allegation, accepted as true, establishes that Siemens senior management were not routinely presented with the daily reports and other metrics detailed in the amended complaint. They therefore cannot be charged with knowledge of the reports' contents. *See Campo v. Sears Holdings Corp.*, 371 F.App'x 212, 217 (2d Cir. 2010) ("[A]lthough CW1 confirmed that a Kmart officer or board member could obtain access to any company information . . . on request, he admitted that he had no knowledge of whether [any officer] actually accessed or reviewed the reports.").

Furthermore, lead plaintiff fails to allege that any information in these reports would have revealed to Siemens executives that they "lacked a reasonable basis for their positive statements about the Company, its prospects and growth." ¶¶ 64, 77. The amended complaint identifies several respects in which Siemens' November 2007 and January 2008 statements were supposedly fraudulent. In these statements, Siemens announced that its volume and profits were expected to grow in 2008, that it would exceed its performance goals for 2010, and that the company's business was "in great shape." These statements were allegedly misleading because Siemens did not disclose that it was experiencing severe cost overruns associated with the legacy projects amounting to more than $1 billion; that its financial returns were materially overstated, as the company was improperly accounting for the legacy projects; or that it was launching an

investigation into the problems plaguing the projects.  ¶¶ 64, 67, 77.  In addition, with respect to the January 2008 statements, lead plaintiff alleges fraud on the basis that Siemens failed to disclose that it had put in place a new corporate structure to address systematic project execution failures that were then costing hundreds of millions of dollars; that it had "commissioned 'a technology engineering team' to understand whether technology related matters were giving rise to [legacy project] delays and/or failures"; that any anticipated increased profitability did not reflect the health of the company, as it would be off-set by massive losses from the legacy projects; and that the review and audit underway had not been thorough, and the €200 million charge did not account for all problems that management could think of.  ¶ 77.

First, defendants' alleged failure to announce the scope of its investigations into the legacy projects' cost overruns cannot serve as the basis for lead plaintiff's fraud claims. Lead plaintiff does not allege that Siemens had undertaken such an investigation at the time of the November 2007 statements, and in January 2008, Siemens clearly announced that it was conducting a review of the projects.  Similarly, Siemens announced in January 2008 that it had replaced its management teams in the Energy and Industry Sectors and the PG and TS divisions in order to address project failures that would cost the company at least €200 million, and Kaeser specifically stated that Siemens had "set up a technology engineering team to really go to the bottom of matters and make sure that we are not looking for root causes in project management whereas they are in technology.""  ¶¶ 73-75, 80.  Accordingly, lead plaintiff's claim that defendants committed securities fraud by failing to make those very disclosures contradicts the particular facts alleged in the amended complaint.

Second, with respect to lead plaintiff's allegations that Siemens' financial projections were overstated, the amended complaint does not identify a single report or set of

documents indicating that the cost overruns associated with the legacy projects amounted to more than $1 billion or were significant enough to undermine Siemens' bullish predictions for the company as a whole.  Instead, the amended complaint cites a complex mass of undistilled data relating to the legacy projects' day-to-day implementation.  Even if Siemens executives had been provided with the undigested data described in the amended complaint, they could not have been expected to draw from it conclusions that lead plaintiff does not even allege it contained. *See Dynex Capital*, 531 F.3d at 196 ("Teamsters' broad reference to raw data lacks even an allegation that these data had been collected into reports that demonstrated that loan origination practices were undermining the collateral's performance.  Accordingly, they have not raised an inference of scienter based on knowledge of or access to information demonstrating the inaccuracy of Dynex's public statements.").

Furthermore, lead plaintiff does not allege that defendants' financial projections would have been any different had they taken account of the data allegedly available to them at the time of the disputed statements.  There is no indication that costs associated with a number of individual projects in a company as large as Siemens would obviously have undermined defendants' optimistic observations and predictions about the health of the company as a whole.  Nor do the amended complaint's allegations suggest that defendants ignored what they knew or should have known about the legacy projects' losses in formulating their financial projections.  While the impact of the legacy projects' losses were clearly greater than Siemens indicated in November 2007 or January 2008, lead plaintiff has not shown that the calculations Siemens used to determine its financial projections at those times "were both objectively and subjectively false. . . . Plaintiffs do not allege that Defendants knew of the error and used it to mislead others." *Plumbers & Steamfitters Local 773 Pension Fund v. Canadian Imperial Bank of Commerce*, 694

F.Supp.2d 287, 301 (S.D.N.Y. 2010); *see also Gildan Activewear, Inc. Secs. Litig*, 636

F.Supp.2d 261, 273 (S.D.N.Y. 2009) (" . . . Plaintiffs do not allege any facts to suggest what [the

defendants' financial] models revealed at the time, or what effect the models might have had on

Gildan's financial results.").  Instead, lead plaintiff's allegations amount to a claim that Siemens

should have seen or better anticipated the severity of the legacy projects' troubles.  "[T]he

securities laws do not allow fraud by hindsight claims" of this sort.  *Plumbers & Steamfitters*,

694 F.Supp.2d at 301; *see also Novak*, 216 F.3d at 309 ("Corporate officials need not be

clairvoyant; they are only responsible for revealing those material facts reasonably available to

them.").

 Accordingly, the facts alleged in the amended complaint do not give rise to a

strong inference of scienter on the basis that Siemens' executives had knowledge of information

contrary to the company's public statements at the time those statements were made.

  ii. *Failure to Check Information Defendants Had a Duty to Monitor*

 Lead plaintiff makes general allegations that the defendants had a duty "to closely

monitor Siemens' operational and financial performance on the Legacy Projects," ¶ 107, and that

their failure to disclose the full impact of the projects' losses at the time of the allegedly

misleading statements therefore amounted to recklessness if not to conscious misbehavior.

However, lead plaintiff does not allege facts demonstrating "highly unreasonable [conduct]

which represents an extreme departure from the standard of ordinary care to the extent that the

danger was either known to the defendant or so obvious that the defendants must have been

aware of it[.]"  *South Cherry Street, LLC v. Hennessee Group LLC*, 573 F.3d 98, 109 (2d Cir.

2009) (quoting *In re Carter-Wallace, Inc. Securities Litigation*, 220 F.3d 36, 39 (2d Cir. 2000)

(internal quotation marks omitted)).  Indeed, far from establishing "[a]n egregious refusal to see

the obvious, or to investigate the doubtful," *Chill*, 101 F.3d at 263 (quotation marks omitted), the amended complaint indicates that, as soon as it became aware of the problems facing the legacy projects, Siemens' management acted promptly to discover and disclose their causes and import.

The amended complaint alleges that senior management did not realize the legacy projects were experiencing delays and cost overruns until the winter of 2007. ¶ 52. Having learned of these problems, Siemens' executives immediately undertook "an exhaustive review" to better understand the difficulties besetting the projects. *Id.* By the time of the January 24, 2008 statements – at most no more than a few months after Siemens senior executives became aware of the problem – the company had replaced its management teams in the PG and TS divisions, begun a review and audit of the legacy projects, and announced a €200 million charge on the basis of that review.[12] ¶ 73-75. In their January 24, 2008 statements, Siemens also made clear that although it believed the €200 million charge would account for all legacy project losses, the company would continue to investigate the cause and extent of the projects' problems. *Id.* Several weeks later, prior to the end of the reporting period, Siemens announced that, based on its ongoing review, the company expected to take a €900 million charge in the third quarter of fiscal 2008 in light of the legacy projects' cost overruns. ¶ 78-81.

"[C]ommencement of an investigation and prompt disclosure of its findings must be counted against any inference of fraudulent intent." *Slayton v. American Express Co.*, 604 F.3d 758, 774 (2d Cir. 2010). Lead plaintiff's allegations show that Siemens "chose an incremental measured response," *Plumbers & Steamfitters*, 694 F.Supp.2d at 301, to address a

---

[12] As discussed above, I understand "winter of 2007" to mean late 2007. *See supra* note 10. But even if "winter of 2007" refers to early 2007, lead plaintiff does not allege facts indicating that Siemens was reckless in waiting until late 2007 or early 2008 to review the projects. As stated in the amended complaint and discussed more fully below, *see infra* Section A.2.c, Siemens was occupied in early 2007 with bribery investigations that presumably (and reasonably) claimed the focus of the company's senior management until they were resolved in late 2008.

potential source of loss to the company, announcing costs as they were discovered and understood. These facts do not create a strong inference of scienter. "Taking the time necessary to get things right is both proper and lawful. Managers . . . are entitled to investigate for a reasonable time[.]" *Higginbotham v. Baxter Int'l, Inc.*, 495 F.3d 753, 761 (7th Cir. 2007). Lead plaintiff has not "specifically identified any reports or statements that would have come to light" had Siemens conducted its investigation differently that would have "demonstrated the falsity of the allegedly misleading statements." *Dynex Capital*, 531 F.3d at 196. Instead, lead plaintiff's allegations amount to a challenge of the timing of Siemens' investigation and disclosure. *See, e.g.*, ¶ 83 (quoting financial analysts expressing surprise at the size and timing of the €900 million charge). Such a challenge is insufficient to sustain a claim of securities fraud. *Plumbers & Steamfitters*, 694 F.Supp.2d at 301 ("[A]fter-the-fact 'allegations that statements in one report should have been made in earlier reports do not make out a claim of securities fraud.'" (quoting *Acito*, 47 F.3d at 53)).

In addition, the timing of Siemens' March 17, 2008 announcement of the anticipated €900 million charge weighs against a finding of recklessness. The announcement of the charge prior to the deadline for filing financial statements only strengthens the inference that Siemens acted promptly and openly in accounting for the costs associated with the legacy projects. *See Rombach v. Chang*, 355 F.3d 164, 176-77 (2d Cir. 2004) ("Further, the allegation that defendants behaved recklessly is weakened by their disclosure of certain financial problems prior to the deadline to file its financial statements.").

For the reasons stated above, the amended complaint fails to create an inference that Siemens' senior executives disregarded information they had a duty to monitor or otherwise acted with recklessness in making the allegedly misleading statements.

c.    *Inferences More Compelling Than Fraudulent Intent*

In order to establish a "strong inference" of scienter, lead plaintiff must allege facts that render the requisite state of mind "cogent and at least as compelling as any opposing inference of nonfraudulent intent." *Tellabs*, 551 U.S. at 314. Lead plaintiff has not done so. The argument that defendants acted "to deceive, manipulate, or defraud" the public, *Tellabs*, 551 U.S. at 319 (quoting *Ernst & Ernst*, 425 U.S. at 193-94 (1976)), is not compelling in light of the facts alleged. The amended complaint suggests no reason for Siemens management to have concealed the costs of the legacy projects in November 2007, and to have fraudulently announced only a fraction of those costs in January 2008, only to disclose their full magnitude just several weeks later in March 2008. *See Slayton*, 604 F.3d at 774 ("The defendants urge that the plaintiffs do not provide any reason why the defendants would knowingly make a false prediction, in deviation from their usual practice of prompt disclosure, even though the truth would inevitably come to light within a few weeks.").

Indeed, Siemens' behavior was directly contrary to the motivations attributed to its executives by lead plaintiff. According to the amended complaint, during the class period, Siemens' main objective was to restore the company's credibility. ¶ 4. To do so with respect to the legacy projects, Siemens hoped to "tak[e] a single, very large charge" and avoid "dribbl[ing] out bad news," ¶ 53. However, dribbling out bad news is precisely what the company did, severely undermining its credibility among investors, *see* ¶ 83 (documenting financial analysts' reaction to Siemens' March 17, 2008 announcement). The facts stated in the amended complaint suggest no reason to suspect that Siemens' allegedly mistaken projections were the result of anything other than honest, even if possibly negligent, misjudgment.

A much more plausible explanation than fraudulent intent for Siemens' alleged sluggishness in announcing the full damage of the legacy projects' failures can be inferred from lead plaintiff's allegations concerning the bribery scandal from which Siemens was reeling in 2007 and 2008. *See* ¶¶ 4, 54. In early 2007, the company began an internal investigation into its bribery practices, which led to the departure of many of its long-standing directors and officers. *Id.* Löscher assumed the position of CEO in the summer of 2007, and his primary concern was to "finish the clean up of the Siemens Bribery Scandal, restore managements' [sic] reputation and credibility and improve Siemens' business." ¶ 4. Effective January 1, 2008, Siemens' operations underwent a complete restructuring. ¶¶ 34-37. The most compelling inference that can be drawn from the amended complaint's allegations is that Siemens' management did not grant the legacy projects the attention lead plaintiff argues they deserved because of the upheaval of the company's organizational structure and its top personnel, and because of the new executives' focus on their "mission" of addressing the fall-out from the company's "systematic[] and extensive[] engage[ment] in illegal activities," ¶¶ 4, 57.

At most, the amended complaint suggests that Siemens' executives are guilty of mismanaging the company by entering into "multi-year, fixed priced contracts, which subjected Siemens to significant risks, including financial, performance, reputational and customer-specific and/or country-related risks," ¶ 105, and by failing to better monitor the progress of these risky contracts. *See* ¶ 83 (quoting analysts' reports accusing Siemens of mismanagement). Allegations of mismanagement are insufficient to state a claim of securities fraud. *See Decker v. Massey-Ferguson, Ltd.*, 681 F.2d 111, 115 (2d Cir. 1982) ("[S]ection 10(b) was not designed to regulate corporate mismanagement nor to prohibit conduct which does not involve manipulation or deception.").

Because an inference of scienter is neither "cogent [nor] at least as compelling as any opposing inference of nonfraudulent intent," *Tellabs*, 551 U.S. at 314, the amended complaint fails to satisfy the pleading requirements of the PSLRA.

    d.    *Insufficiency of Accounting Allegations to Establish an Inference of Scienter*

Where a plaintiff's allegations fail to establish motive and opportunity or conscious misbehavior or recklessness, "[a]llegations of GAAP violations or accounting regularities, standing alone, are insufficient to state a securities fraud claim." *ECA*, 553 F.3d at 200 (quotation marks omitted). "Only where such allegations are coupled with evidence of 'corresponding fraudulent intent' might they be sufficient." *Novak*, 215 F.3d at 309 (quoting *Chill*, 101 F.3d at 270). As discussed above, the amended complaint fails to allege facts that give rise to an inference of fraudulent intent regarding Siemens' public statements generally, and it provides no facts from which to infer that any accounting irregularities were deliberate or recklessly committed. Accordingly, lead plaintiff's allegations concerning Siemens' accounting treatment of the legacy projects cannot be relied on to establish a strong inference of intent where its other allegations have failed.

For the reasons stated above, lead plaintiff's claims under § 10(b) and Rule 10b-5 are dismissed pursuant to Fed. R. Civ. P. 12(b)(6) for failure to state a claim, because the amended complaint's factual allegations do not give rise to a strong inference of scienter.

B.    *Plaintiff's Claims Under Section 20(a)*

The amended complaint states that the individual defendants, Löscher and Kaeser, are jointly and severally liable pursuant to § 20(a) of the Exchange Act for Siemens' alleged violations of § 10(b). However, as discussed above, lead plaintiff has failed to state a claim that Siemens violated § 10(b) or Rule 10b-5. "In the absence of a primary violation of Section 10(b)

or Rule 10b-5, plaintiffs cannot state a claim for controlling person liability under Section 20(a) of the Exchange Act." *Keyspan*, 383 F. Supp. 2d at 389. Accordingly, lead plaintiff's claims under § 20(a) are dismissed pursuant to Fed. R. Civ. P. 12(b)(6) for failure to state a claim.

C.     *Leave to Replead*

Lead plaintiff requests "an opportunity to move for leave to amend [its pleadings] in accordance with Fed. R. Civ. P. 15(a)." Pl.'s Mem. Opp. Mot. Dismiss 35 n. 16. Pursuant to Rule 15(a)(2), "a party may amend its pleading . . . with . . . the court's leave," and such leave should be "freely give[n] when justice so requires." While "[i]t is the usual practice upon granting a motion to dismiss to allow leave to replead," *Cortec Industries, Inc. v. Sum Holding L.P.*, 949 F.2d 42 (2d Cir. 1991), "it is within the sound discretion of the district court to grant or deny leave to amend," *McCarthy v. Dun & Bradstreet Corp.*, 482 F.3d 184, 200 (2d Cir. 2007), and such leave should be denied where the problem with the complaint is substantive so that "better pleading will not cure" the deficiency and "would thus be futile," *Cuoco v. Moritsugu*, 222 F.3d 99, 112 (2d Cir. 2000); *see also Ellis v. Chao*, 336 F.3d 114, 127 (2d Cir. 2003) ("[I]t is well established that leave to amend a complaint need not be granted when amendment would be futile.").

The amended complaint fails not because of inartful pleading, but because the substantive factual allegations do not establish an inference of scienter. Lead plaintiff has not provided "a specific explanation of the manner in which [it] propose[s] to cure the defects in [its] complaint," *Campo*, 371 F. App'x at 218 (citing *Porat v. Lincoln Towers Cmty. Ass'n*, 464 F.3d 274, 276 (2d Cir., 2006). The amended complaint "fails to allege the existence of information that would demonstrate that the statements made to investors were misleading," *Dynex Capital*, 531 F.3d at 197, and lead plaintiff has not indicated that any such information exists. Because

lead plaintiff has not indicated that any additional factual allegations can be made that render an inference of scienter at least as likely as other inferences, amendment of lead plaintiff's complaint would be futile. Accordingly, leave to replead is denied.

CONCLUSION

For the reasons stated above, the motion to dismiss is granted without leave to replead. Lead plaintiff's claims under § 10(b) and Rule 10b-5 against Siemens are dismissed pursuant to Fed. R. Civ. P. 12(b)(6) for failure to state a claim, as the amended complaint fails to allege facts giving rise to a strong inference of scienter as required under the PSLRA. In the absence of an alleged violation of § 10(b) or Rule 10b-5, lead plaintiff's claims against Löscher and Kaeser under § 20(a) are dismissed also pursuant to Rule 12(b)(6) for failure to state a claim. Because I dismiss the complaint on these grounds, I need not address Siemens' alternative arguments in support of its motion to dismiss.

So ordered.


John Gleeson, U.S.D.J.

Dated: March 31, 2011
      Brooklyn, New York